1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SERVER TECHNOLOGY, INC.,                    )
                                            )
          Plaintiff and Counterdefendant,   )          3:06-CV-00698-LRH-VPC
                                            )
v.                                          )
                                            )          ORDER
AMERICAN POWER CONVERSION                   )
CORPORATION,                                )
                                            )
          Defendant and Counterclaimant     )
_____)

Before the court is defendant American Power Conversion Corp.'s ("APC") motion for

summary judgment on the issues of anticipation, obviousness, and non-infringement. Doc. #287.[1]

Plaintiff Server Technology, Inc. ("STI") filed an opposition (Doc. #301) to which APC replied

(Doc. #324).

I.     **Facts and Procedural History**

       **A.  Procedural Overview**

       Plaintiff STI manufactures intelligent power distribution devices. STI brought the

underlying patent infringement action against defendant APC alleging that APC's product designs

infringe three of its patents: United States Patents numbers 7,043,543[2] ("the '543 patent"),

_____

       [1] Refers to the court's docket number.

       [2] A copy of the '543 patent is attached as Exhibit 1 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 1.

7,141,461[3] ("the '461 patent"), and 7,702,771[4] ("the '771 patent). Specifically, STI alleges that APC's various products infringe claims 1-3, 6, and 15-17 of the '543 patent; claims 1, 3, and 8 of the '461 patent; and claims 15-17 of the '771 patent.

Like STI, APC manufacturers intelligent power distribution devices.  APC denies that its products infringe STI's patents and has raised three defenses: (1) anticipation under 35 U.S.C. § 102; (2) obviousness under 35 U.S.C. § 103; and (3) non-infringement.

On April 13, 2010, the court issued a *Markman* order construing various disputed terms of the patents in suit. Doc. #163. Thereafter, APC filed the present motion for summary judgment. Doc. #287. On February 23, 2012, the court heard argument on the motion.

**B.  The Patents Generally**[5]

STI's patents in suit ('543, '771, and '461 patents) describe and relate to intelligent power distribution devices, also referred to as "intelligent plugstrips" or "PDUs." Like an ordinary electrical plugstrip used in a home or office, intelligent plugstrips are primarily intended to distribute power from a wall outlet through an input power cord to a number of power outlets. But unlike ordinary plugstrips, intelligent plugstrips are intended for large scale applications such as commercial data centers and include several enhanced features. These enhanced features enable a user to locally or remotely control and monitor the power supply to connected appliances such as computers, servers, routers, and other electronic equipment through various internal relay controls.

///

---

[3] A copy of the '461 patent is attached as Exhibit 2 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 2.

[4] The '771 patent is a continuation of the '543 patent. A copy of the '771 patent is attached as Exhibit 47 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 47.

[5] For a more thorough discussion of the features of the individual patents, see the court's claim construction order (Doc. #163).

## II.     Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

1    **III.     Discussion**

2             In its motion, APC seeks an order from the court (1) that asserted claims 1, 2, 3, and 6 of

3    the '543 patent are invalid as anticipated under 35 U.S.C. § 102; (2) that asserted claims 15, 16,

4    and 17 of both the '543 patent and the '771 patent are invalid as obvious under 35 U.S.C. § 103;

5    and (3) that accused APC product designs, the AP7900 and AP8900, do not infringe asserted

6    claims 1, 3, and 8 of the '461 patent. Doc. #287. The court shall address each argument below.

7             **A.   Anticipation**

8             APC argues that claims 1, 2, 3, and 6 of the '543 patent are invalid as anticipated based on

9    two pieces of prior art, the MasterSwitch VM ("MSVM") manufactured by APC and the RPC-21

10   manufactured by non-party BayTech. Doc. #287.

11            In opposition, STI argues that the '543 patent is not anticipated because neither identified

12   prior art design (1) contains a "current-related information display" in "current-related information-

13   determining communication," or (2) is a "plugstrip" as that term is used and understood in the

14   patent. Doc. #301.

15            **1.   Anticipation Standard**

16            An issued patent is presumed valid by statute. 35 U.S.C. § 282. However, a patent may be

17   held invalid as a matter of law if it is anticipated. 35 U.S.C. § 102. A patent is anticipated if a

18   single reference, either printed publication or prior use, published more than one year before the

19   date of the patent application, discloses, expressly or inherently, every limitation of the claim such

20   that a person of ordinary skill in the art could practice the invention without experimentation.

21   35 U.S.C. § 102(b); *see also Advanced Display Systems, Inc. v. Kent State Univ.*, 212 F.3d 1272,

22   1282 (Fed. Cir. 2000).

23            The anticipating reference must describe the patented features "with sufficient clarity and

24   detail" such that a person of ordinary skill in the field would recognize the existence of the patent

25   features in the reference. *Crown Operations Int'l v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir.

26

1   2002). Moreover, "all of the elements and limitations of the claim must be shown in a single prior

2   reference, arranged as in the claim." *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376,

3   1383 (Fed. Cir. 2001).

4                **2.   Person of Ordinary Skill in the Art**

5            A person of ordinary skill in the art is a person presumed to think "along the line of

6   conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and

7   often expensive, systematic research or by extraordinary insights." *Standard Oil Co. v. Am.*

8   *Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). For purposes of this motion, the parties agree

9   that a person of ordinary skill in the art is one who would have an electrical or computer

10  engineering degree (or the equivalent industry experience) and at least one to three years of

11  experience designing power distribution devices.

12               **3.   Identified Prior Art**

13           APC identifies two pieces of prior art anticipating the '543 patent: the RPC-21[6] and the

14  MSVM.[7] *See* Doc. #287. Both of these products were advertised and sold in 1999,[8] and as such,

15  ――――――――――――――――

16        [6] In 1999, non-party BayTech developed several different PDUs culminating in the RPC-21, a vertically
     mounted device which included certain common features of intelligent PDUs including (1) an input power cord;
17   (2) a number of power outlets; (3) associated relays; (4) an LED display; and (5) the ability to remotely report
     current-related information to a technician over a network using a NIC component housed in a separate
18   enclosure from the vertical outlet enclosure. *See* Doc. #287, Exhibit A, Claim Chart at 1-6; Doc. #288 Exhibit
     16, North Depo.

19
        [7] In the fall of 1999, APC developed an intelligent PDU similar to BayTech's RPC-21, the MSVM.
20   Like the RPC-21, the MSVM was a vertical device with (1) an input cord; (2) a number of outlets; (3) a number
     of relays; (4) an LED display; and (5) a NIC component housed in a separate enclosure associated with the
21   outlet component that allowed for reporting of current information over a network. *See* Doc. #287, Exhibit A,
     Claim Chart at 1-6; Doc. #288, Exhibit 4. Similar to the LED display of the RPC-21, the LED of the MSVM
22   displayed current-related information, but displayed three different indicators: the LED lit up green when
     current was at a normal level, flashed green when current almost reached a potentially unsafe level, and lit up
23   red when current exceeded that safe threshold level. *Id.*

24        [8] The RPC-21 was advertised as early as October 1999. Doc. #288, Exhibit 13, BayTech October 1999
25   Press Release; Exhibit 14, BayTech November 1999 Press Release. The MSVM was first exhibited at the
     Internet Service Provider Tradeshow in October 1999. *See* Doc. #288, Exhibit 8, McNally Depo., p.77-79.

26
                                          5

these designs pre-date the '543 patent application of December 8, 2000, by more than one year.

STI concedes that the RPC-21 and MSVM are prior art references for the purpose of the court's anticipation analysis. Further, the parties do not distinguish between the MSVM and the RPC-21 in addressing APC's motion. Therefore, for the sake of simplicity, the court will analyze APC's anticipation arguments using the MSVM design.

### 3.   Claim Language

Independent claim 1 of the '543 patent discloses:

> An electrical power distribution plugstrip connectable to one or more electrical loads in a vertical electrical equipment rack, the electrical power distribution plugstrip comprising in combination:
>   A.  a vertical strip enclosure having a thickness and a length longer than a width of the enclosure;
>   B.  a power input penetrating said vertical strip enclosure;
>   C.  a plurality of power outputs disposed along a face of said length of the strip enclosure, each among the plurality of power outputs being connectable to a corresponding one of said one or more electrical loads;
>   D.  a plurality of power control relays disposed in said vertical strip enclosure, each among said plurality of power control relays being connected to said power input and in independent power controlling communication with one or more corresponding power outputs among said plurality of power outputs;
>   E.  a current-related information display disposed on said vertical strip enclosure in current-related information-determining communication with at least one among said power input and said plurality outputs; and
>   F.  a current-related information reporting system associated with said vertical strip enclosure and being (i) in current-related information-determining communication with at least one among said power input and said plurality of power outputs, and (ii) connectable in current-related information transfer communication with a separate communications network distal from the electrical power distribution plugstrip.

Doc. #288, Exhibit 1, '543 patent, Col. 10:57-11:19. Claim 2 is a dependent claim of claim 1 and discloses:

> The electrical power plugstrip of claim 1 further comprising at least one intelligent power section disposed in the vertical strip enclosure and in which is disposed at least one of the plurality of power control relays.

Doc. #288, Exhibit 1, '543 patent, Col. 11:20-24. Claim 3 is a dependent claim of both claims 1 and 2 and discloses:

The electrical power plugstrip of claim 2 further comprising an external power manager application external to the vertical strip enclosure in network communication with the intelligent power section disposed in the vertical strip enclosure, whereby a user of the of the external power manager may control power provided to selectable ones of said plurality of power outputs.

Doc. #288, Exhibit 1, '543 patent, Col. 11:25-31. Finally, claim 6 is a dependent claim of claim 1 and discloses:

The electrical power plugstrip of claim 1 wherein the current-related information display is in current determining communication with all among the plurality of power outputs through at least one current sensing device.

Doc. #288, Exhibit 1, '543 patent, Col. 11:45-48.

### 4. Independent Claim 1

The plain language of claim 1 requires a power distribution plugstrip with the following limitations: (a) a vertical strip enclosure; (b) a power input; (c) a number of outlets; (d) remotely controllable relays associated with the outlets; (e) a current-related information display; and (f) a current reporting system. *See* Doc. #288, Exhibit 1, '543 patent, Col. 10:57-11:19.

In its motion for summary judgment, APC argues that the MSVM includes all these limitations. *See* Doc. #287. STI concedes that the MSVM meets limitations (a) through (d) of claim 1 but argues that the MSVM does not contain (1) a "current-related information display . . . in current-related information-determining communication" as required by limitation (e); and (2) a network device contained within the vertical strip enclosure as required by limitation (f). *See* Doc. #301. The court shall address each argument below.

### a. Current-related Information Display

In substance, limitation (e) requires that the device contain a display that conveys current-related information. *See* Doc. #288, Exhibit 1, '543 patent, claim 1(e). During the claim construction process, the court did not construe the phrase "current-related information-determining communication" because the parties agreed that "current-related information-determining communication" meant "communication in which current is measured." *See* Doc. #94,

1   STI's Opening Claim Construction Brief, p.45-46; Doc. #122, APC's Response, p.39.

2          STI now argues that because "current-related information-determining communication"

3   means "communication in which current is measured," limitation (f) requires that the same

4   measured current information be communicated to the display. STI's interpretation requires a

5   numerical value that is then transmitted and displayed, which, it argues, can only be accomplished

6   through a digital display. Thus, at its core, STI's interpretation of limitation (e) requires a digital

7   display. As the MSVM used an LED display which did not, and could not, display a numerical

8   value, STI argues that it cannot anticipate the '543 patent.

9          The court has reviewed the documents and pleadings on file in this matter and finds that,

10   contrary to STI's arguments, (1) limitation (e) does not require a digital display, and (2) the MSVM

11   contains a "current-related information display . . . in current-related information-determining

12   communication." First, STI's interpretation of limitation (e) is in direct contradiction to the court's

13   claim construction order. In that order, the court found that STI's interpretation of "current-related

14   information display" to mean a digital display that conveyed a numerical current value was

15   contrary to the plain claim language and specification of the '543 patent. *See* Doc. #163, p. 21-22

16   ("STI's interpretation is contrary to the terms plain meaning and usage" and "would improperly

17   limit the claim language based on the specification.").

18          Second, STI's attempt to salvage its argument by relying on the word "determining" in the

19   claim phrase is equally unavailing. Both claims 1 and 15 of the '543 patent require a display in

20   "current-related information-determining communication," but while claim 1 discloses a display,

21   claim 15 specifically discloses a digital display confirming that the "determining" language is not

22   determinative for claim construction. STI's attempt to limit claim 1 to require a digital display

23   would render the specific "digital display" language in claim 15 meaningless. *See e.g., AllVoice*

24   *Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1247 (Fed. Cir. 2007) ("[C]laim

25   differentiation takes on relevance in the context of a claim construction that would render

26

additional, or different, language in another independent claim superfluous.").

Finally, the court finds that the MSVM's LED display does, in fact, display determined current information. The crux of STI's argument is that the only kind of current information that can be determined is a numerical value. However, information other than a numerical value can be "determined." For example, one can determine whether something is hot or cold, without measuring a precise value of temperature. Similarly, a PDU device can determine that current is high or low, or above or below a certain threshold, and this determined information can then be communicated to an LED display.

Here, it is undisputed that the MSVM's LED determines and communicates a condition: when the PDU is operating in a normal current condition under a pre-programmed threshold value the LED displays a solid green indicator; when the PDU's current draw is approaching an overload condition the LED displays a flashing green indicator; and when the current level has passed the overload condition the LED displays a solid red indicator. *See* Doc. #310, Exhibit 6, Bors Depo., p.47:13-18. Hence, the MSVM measures the level of input current, determines whether the measured input current is above or below a threshold level, and communicates this information to the LED. Based on this function, the court finds that the MSVM displays determined current-related information, and therefore, meets limitation (e) of the '543 patent.

### b. "Plugstrip"

STI also argues that the MSVM does not anticipate claim 1 of the '543 patent because it is not a "plugstrip" as that term is used and understood in the '543 patent. STI contends that claim 1 of the '543 patent discloses a single piece vertical plugstrip that houses all identified parts including the "current-related information reporting system" disclosed in limitation (f). Because it is undisputed that the MSVM is a two-piece device that has a separate network component for remote communication, STI argues it is not a "plugstrip." The court agrees.

///

1    Claim 1 discloses "[a]n electrical power distribution plugstrip . . . comprising in

2 combination . . . (F) a current-related information reporting system associated with said vertical

3 strip enclosure . . . ." Doc. #288, Exhibit 1, '543 patent, claim 1. The claim term "comprises" is

4 presumed to mean "includes as a part of." *See Crystal Semiconductor Corp. v. TriTech Microelecs.*

5 *Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("The transition 'comprising' creates a

6 presumption that the recited elements are a part of the [claimed] device. . . ."). Thus, the use of the

7 word "comprising" in claim 1 requires that all the limitations of the claim, including the current

8 reporting system, are contained within the plugstrip.

9    In opposition, APC argues that limitation (f) only requires that the current-related

10 information reporting system be "associated with" the vertical strip enclosure.  APC contends that

11 the use of the phrase "associated with" means that the  reporting system need not reside in the

12 plugstrip. However, the term "associated with" must be understood in the context of the entire

13 patent. The '543 patent as a whole makes it clear that the "plugstrip" is a one-piece, fully-

14 integrated device. First, the patent is entitled "Vertical-Mount Electrical Power Distribution

15 Plugstrip." Second, the summary of the invention refers repeatedly to the invention as a "power

16 distribution plugstrip." Third, the specification describes the device as a fully integrated plugstrip.

17 *See* Doc. #288, Exhibit 1, '543 patent, Col. 10:17-18 ("All of PDU is preferably fully integrated

18 within power distribution plugstrip . . . ."). Finally, the design of the plugstrip shown in Figure 1

19 displays a one-piece plugstrip that houses all the design features, including the reporting system.

20 *See* Doc. #288, Exhibit 1, '543 patent, Figure 1. Therefore, the court finds that claim 1 discloses a

21 fully integrated plugstrip that contains the current-related information reporting system.

22    Because the reporting system of the MSVM is an external system connected to the plugstrip

23 by a cable, it is not contained within the plugstrip. As such, the MSVM does not meet

24 limitation (f). Therefore, the MSVM does not contain every limitation of claim 1 and cannot

25 anticipate claim 1 as a matter of law. *See Karsten Mfg. Corp.*, 242 F.3d at 1383 ("[A]ll of the

26

10

elements and limitations of the claim must be shown in a single prior reference, arranged as in the claim."). Accordingly, the court shall deny APC's motion for summary judgment on the issue of anticipation.

### 5. Remaining Claims

Claims 2, 3, and 6 of the '543 patent are dependent claims of claim 1. Because the court finds that claim 1 is not anticipated by the MSVM as addressed above, these dependent claims are also not anticipated.

### B. Obviousness

In its motion for summary judgment, APC argues that asserted claims 15, 16, and 17 of both the '543 patent and '771 patent are invalid as obvious under 35 U.S.C. § 103. Specifically, APC argues that a person of ordinary skill in the art would have combined APC's prior art PDU, the MSVM, with APC's identified prior art digital displays, United States patents no. 5,650,771[9] ("the Lee patent") and 6,476,729[10] ("the Liu patent"), to arrive at STI's patented PDU designs in order to alleviate the known problem of alerting an end-user to a current overload condition.[11] *See* Doc. #287.

In opposition, STI argues that summary judgment is not appropriate because: (1) combining the MSVM with the digital displays disclosed in the Lee and Liu patents does not encompass the design disclosed in independent claim 15; (2) there is a disputed issue of material fact as to whether one skilled in the art would have had a reason to combine the prior art references; and (3) there is sufficient evidence of secondary considerations to support a finding of non-obviousness

---

[9] A copy of the Lee patent is attached as Exhibit 22 the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 22.

[10] A copy of the Liu patent is attached as Exhibit 23 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 23.

[11] A current overload condition occurs when the level of current within the PDU begins to exceed a potentially safe level which, if not corrected, would lead to a current overload and cause the PDU, and attached devices to shut down.

on summary judgment. *See* Doc. #301.

The court has reviewed the documents and pleadings on file in this matter, as well as the arguments and submissions by counsel at the February 23, 2012 hearing, and finds that there are disputed issues of fact as discussed below precluding summary judgment that claims 15, 16, and 17 of the '543 and '771 patents are invalid as obvious under 35 U.S.C. §103. Accordingly, the court shall deny APC's motion for summary judgment on this issue.

### 1. Obviousness Standard

Under the Patent Act, a patent may be deemed invalid as a matter of law "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

A patented invention is obvious if a person of ordinary skill in the art would have had a reason to combine the particular elements or technologies in the way the claimed new invention does. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The mere fact that prior references could be combined to reach the patented design does not render the resultant combination obvious absent a reason to combine the references in such a manner. *In re Mills*, 916 F.2d 680, 682 (Fed. Cir. 1990). This "apparent reason" can be shown by identifying some teaching, suggestion or motivation in the prior art to combine or modify the prior art in the manner identified in the claims. *KRS*, 550 U.S. at 418-19. However, an invention is not obvious "where vague prior art does not guide an inventor toward a particular solution." *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009). For purposes of summary judgment, the evidence must support particular findings "as to the reason the skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed." *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000).

///

12

Although the ultimate determination of obviousness under § 103 is a question of law, it is based on several underlying factual findings, including (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, such as commercial success, long-felt need, and the failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). A defendant proffering the affirmative defense of obviousness bears the burden to prove the patent is obvious by clear and convincing evidence. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001); *see also*, *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999).

## 2.  Prior Art

For purposes of the present motion, the parties agree that the MSVM, Lee patent, and Liu patent are prior art references to STI's '543 and '771 patents. The parties further agree that both the Lee and Liu patents disclose a digital display to measure and display current on a power regulating device.[12]

## 3.  Person of Ordinary Skill in the Art

As stated above, the parties agree that a person of ordinary skill in the art is one who would have an electrical or computer engineering degree (or the equivalent industry experience) and at least one to three years of experience designing power distribution devices.

## 4.  Claim Language

Independent claim 15 - and thereby dependent claims 16 and 17 - contains the same limitations identified in claim 1 of the '543 patent except claim 15 also requires a *digital* current information display. Specifically, claim 15 discloses:

---

[12] The Lee patent, issued in 1997, discloses a design for an electrical socket containing digital displays to monitor various operating conditions including ambient temperature, voltage, and current. *See* Doc. #288, Exhibit 22, Abstract; Figure 1.

The Liu patent, issued in 2002, discloses a digital display power monitoring module that can be mounted into different types of power regulating devices, and measures various electrical parameters including current. *See* Doc. #288, Exhibit 23, Col. 1:44-46; Col. 4:47-5:2; Abstract Figure 1 and Figure 3.

An electrical power distribution plugstrip connectable to one or more electrical loads in a vertical electrical equipment rack, the electrical power distribution plugstrip comprising in combination:

    A. a vertical strip enclosure having a thickness, and a length longer that a width of the enclosure;

    B. a power input penetrating said vertical strip enclosure;

    C. a plurality of power outputs disposed along an area on a face of said length of the strip enclosure, each among the plurality of power outputs being connectable to a corresponding one of said one or more electrical loads;

    D. a plurality of power control relays disposed in said vertical strip enclosure, each among said plurality of power control relays being connected to said power input and to one or more corresponding power outputs among said plurality of power outputs;

    E. a digital current information display disposed on another area of said vertical strip enclosure and adjacent to said plurality of outputs in current-determining communication with at least one among said power input and said power outputs; and

    F. a plugstrip current reporting system (i) associated with the vertical strip enclosure (ii) in power information determining communication with at least one among said power input and said plurality of power outputs, and (iii) communicatingly connectable with a distal current reporting system through a communications network external to the electrical power distribution plugstrip.

Doc. #288, Exhibit 1, '543 patent, Col. 12:21-50. Claim 16 is a dependent claim of claim 15 and

discloses:

The electrical plugstrip of claim 15 further comprising at least one intelligent power section disposed in the vertical strip enclosure and in which is disposed at least one of the plurality of power control relays.

Doc. #288, Exhibit 1, '543 patent, Col. 12:51-54. Claim 17 is also a dependent claim of both

claims 15 and 16 and discloses:

The electrical power plugstrip of claim 16 further comprising, an external power manager application external to the vertical strip enclosure in network communication with the intelligent power section disposed in the vertical strip enclosure, whereby a user of the external power manager may control power provided to selectable ones of said plurality of power outputs.

Doc. #288, Exhibit 1, '543 patent, Col. 12:55-62.

Claims 15-17 of the '771 patent are virtually identical to those of the '543 patent, except

that the '771 patent claims are broader in nature in that they are not limited to a "vertical" device.

See Doc. #288, Exhibit 47, '771 patent, Col. 12:19-57. Because the claims of the '771 patent are

14

broader than those of the '543 patent, a finding that the '543 patent claims are not obvious

necessarily means that those of the '771 patent are likewise not obvious. Thus, for purposes of this

motion, the court analyzes obviousness with respect to the claims of the '543 patent only.

### 5. Combined Prior Art

In order for a patented design to be obvious as a matter of law, the combination of all prior

art references must include all the limitations of the patented design. *See KRS*, 550 U.S. at 418-

419. As addressed in the previous section on anticipation, the court has found that the MSVM does

not contain all the limitations of claim 1 of the '543 patent because the MSVM does not contain a

current-related information reporting system contained within the vertical plugstrip enclosure. That

finding carries over to the court's analysis of obviousness. Thus, for claim 15 of the '543 patent to

be obvious, that additional limitation, along with the disclosure of a digital display, must be found

in the Lee and Liu patents. Reviewing the Lee and Liu patents, the court finds that neither

reference meets the "plugstrip" limitation of claim 1, and thus does not meet the same limitation of

claim 15. Because the Lee and Liu patents do not disclose this limitation, combining these

references with the MSVM does not reach the patented design of claim 15 of the '543 patent.

Therefore, the patented design cannot be held invalid as obvious as a matter of law. Accordingly,

the court shall deny APC's motion as to this issue. Nevertheless, the Court will consider the

obviousness question in light of the remaining *Graham* factors.

### 6. Reason to Combine

APC argues that a person of ordinary skill in the art would have combined the identified

prior art references in order to solve the known problem of how to alert a user about a possible

current overload condition. *See* Doc. #287. APC contends that during the relevant time period,

those skilled in the art were aware of the problem of excessive current levels in a PDU and knew

that adding a display showing current output could alert the end user that he was approaching a

current overload condition.

It is undisputed that both an LED and a digital display were known design options to those in the art as a way to alert an end user of a possible current overload condition.[13] However, the relevant question before the court is not whether a digital display was a known option to alert an end-user to a current overload condition as APC contends, but whether one skilled in the art would have had a reason to use a digital display as a design alternative to an LED. *See In re Kotzab*, 217 F.3d at 1371 (holding that for a patent to be obvious, a person of ordinary skill must have had a reason to use a particular component over another). As the problem of alerting an end-user to a current overload condition was already addressed in the market by the use of an LED, for the digital display to be obvious, a person of ordinary skill must have had a reason, articulated by clear and convincing evidence, to use the digital display in lieu of an LED.

Here, viewing the evidence in the light most favorable to STI, the court finds that there was no reason a person of ordinary skill would have combined a digital display into a vertical plugstrip solely to alert an end-user of a current overload condition. The evidence before the court establishes that an LED worked better than a digital display for alerting an end-user to a current overload condition. *See* Doc. #310, Exhibit 14, Rohr Depo., p.296:8-297:7 (testifying that a digital display was too "complex" and that an LED was the "best solution" to providing an end-user with a visual display). In particular, Alex North, the lead engineer at BayTech testified that he believed a display was "*worthless*" because an LED indicator provided technicians with all of the information required. Doc. #310, Exhibit 12, North Depo., p.72:10-73:13; p.146:17-147:7. Further, the evidence establishes that a digital display was more costly than an LED display to add to a vertical plugstrip and lead to additional unnecessary "complications" in product design.

_____

[13] By its nature, the LED of the MSVM (which lights up when a potentially unsafe current level has been reached) was directed to address this problem. Further, the Lee patent teaches that the digital display may be used to alert a user to a potential overload condition. Doc. #288, Exhibit 22, Col.1:42-47 ("The object of the present invention is to provide an electrical socket with a monitoring unit that is capable of monitoring operating conditions of the electrical socket and that can be used to alert the user in the event that a preset overload condition has been detected to help avert actual occurrent of an overload.").

16

1   Doc. #310, Exhibit 14, Rohr Depo., p.296:8-297:7.

2          Finally, the evidence establishes that there were no design incentives to incorporate a

3   digital display into a PDU. APC's expert Douglas Bors, in his export report, stated that there was

4   no need for a digital display because users had acceptable alternative means, including the use of

5   manufacturers' "name plate" data, to determine appropriate equipment use. Doc. #314, Exhibit 1,

6   Bors Expert Report, § 247. Thus, designers during that time thought the inclusion of a digital

7   display was unnecessary. Based on the foregoing, the court concludes that there is no clear and

8   convincing evidence establishing any reason for a person of ordinary skill to include a digital

9   display in a PDU.

### 7. Secondary Considerations of Non-Obviousness

11         Before a court can make a finding of obviousness, and thereby hold a patent invalid, a court

12  must determine whether there are any "secondary considerations" supporting a finding of

13  nonobviousness. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 405 (2007). This is because

14  "[s]econdary considerations 'may often establish that an invention appearing to have been obvious

15  in light of the prior art was not.'" *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310 (Fed. Cir. 2010)

16  (quoting *Stratoflex, Inc. v. Areoquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)). Further,

17  "[s]econdary considerations 'can be the most probative evidence of non-obviousness in the

18  record, and enables the . . . court to avert the trap of hindsight.'" *Id.* (quoting *Custom Accessories,*

19  *Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed Cir. 1986)); *see also*, *Gambro Lundia AB*

20  *v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (citing *Stratoflex, Inc.*, 713 F.2d

21  at 1538 ("[O]bjective indicia may often be the most probative and cogent evidence [of non-

22  obviousness] in the record.").

23         Secondary considerations relevant to an obviousness determination include: commercial

24  success; skepticism in the field; copying by others; meeting a long felt, but unsolved need; and

25  failure by others. *See e.g., KRS*, 550 U.S. at 405 (commercial success and long felt need);

26

*Metabolite Labs. Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004) (initial skepticism); *Akami Techs., Inc. v. Cable & Wireless Servs., Inc.*, 344 F.3d 1186, 1196 (Fed. Cir. 2003) (copying); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1304-05 (Fed. Cir. 2010) (affirming non-obviousness based on commercial success, copying by others).

In further support of its opposition, STI argues that substantial evidence of secondary considerations establish that adding a digital display to a vertical plugstrip was not obvious. *See* Doc. #301. In particular, STI focuses on (1) the commercial success of its digital display PDUs; (2) subsequent copying by others, including APC; and (3) a long felt, but unsolved need of knowing the exact measured current value. As addressed below, the court finds that STI's  evidence of secondary considerations supports the court's finding that claims 15-17 of the '543 and '771 patents are not obvious.

### a. Commercial Success

Initially, STI argues that the commercial success of its digital display PDUs establishes the products' novelty and non-obviousness.

Taken in the light most favorable to STI, the evidence indicates that STI's digital display PDUs have been commercially successful. First, the combined sales revenue for STI's PDUs containing a digital display have grown significantly over the last several years since their introduction in 2003. Doc. #13, Exhibit 41, Ewing Decl., ¶14, 17-18. Second, STI's products have carved out a large market share of the total intelligent PDU market. *Id*. at ¶21-22 (quoting Frost & Sullivan Award for Product Line Strategy through Competitive Growth Strategy Report).

Further, the evidence supports STI's contention that its commercial success is related directly to the use of a digital display in its PDUs. *Id*. at ¶ 21 (quoting Frost & Sullivan Award for Product Line Strategy through Competitive Growth Strategy Report) ("Server Technology, Inc. was the first company to bring input current monitoring (ICM) to the market with digital display

indicators built into the Sentry enclosures to report the true RMS input.").

### b. Copying By Others

STI also contends that its design of a digital display has now become the industry standard in vertical PDUs, further establishing the patented design's novelty and non-obviousness.

Viewing the evidence in the light most favorable to STI, the court finds that STI's digital display has now become the industry standard. *See* Doc. #311, Exhibit 1, Mares Decl., ¶23 ("[V]ertical PDUs having a local display remote reporting, and switchable output design characteristics have become a de facto standard in the industry."). Testimony of representatives from both APC and BayTech confirms this fact. APC's designer, Joe Kramer, testified that he was "not aware of a single competing product" available today without the local current display. Doc. #310, Exhibit 9, Kramer Depo., p.171:5-172:17. Further, BayTech's lead engineer Alex North testified that having a digital display is standard, and that BayTech "would be at a competitive disadvantage" if it did not have a digital current display. Doc. #310, Exhibit 12, North Depo., p.239:22-240:4; p.303:8-17.

### c. Long Felt, but Unsolved Need

Finally, STI argues that its digital display solved the problem of allowing an end-user to maximize the capacity of each individual PDU which was a desired outcome. It is undisputed that prior art intelligent PDUs did not provide an end-user with a measured value of how much current was being drawn by the equipment connected to the PDU. It is further undisputed that end-users wishing to maximize PDU efficiency by connecting the maximum amount of equipment into each PDU would have to add pieces individually to see when a current overload condition was being approached. STI argues that its digital display allowed an end-user to locally determine how much current was being used and therefore maximize the total draw of the PDU without overloading the plugstrip and causing the connected equipment to fail.

///

19

1    STI argues that at the time it was necessary for end-users to know, particularly in large data

2    centers, how much equipment could be connected to an individual PDU to maximize efficiency

3    and save space. Data center technicians using conventional methods without readily visible digital

4    displays would risk making significant and costly errors in determining power consumption and in

5    building data centers. LED displays did not provide this information and discouraged users from

6    adding additional equipment to the racks, whereas digital displays showed exactly how much

7    current was being used. The digital display end user knew how much more current he could draw,

8    and how many more pieces of equipment could be added before reaching an overload condition.

9    The ability to monitor current levels locally allowed users to observe the amount of remaining

10   capacity, and determine actual power consumption of the various network devices and storage

11   equipment.

12   In short, reviewing the evidence in the light most favorable to STI, it appears that only STI

13   solved the problem arising from the lack of a digital display: that technicians needed detailed

14   information concerning the amount of current drawn by a PDU displayed directly on the PDU. It

15   appears that STI alone discovered that a current-related information display could be used to

16   maximize rack capacity.

17   **C. Patent Non-Infringement**

18   In its motion for summary judgment, APC argues that its accused product designs, the

19   AP7900 and AP8900, do not infringe claims 1, 3, and 8 of the '461 patent because these designs

20   do not: (1) include a current sensor in communication with a communication bus; (2) display

21   "power-related information;" (3) monitor or display parameters at the "output" level; or (4) include

22   more than one intelligent power section.

23   In opposition, STI argues that there are disputed issues of material fact concerning the

24   accused designs that preclude summary judgment on the issue of non-infringement.

25   ///

26
20

### 1.   Patent Infringement Standard

A district court analyzes a patent infringement claim in two steps. First, the court construes the claims as a matter of law, then the court applies the properly construed claims to the accused invention. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir.1999); *EMI Group N. America, Inc. v. Intel Corp.*, 157 F.3d 887, 891 (Fed. Cir. 1998). Infringement can occur either literally or under the doctrine of equivalents. *Kahn v. Gen'l Motors Corp.*, 135 F.3d 1472, 147-78 (Fed. Cir. 1998). Literal infringement occurs when every limitation set forth in a patent claim is found in an accused product. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). The smallest deviation from the literal claim language precludes infringement. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

Under the doctrine of equivalents, infringement "requires a showing that the difference between the claimed invention and the accused product [is] insubstantial." *Sumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007) (*citing Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608 (1950)). This is accomplished by demonstrating on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way and with substantially the same result as each limitation of the patented product. *Id.*

### 2.   APC's Allegedly Infringing Devices

APC's AP7900 and AP8900 product designs are for intelligent PDUs.  The AP7900 product design has been sold since 2003 and the AP8900 product design since 2010. Both designs include a power input, a number of relay controlled outlets, a display, and the ability to remotely monitor and control the devices over a network. But the AP7900 and AP8900 product designs differ with respect to which electric parameters the devices measure and display. The AP7900 design measures and displays information solely about current. Doc. #293, Exhibit 45, Horenstein Decl., Exhibit 2 at 16-17. The AP8900 design measures and displays both current and power. *Id*.

///

### 3.   Claim Language

Independent claim 1 of the '461 patent discloses:

A remotely manageable power management output strip comprising in combination:

A.   a power strip housing;

B.   a plurality of power inputs disposed in the power strip housing;

C.   a first plurality of power outputs disposed in the power strip housing, each among the first plurality of power outputs being connectable to one or more electrical loads external to the power strip housing and connected to a first power input among the plurality of power inputs;

D.   a second plurality of power outputs disposed in the power strip housing, each among the second plurality of power outputs being connectable to one or more electrical loads external to the power strip housing and connected to a second power input among the plurality of power inputs;

E.   a communications bus disposed in the power strip housing;

F.   a plurality of power control sections disposed in the power strip housing, each said power control section being in communication with the communications bus and thereby in power controlling communication with one or more corresponding power outputs among the first or second plurality of power outputs;

G.   a communications system disposed in the power strip housing, being in communication with said communications bus, and having a communications processor system in communication with (i) said communications bus; (ii) said plurality of power control sections through the communications bus; (iii) a communications port connectable to an external communications link external to the power strip housing;

H.   a display disposed in the power strip housing in communication with the communications bus; and

I.   a current determining section disposed in the power strip housing in communication with the communications bus, whereby the current determining section may communicate power-related information to said display.

Doc. #288, Exhibit 2, '461 patent, Col. 21:44-22:17. Claim 3 is a dependent claim of claim 1 and

discloses:

The remotely manageable power management output strip of claim 1 wherein each among the plurality of power control sections includes a power-on status determination circuit, whereby the power-on status determination circuit may report power-on status of said corresponding power output through said communications bus.

Doc. #288, Exhibit 2, '461 patent, Col. 22:24-29. Finally, independent claim 8 discloses:

A remotely manageable power management output strip of the type useable to remotely control, or assess information relating to, power provided to external

electrical loads from a manager location distal from the external electrical loads, the remotely manageable power management output strip comprising in combination:

    A. a power strip housing;

    B. a power input disposed in the power strip housing;

    C. a plurality of power outputs disposed in the power strip housing, each said power output being connectable to an electrical load external to the power-strip housing;

    D. at least one intelligent power section disposed in the power strip housing in power controlling communication with at least one corresponding power output among said plurality of power outputs;

    E. a network communications module (i) having memory and a transfer-control-protocol/Internet Protocol network interface application system residing in the memory and providing a web page interface, and (ii) being disposed in the power strip housing in independent communication with the intelligent power sections and in communication with at least a first external network communications port; and

    F. a current display mounted in association with the power strip housing in current-determining communication with at least one among the plurality of power outputs; whereby an external power manager and the network communications module may exchange, through the first external network communications port and an external network link, information relating to the intelligent power sections in the power strip housing.

Doc. #288, Exhibit 2, '461 patent, Col. 22:53-23:16.

### 4. Claim 1

In its motion, APC argues that its AP7900 and AP8900 product designs do not literally infringe claim 1 of the '461 patent because these designs do not have a "current determining section" in communication with a "communications bus." *See* Doc. #287. APC also argues that the AP7900 design does not literally infringe claim 1 because it does not display power-related information. The court shall address both arguments below.

### a. Current-determining Section

The plain language of limitation (i) of claim 1 requires a current determining section in communication with a communications bus. Doc. #288, Exhibit 2, '461 patent, Col. 22:15-17. APC argues that its accused designs do not have a current determining section that is in communication with a communications bus because STI, in its final infringement contentions,

1   identified the current determining section as only the "load sensors" or "load sensing toroids"[14] of

2   the accused designs. Doc. #290, Exhibit 32 at C-5. It is undisputed that the current sensing toroids

3   are not "in communication" with the communications bus as no information passes directly from

4   the toroids to the communications bus. Therefore, APC argues there is no literal infringement of

5   claim 1.

6        In opposition, STI argues that the accused designs include a "current determining section"

7   in communication with a "communications bus" because the current determining section is more

8   than just the current sensing toroids. STI argues that the current determining section also

9   comprises the signal conditioner, the analog-to-digital converter, and the microprocessor; all of

10  which are housed on the PCB board with the current sensing toroids. STI argues that there is

11  evidence that the PCB board and its components are in communications with the communications

12  bus, and therefore, APC's accused designs literally infringe claim 1.

13       In reviewing STI's arguments in opposition, the court finds that STI effectively seeks to

14  amend its final infringement contentions to add these additional components. The Patent Rules

15  allow a plaintiff to modify its infringement theory upon a showing of "good cause."  N.D. Cal.

16  Patent Local R. 3-7 (2001); *cf.* D. Nev. Patent Local R. 16.1-12 (2011).

17       Here, the court finds that there is no good cause to allow STI to amend its final

18  infringement contentions concerning limitation (i) to include the additional components in the

19  PCB board. First, STI has waited over four years to identify these components as part of the

20  infringing design even though STI knew all of these components were on the PCB board at the

21  time it filed its final infringement contentions. Second, expert discovery has already concluded in

22  this action. Allowing amendment would require also allowing expanded expert discovery and

23  increased litigation costs. Finally, the new components were only identified in response to APC's

24  motion for summary judgment after STI conceded that the current sensing toroids alone were not

25  _____

26       [14] The toroids are the component within the APC designs that senses current.

1    in communication with a communications bus and thus, did not infringe claim 1. Therefore, the

2    court finds there is no good cause to allow STI to amend its final infringement contentions

3    concerning claim 1 of the '461 patent. As such, the court finds that, as addressed above, APC's

4    AP7900 and AP8900 product designs do not literally infringe claim 1 of the '461 patent.[15]

5    Accordingly, the court shall grant APC's motion for summary judgment on this issue.

6                          **b. Power-related Information**[16]

7          APC also argues that its AP7900 design does not literally infringe limitation (i) of claim 1

8    because it does not display "power-related information." The court agrees. It is undisputed that the

9    AP7900 design displays only current-related information. In the court's claim construction order,

10   the court found that current and power are distinct concepts and that current alone is insufficient to

11   determine power. Specifically, the court construed the terms "power information" from the

12   '543 patent and "power-related information" from the '461 patent to mean "information necessary

13   to quantify or describe power, rather than current alone." Doc. #163, p. 25. A current only display,

14   as in the AP7900 design, does not meet this limitation. Accordingly, based on the court's claim

15   construction of these terms, the court holds that the AP7900 design does not infringe claim 1 of the

16   '461 patent.

17         In opposition, STI argues that the court's construction of "power information" and "power-

18   related information" should be reconsidered. STI contends that the court's construction rendered

19   the term "related" in "power-related information" superfluous. In STI's opinion, once the court

20   construed the term "power information" narrowly, it became necessary to differentiate between the

21   meaning of "power information" and "power-related information." Construing the two phrases

22

23         [15] Because claim 3 is dependent on claim 1, the court's finding that the AP7900 and AP8900 designs
24   do not literally infringe claim 1 necessarily means that these designs also do not literally infringe claim 3 of
     the '461 patent.

25         [16] This section applies only to the AP7900 product as APC concedes that the AP8900 product displays
26   power-related information.

1   identically discounts the word "related." STI concludes that the construction of the term "power-

2   related information" should be revised to mean: "information related to power, namely, at least one

3   of power, voltage or current."

4        The court disagrees and finds that reconsideration of the court's claim construction order is

5   not warranted. First, during claim construction proceedings, STI offered the same argument  that

6   "power information" and "power-related information" are broad enough to include the concept of

7   current. However, the court rejected that argument. *See* Doc. #163, p. 25 ("Permitting current

8   information to satisfy the power information limitation" in STI's claims "would eliminate the

9   distinction suggested by the plain language of the claims.").

10       Second, in support of its request for reconsideration, STI now asserts that "power

11  information" and "power-related information" must necessarily have a different scope because the

12  word "related" only appears in one of the terms. This position is entirely inconsistent with STI's

13  position during claim construction. There, STI proposed the same construction for both of these

14  terms, and presented the same analysis treating the terms as identical in scope. *See* Doc. #163, p.

15  25, fn. 9. Further, STI's reliance on the word "related" as a basis to expand the scope of "power-

16  related information" would again eliminate the distinction between power and current suggested

17  by STI's patent claims. As noted above, some of STI's claims require "current" or "current-

18  related" information, and other claims specifically require "power" or "power-related"

19  information. This language clearly suggests a difference between current and power, whether the

20  claim language at issue is "power" information or "power-related" information, and thus, the term

21  "related" is not determinative of the claims.

22       In light of the above, the court declines to reconsider its earlier claim construction of the

23  terms "power information" and "power-related information." Therefore, the court finds that the

24  AP7900 design also does not infringe claim 1 of the '461 patent because it does not display

25  "power-related information."

26
                                        26

### 5. Claim 8

In its motion, APC argues that its designs do not literally infringe claim 8 of the '461 patent. Specifically, APC argues that its designs: (1) contain a display of input, rather than output, current; and (2) do not contain "intelligent power sections." The court shall address each argument below.

#### a. Display of Outputs

Limitation (f) of claim 8 discloses in relevant part: "a current display mounted in association with the power strip housing in current-determining communication with at least one among the plurality of power outputs." Doc. #288, Exhibit 2, '461 patent, Col. 23:13-16. Based on the plain language limitation (f) requires that the display communicates with at least one power output. It is undisputed that APC's accused designs do not communicate with any power output, and instead only display total input current. Accordingly, the court finds that the accused products do not literally infringe claim 8 because they do not have a current display "in current-determining communication with at least one among the plurality of power outputs the output."

In opposition, STI argues that even though the accused designs do not literally infringe limitation (f), the accused designs infringe under the doctrine of equivalents. *See* Doc. #301. The equivalent at issue here is whether a display in current determining communication with the power input is equivalent to communication with at least one of the power outputs.

The function of limitation (f) is to display the amount of current flowing to the connected devices. There is evidence that the APC designs display total aggregate current being used by the PDU. *See* Doc. #310, Exhibit 3; Doc. #309, Exhibit 9. That is the same function served by limitation (f). There is also evidence before the court that APC's designs serve that function in substantially the same way as described in claim 8. *See* Doc. #320, Exhibit 15, Aucoin Decl., ¶ 45. Even though APC's designs measure aggregate input current, that measured value, minus some negligible draw from internal parts, is equal to the aggregate output current flowing to the

27

1   connected devices. *Id*. at ¶¶ 41-43. Thus, the result of both designs is that a user has a measured

2   value of all current flowing to the connected devices. *Id*. at ¶¶ 40-41.

3          Applying the doctrine of equivalents to this claim, and viewing the evidence in the light

4   most favorable to STI, the court finds that there is a genuine issue of material fact concerning

5   whether the APC accused products infringe limitation (f). Accordingly, the court shall deny APC's

6   motion for summary judgment as to this issue.

7                              **b. Intelligent Power Sections**

8          When the '461 patent issued, limitation (e) and (f) required a design that included

9   "intelligent power sections." *See* Doc. #288, Exhibit 2, '461 patent, Claim 8(e) and (f). The court

10  construed "intelligent power section" to require a microcontroller and associated outlet/relays

11  combinations. *See* Doc. #163. It is undisputed that APC's designs only contain a single

12  microcontroller and therefore, do not include "intelligent power *sections*" as required by

13  limitations (e) and (f). Thus, the court finds that the AP7900 and AP8900 designs do not literally

14  infringe claim 8 of the '461 patent.

15         In opposition, STI argues that a certificate of correction, issued by the patent office on April

16  10, 2007, revised limitations (e) and (f) to require only a single "intelligent power section." The

17  Federal Circuit has held that the issuance of a certificate of correction applies only to causes of

18  action that accrue after the certificate issues. *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d

19  1280, 1294 (Fed. Cir. 2000) ("for causes arising after the PTO issues a certificate of correction, the

20  certificate of correction is to be treated as part of the original patent-i.e., as if the certificate had

21  been issued along with the original patent."). But,"each act of infringement gives rise to a separate

22  cause of action." *E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.*, 525

23  F.3d 1353, 1362 (Fed. Cir. 2008). Thus, STI seeks to revise its final infringement contentions

24  regarding claim 8 to refer to the revised language in the certificate of correction issued on the '461

25  patent.

26

                                                   28

1    The court has reviewed the documents and pleadings on file in this matter and finds that

2    there is not good cause to allow STI to amend its final infringement contentions to include the

3    revised language of claim 8. The court notes that STI was obligated to amend its pleadings to

4    assert the '461 patent as corrected or in some way alert APC and the Court that it was proceeding

5    under the patent as corrected as soon as the certificate of correction was issued. *See LG Elecs., Inc.*

6    *v. Quanta Comp., Inc.*, 566 F. Supp. 910, 912-13 (W.D. Wis. 2008) ("any certificate of correction

7    [patentee] received from the patent office would not be effective for the purpose of enforcement

8    unless it filed a new lawsuit or amended its complaint"). In *LG Electronics*, the court refused to

9    allow a patentee to raise a corrected version of the patent in light of the fact that the plaintiff

10   waited three months after it had received a Certificate of Correction and raised the corrected

11   version of the patent three days before the deadline for filing summary judgment motions.

12   Here, STI's actions are even more egregious in that it failed to raise its corrected claim at

13   any point during the four years of this litigation, and did so only in response to APC's motion for

14   summary judgment. Indeed, at no point in this litigation did STI seek to amend its complaint to

15   add the altered '461 patent to the list of STI patents asserted against APC even though STI filed an

16   amended complaint after having the certificate of correction issued. *See* Doc. #185. Rather, in

17   litigating this case between 2007 and 2011, STI consistently asserted only the original claim 8 and

18   completely ignored the revised claim 8. For example, STI relied on the original claim 8 in its

19   pleadings (Doc. ##21, 185), its claim construction documents (Doc. #94, Exhibit C, original

20   '461 patent), its preliminary and final infringement contentions (Doc. #284, App. 48 at "Exhibit

21   C," p. 5-7; Doc #290, Ex. 32 at "Exhibit C," p. 10-11), and even in the exhibits that STI presented

22   to the court in support of its own motion for summary judgment (Doc. #281, App. 16, original

23   '461 patent).

24   Thus, the court finds that STI relied on the original claim 8 throughout this litigation. There

25   is no good cause to allow STI to amend its contentions after more than four years of litigation. To

26

allow STI to raise the revised claim 8 in this litigation at this stage, and solely in response to a

motion for summary judgment, would be fundamentally unfair and prejudicial to APC. Thus, the

court holds that STI is precluded from relying on the corrected claim 8 language in this litigation

and the court shall deny STI's request to amend its final infringement contentions to add in the

revised claim 8 language.

Because it is undisputed that APC's accused designs do not have "intelligent power

*sections,*" APC is entitled to summary judgment that the AP7900 and AP8900 designs do not

literally infringe limitations (e) and (f) of claim 8 of the '461 patent. Accordingly, the court shall

grant APC's motion for summary judgment on this issue.

**III.    Conclusion**

In conclusion, the court finds: (1) that asserted claims 1, 2, 3, and 6 of the '543 patent are

not invalid as anticipated under 35 U.S.C. § 102; (2) that asserted claims 15, 16, and 17 of both the

'543 patent and the '771 patent are not invalid as obvious under 35 U.S.C. § 103; (3) that the

AP7900 and AP8900 designs do not literally infringe claims 1 and 3 of the '461 patent; and

(4) that the AP7900 and AP8900 designs do not literally infringe claim 8 of the '461 patent.


IT IS THEREFORE ORDERED that    defendant's motion for summary judgment

(Doc. #287) is GRANTED in-part and DENIED in-part in accordance with this order.

IT IS SO ORDERED.

DATED this 28th day of September, 2012.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE