**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

SERVER TECHNOLOGY, INC.,
a Nevada corporation,

        Plaintiff,

v.

AMERICAN POWER CONVERSION
CORPORATION, a Massachusetts corporation,

        Defendant.

Case No.  3:06-CV-00698-LRH-VPC

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING APC'S INEQUITABLE CONDUCT COUNTERCLAIM**

        This order addresses defendant American Power Conversion Corporation's ("APC") inequitable conduct counterclaim in this action. It follows both a two-week jury trial covering plaintiff Server Technology, Inc's ("STI") patent infringement claims and APC's invalidity contentions, as well as a two-day bench trial addressing APC's inequitable conduct counterclaim. The court has considered all of the evidence presented at both trials, including the recently filed deposition testimony designations (Doc. #593) and the parties' post-trial briefs on the issue of inequitable conduct (Doc. ##609, 611).

# FINDINGS OF FACT

**APC's Allegations:**

        1.      As both an affirmative defense and counterclaim, APC has asserted that STI committed inequitable conduct during the prosecution of the applications for U.S. Patent Nos. 7,043,543 B2 ("the '543 patent") and 7,702,771 ("the '771 patent").  Inequitable Conduct

1   Counterclaim at ¶¶ 6, 8-36 (Doc. 208).  Specifically, APC has asserted that the Carrel Ewing

2   (now deceased) and STI's patent counsel, Robert C. Ryan, each committed inequitable conduct.

3   Pretrial Order at 11 (Doc. 490).

4         2.     As to Mr. Ewing, APC accuses him of failing to disclose to the U.S. Patent and

5   Trademark Office ("PTO") "information regarding APC's MasterSwitch VM or BayTech's

6   RPC-7 or RPC-21 vertical products" in connection with the prosecution of the '543 patent.

7   Inequitable Conduct Counterclaim at ¶¶ 53, 73, 100 (Doc. 208).  *See* Pretrial Order at 11 (Doc.

8   490).  APC also claims that Mr. Ewing intentionally withheld information concerning the RPC-7

9   and/or RPC-21 during the prosecution of the '771 patent.  Inequitable Conduct Counterclaim at ¶

10  124 (Doc. 208).

11        3.     As to Mr. Ryan, APC alleges that he breached the duty of candor required of all

12  patent attorneys in prosecuting patents before the PTO.  Specifically, APC alleges that Mr. Ryan

13  breached his duty of candor in responding to a request for information made by the PTO during

14  the prosecution of the '771 patent application.   Inequitable Conduct Counterclaim at ¶ 116 (Doc.

15  208).

16  **The APC MasterSwitch VM:**

17        4.     The MasterSwitch VM was a two-piece power distribution unit ("PDU") that

18  included a number of power outlets that could be monitored and controlled over a network.  The

19  VM was designed to be attached to one of the vertical rails of an equipment rack.  The VM also

20  included a separate horizontal controller that was necessary to connect the MasterSwitch VM to

21  a network.  Once connected, the VM could be monitored and controlled remotely over the

22  network.  The separate horizontal component was connected to the vertical section of the product

23  via a cable.  (Inequitable Conduct Counterclaim at ¶¶ 18, 19, 22 (Doc. 208).)

24        5.     APC first offered the MasterSwitch VM for sale to one of its customers, Exodus

25  Communications, Inc. in July, 1999.  (D1083.)  However, it appears that the MasterSwitch VM

26  was not offered for sale to the general public until December 19, 2000 at the earliest.  (P312.)

6.     Two STI sales and marketing employees recall seeing a non-functional mock-up of the MasterSwitch VM at a trade show in October 1999.   One of them, Paul Montalvo, wrote an email on November 4, 1999, which was forwarded to Carrel Ewing, and which described certain attributes of the product.  (D1215.)  In addition, APC placed advertisements for the MasterSwitch VM in various publications during 2000, but it is not clear if anyone at STI saw them.  (D1020; D1021 .)

7.     In the fall of 2000, STI personnel tried but failed to purchase a MasterSwitch VM.

8.      U.S. Patent No. 5,949,974 ("the '974 patent"), which is related to the patents-in-suit, issued to STI on September 7, 1999.  (P9.)  Shortly thereafter, Mr. Ewing became concerned that the APC MasterSwitch products potentially infringed the '974 patent.  Carrel Ewing 03/03/2011 Dep. at 263:22-24; 265:1-10.  As a result, STI purchased a MasterSwitch Plus product, which was a horizontal version of the MasterSwitch VM, in October 2000.  The documentation for the MasterSwitch Plus included a CD that contained a copy of the User's Manual for the MasterSwitch VM.  (Carrel Ewing 03/03/2011 Dep. at 228:20-22; 229:19-24; P302; P315.)

9.     STI did not obtain the MasterSwitch VM itself (as opposed to the manual) until May, 2001.  (P109; P317; P1233.)

**The BayTech RPC-7 and RPC-21:**

10.     Like the MasterSwitch VM, the BayTech RPC-21 was a two-piece PDU.  The outlet receptacle was intended to be mounted vertically on an equipment rack, and a separate horizontal controller enabled the RPC-21 to be monitored and controlled over a network. (Inequitable Conduct Counterclaim at ¶ 31 (Doc. 208).)  There were no differences between the MasterSwitch VM and the RPC-21 that are material to the validity of the patents-in-suit.

11.     In May 2000, STI purchased a RPC-21.  One of the inventors on the STI patents, Brian Auclair, wrote a memo in July 2000 to Carrel Ewing, which compared the features of the RPC-21 to the Power Tower, which was then under development at STI.  (D1219; D1220; P178.)

12.     The BayTech RPC-7 was a vertical PDU in which the networking feature was integrated into the vertical housing.  (Inequitable Conduct Counterclaim at ¶ 31 (Doc. 208).)  Around May, 2000, Carrel Ewing became aware that a device called the  RPC-7 existed, but he did not see or obtain one.  STI tried without success to purchase one at the same time they obtained the RPC-21.  (D1219.)  STI was never able to obtain a BayTech RPC-7.  (Carrel Ewing 05/10/2011 Dep. at 33:19-23.)

13.     Mr. Ewing did not have any significant knowledge about the RPC-7.  (P341 at ¶¶ 26-27.)  While product information about the RPC-7 was contained in a competitive products binder created and maintained by the marketing department of STI, there is no evidence that it was contained in the binder when Mr. Ewing reviewed it.

**Prosecution of the '543 Patent:**

14.     STI filed the application that ultimately issued as the '543 patent on August 15, 2001.  The named inventors are Carrel W. Ewing, Brian P. Auclair, Andrew J. Cleveland, James P. Maskaly, Dennis W. McGlumphy, and Mark J. Bigler.  (P1.)  Richard Main was the patent attorney who filed and prosecuted the application until mid-2003.  At that time, STI hired a different patent attorney, Robert C. Ryan, to take over responsibility of the '543 patent application, and Mr. Main ceased taking an active role in the application.  (P2 at APCC037441-443.)

15.     Mr. Main transferred his files related to STI to Mr. Ryan's firm.  Mr. Main's files appeared poorly organized and incomplete when transferred to Mr. Ryan's firm.  Mr. Ryan's firm inquired about the completeness of the files and Mr. Main indicated that he had given them all of his files for STI matters.  However, it appears that a number of documents and copies of product literature were lost.  Specifically, the files as delivered to Mr. Ryan's firm did not contain the MasterSwitch Plus product, the CD containing the MasterSwitch VM manual, or a paper copy of the MasterSwitch VM manual.  As a result, Mr. Ryan had no knowledge of the

1    MasterSwitch VM until he read APC's preliminary invalidity contentions in 2007, after which

2    the MasterSwitch VM information was disclosed to the PTO.

3         16.    STI filed the application as a continuation-in-part application ("CIP") and claimed

4    priority to the filing date of the '974 patent, July 23, 1996.  (P9 at 1.)  The claimed priority date

5    of an application is used to determine the effective filing date of the application, which in turn

6    determines what publications and other things can be considered "material prior art" to the

7    pending application by the examiner.  *See* Manual of Patent Examining Procedure § 706.02(a)

8    ("MPEP").  As explained more fully below, patent applicants and their attorneys are only

9    required to disclose material prior art to the PTO.

10        17.    The examiner first questioned whether July 23, 1996, was the proper priority date

11   for the '543 patent application on October 22, 2004.  On that date, the examiner expressed his

12   view that the user display claimed in the '543 application was not described in the '974

13   application.  Instead, the examiner concluded that the display was first described in the

14   application for U.S. Patent Nos. 7,099,934 B1 ("the '934 patent"), which STI filed on December

15   8, 2000.  Therefore, on October 22, 2004, the examiner established December 8, 2000, as the

16   priority date for the '543 patent.  (P2 at APCC037474.)

17        18.    The '543 patent issued on May 9, 2006.  (P1 at 1.)

18   **Prosecution of the '771 Patent:**

19        19.    STI filed the application that ultimately issued as the '771 Patent on October 11,

20   2006.  The named inventors are Carrel W. Ewing, Brian P. Auclair, Andrew J. Cleveland, James

21   P. Maskaly, Dennis W. McGlumphy, and Mark J. Bigler.  (P3.)  The Patent Examiner at the PTO

22   assigned to the '771 patent application was Ashok B. Patel.

23        20.    STI also filed the '771 patent application as a continuation application off of the

24   '543 patent, and claimed priority back to July 23, 1996.  (P4 at APCC038490.)

25        21.    This lawsuit was filed on December 18, 2006.  Complaint (Doc. 1).  On October

26   12, 2007, APC served its preliminary invalidity contentions, which asserted, in part, that the '543

5

patent was invalid in light of the MasterSwitch VM.   (D1470.)  The evidence cited by APC in support of its invalidity contentions included the "MasterSwitch VM Power Distribution Unit User Guide," the "MasterSwitch VM Power Distribution Unit Installation and Quick Start Manual," the "PowerNet SNMP Management Information Base v3.1.0 Reference Guide" (collectively, "MasterSwitch VM manuals").  ( D1470 at Ex. A, p. 1.)  The preliminary invalidity contentions did not cite or rely upon any of the BayTech products.

22.     Also on September 29, 2007, STI served its fifth amended preliminary infringement contentions, which identified a number of APC products that STI contended infringed the '543 patent.  The list of infringing products did not include the MasterSwitch VM. ( P4 at APCC039595-96.)

23.     On October 20, 2008, in the prosecution of the '771 patent, STI filed a Supplemental Information Disclosure Statement ("Supplemental IDS").  The second, third, and fourth items listed on the Supplemental IDS were the MasterSwitch VM manuals.  APC's preliminary invalidity contentions, which identified the MasterSwitch VM and included detailed claim charts showing how APC believed the MasterSwitch VM manuals invalidate the '543 patent, were sixth on the list.  (P4 at APCC039707-709.)  (D1470 at APCC040108-109.)

24.     The supplemental IDS also included STI's preliminary infringement contentions. (P4 at APCC039708.)

25.     As indicated by his initials next to the references listed on the information disclosure statement and his signature on the bottom of that document dated 1/13/2010, Examiner Patel reviewed and considered each of these documents, including the MasterSwitch VM manuals and APC's preliminary invalidity contentions.  (P4 at APCC040107-109.)

26.     On June 25, 2009, Examiner Patel issued a Requirement for Information under 37 C.F.R. § 1.105 (the "105 Request").  Specifically, he requested from STI "any documentations including but not limited to:  Instruction Manuals, Installation Manuals, Sales Manuals and any other information pertaining to the APC family of products which are relevant to the instant

disclosure," including "the current as well as all prior versions of the documents that are related to the APC family of products." (P4 at APCC040028.) In the 105 Request, Examiner Patel expressly defined the term "APC family of products" to refer to the infringing APC products identified in STI's preliminary infringement contentions previously submitted by STI pursuant to the Supplemental IDS.

27.    On November 20, 2009, Mr. Ryan discussed the 105 Request in a phone call with Examiner Patel. (P4 at APCC040056.) Prior to the conversation, on October 27, 2009, Mr. Ryan faxed to Examiner Patel the questions to be discussed during the conversation. The first question asked, in part, whether by asking for APC documents "which are relevant to the instant disclosure" Examiner Patel meant that STI needed to search for and disclose APC documents that are material to the prosecution of the '771 patent application. (P4 at APCC040085.)

28.    Mr. Ryan testified credibly that, based on that call with Examiner Patel, he understood that in responding to the 105 Request, the examiner required STI to disclose only those documents that were "material" to the patentability of the '771 patent application, as that term was defined by 37 C.F.R. §§ 1.56, 1.97, and Federal Circuit case law. (P4 at APCC040085.)

29.    On December 23, 2009, STI filed a response to the 105 Request. The response was submitted on behalf of Mr. Ryan and was signed by Mr. Ryan's colleague, patent attorney, Ken C. Winterton. (P4 at APCC040056.) The response stated:

> In an Office Action dated June 25, 2009, the Examiner has requested certain documents under 37 C.F.R. §1.105. Citing Rule 1.105, the Examiner requested certain documents relating to a number of APC products. Mr. Robert C. Ryan of Holland & Hart (attorneys for the applicants) discussed this request with the Examiner on November 20, 2009. In this discussion, Mr. Ryan explained that we have investigated the matter, reviewed the requested materials, and found nothing material in them. In view of that explanation, we understood the Examiner to indicate that the applicants therefore need provide nothing further in response to the Rule 1.105 request.

(P4. at APCC040085.)

30.     On February 26, 2010, Examiner Patel issued a notice of allowability and a notice of allowance.  Examiner Patel stated regarding the conversation with Mr. Ryan concerning the 105 Request: "Examiner had stated during the discussion that the material had to be reviewed for its applicability to the patentability of the claims of this application.  From the response of Mr. Ryan . . . Examiner deducts that the 'material' has nothing in it for its applicability to the patentability of the claims of this application."  ( P4 at APCC040063.)

31.     Examiner Patel allowed Claims 1-23, as filed.  ( P4. at APCC040062.)  As noted, Examiner Patel reviewed and considered the MasterSwitch VM manuals and APC's preliminary invalidity contentions before issuing the notice of allowance, as indicated by his initials next to the references and his signature on the bottom of the information disclosure statement dated 1/13/2010.  P4 at APCC040107-109.

32.     The '771 patent issued on April 20, 2010.  (P3.)

**Findings Regarding Mr. Ewing's Intent:**

33.     Carrel Ewing testified repeatedly under oath that at no time did he make a deliberate decision to withhold the VM manual and BayTech information from the PTO, and that he did not intend to deceive the Patent Office.  (Carrel Ewing 03/03 & 03/04/2011 Dep. at 268:18-270:2; 276:19-277:1; 279:13-280:12; Carrel Ewing 05/10/2011 Dep. at 7:12-13:10; P341 at ¶ 33.)

34.     Messrs. Ewing and Main testified that late in the fall of 2000, Mr. Main was both preparing the application for the '934 patent and conducting the infringement analysis of whether the MasterSwitch products infringed STI's '974 patent.  Carrel Ewing 03/03 & 03/04/2011 Dep. at 268:18-270:2; 276:19-277:1; 279:13-280:12; P315.)  At that time, Mr. Ewing gave to Mr. Main the APC MasterSwitch product, and a CD that came with the product and that contained a User's Manual for the MasterSwitch VM.  Carrel Ewing 03/03 & 03/04/2011 Dep. at 268:18-270:2; 276:19-24; 279:12-23; (P315.)

35.     At the same time, Mr. Ewing also gave Mr. Main a document containing "a product comparison summary of how APC, BayTech, Western Telmatic, and ISA compare to Server Technology's products."  (P315.)  The "BayTech" product was the RPC-21.  (Carrel Ewing 03/03 & 03/04 Dep. at 280:18-22; 281:3-6; 282:11-16; 283:15-20; 284:18-285:24.)  Additionally, video recordings made by Mr. Main of meetings in and around the time of the drafting and prosecution of the applications in question demonstrate that Mr. Ewing freely provided to Mr. Main information concerning the APC PDU products, including the MasterSwitch VM.  (P409-425.)

36.     Both Messrs. Ewing and Main have testified consistently and credibly that Mr. Ewing did not tell Mr. Main to withhold any of the information, including the MasterSwitch VM manual and the information concerning the RPC-21,  from the PTO.  (P341 at ¶ 18.)  Similarly, Mr. Main testified that he did not believe that Mr. Ewing placed any restrictions on his use of the VM manual or the information concerning the RPC-21, and he was free to use the information as he saw fit in connection with his prosecution of the applications for the STI patents.  (P339 at ¶ 4.)  And, Mr. Ewing testified that he provided the VM manual to Mr. Main to be used "for any purpose" Mr. Main found necessary, including both for the infringement analysis and for possible disclosure to the PTO in connection with the prosecution of the '934 patent application.  (Carrel Ewing 03/03 & 03/04/2011 Dep. at 268:18-270:2; 276:19-277:1; 279:12-23.)

37.     Further, Mr. Ewing testified that he believed that he had complied with his duty of candor by providing the information concerning the MasterSwitch VM and the RPC-21 to Mr. Main.  He also believed that Mr. Main would disclose the information concerning the MasterSwitch VM and the RPC-21 to the PTO if it was appropriate to do so.  (Carrel Ewing 04/07/2011 Dep. at 637:2-4; 637:14-18; 637:23-638:4; P341 at ¶ 28.)

38.     Mr. Main testified credibly that he does not recall specifically why he did not disclose the VM manual and BayTech product information to the PTO, but believes that he must

1  have concluded that it was not prior art.  (P339 at ¶ 6.)  APC has not accused Mr. Main of

2  inequitable conduct.

3      39.   Mr. Ewing testified credibly that he believed Mr. Main transferred his files –

4  including the files containing the VM manual and the comparison of the RPC-21 – to Mr. Ryan's

5  firm when the firm took over STI's patent prosecution in 2003.  (Carrel Ewing 05/10/2011 Dep.

6  at 32:14-33:14; 37:11-22.)  However, Mr. Main's files were poorly organized and incomplete

7  when transferred to Mr. Ryan's firm.  Indeed, Mr. Ryan testified that his firm inquired about the

8  completeness of the files and Mr. Main indicated that he had given them all of his files for STI

9  matters.  However, it appears that a substantial number of documents and copies of product

10  literature were lost.  Specifically, the files as delivered to Mr. Ryan's firm did not contain the

11  MasterSwitch Plus product, the CD containing the VM manual, or a paper copy of the VM

12  manual.  As a result, Mr. Ryan had no knowledge of the MasterSwitch VM until he read APC's

13  preliminary invalidity contentions in 2007, after which the VM information was disclosed to the

14  PTO.

15      40.   On October 22, 2004, the priority date for the '543 patent was questioned by the

16  examiner as set forth above.  (P341 at ¶ 31.)  At the time the examiner questioned the priority

17  date, Mr. Ryan asked Mr. Ewing to review STI's files for additional documentation to be

18  submitted to the PTO in connection with the prosecution of the '543 application, as well as other

19  applications.  In particular, Mr. Ryan asked Mr. Ewing to update his search of the STI files for

20  potentially relevant product literature.  (P326.)  In those instances, Mr. Ewing focused his search

21  on more recent product literature because he believed all pertinent product literature in STI's

22  files as of 2001 already had been provided to Mr. Main.  (P341 at ¶ 31.)

23      41.   Mr. Ewing testified that he focused on competitive products only when STI

24  encountered those products in competitive sales situations.  By 2004-05, the MasterSwitch VM

25  was no longer a factor in the marketplace, as the marketplace had moved on to more

26  sophisticated products sold by APC and STI.  Likewise, the RPC-21 was not a factor in the

marketplace during the same time period.  As a result, Mr. Ewing no longer gave any thought to the VM or the RPC-21.  (P341 at ¶ 32.)

42.     As noted above, Mr. Ewing testified consistently and credibly that at no time during the prosecution of the '543 and '771 patent applications did he have any significant knowledge of or information about the BayTech RPC-7 product.  (Carrel Ewing 05/10/2011 Dep. at 33:19-21; Carrel Ewing 04/07/2011 Dep. at 620:8-621:2; P341 at ¶¶ 26-27.)  While information concerning the RPC-7 was contained in STI's Competitive Products Binder produced in this case, there is no evidence that it was in the binder when Mr. Ewing reviewed it, or that Mr. Ewing understood its potential significance to the prosecution of the '543 or '771 patent applications.

**Findings Regarding Mr. Ryan's Intent:**

43.     As noted above, on October 20, 2008, in the prosecution of the '771 patent, STI filed a Supplemental Information Disclosure Statement ("Supplemental IDS"), which included APC's preliminary invalidity contentions and STI's preliminary infringement contentions. APC's preliminary invalidity contentions identified the MasterSwitch VM and included detailed claim charts showing how APC believed the MasterSwitch VM manuals invalidate the '543 patent.  (D1470 at APCC040108-109; P4 at APCC039708.)  STI also filed separate copies of the MasterSwitch VM manuals with the Supplemental IDS.  (P4 at APCC039707-708.)

44.     Thereafter, on June 25, 2009, Examiner Patel served a "Requirement for Information Under 37 C.F.R. § 1.105" ("Rule 105 Request"), in which the examiner sought the submission of instruction manuals, installation manuals, sales manuals and any other information pertaining to the "APC family of products."  The examiner expressly defined the term "APC Family of Products" to include only those APC products identified in STI's preliminary infringement contentions.[1]  (P4 at APCC040028.)

---

[1] The APC product numbers listed by the examiner as falling within his definition of "APC family of products" were AP7900, AP7901, AP 7902, AP7930, AP7931, AP7932, AP7940, AP7941, AP7911, AP7920, AP7921, AP7960, AP7961, AP7968, AP7990, AP8991 and AP7998. (App. 18 at 159.)

11

45.     On November 20, 2009, Mr. Ryan discussed the 105 Request in a phone call with Examiner Patel.  (P4 atAPCC040056.)  Prior to the conversation, on October 27, 2009, Mr. Ryan faxed to Examiner Patel the questions to be discussed during the conversation.  The first question asked, in part, whether by asking for APC documents "which are relevant to the instant disclosure" the examiner meant that STI needed to search for and disclose APC documents that are material to the prosecution of the '771 patent application.  (P4 at APCC040085.)

46.     Mr. Ryan testified credibly, based on that call with Examiner Patel, he understood that in responding to the 105 Request, the examiner required STI to disclose only those documents that were "material" to the patentability of the '771 patent application, as that term was defined by 37 C.F.R. §§ 1.56, 1.97, and Federal Circuit case law.  (P4 at APCC040085.)

47.     On December 23, 2009, STI filed a response to the 105 Request.  The response was submitted on behalf of Mr. Ryan and was signed by Mr. Ryan's colleague, patent attorney, Ken C. Winterton.  (P4 at APCC040056.)  The response stated:

> In an Office Action dated June 25, 2009, the Examiner has requested certain documents under 37 C.F.R. §1.105.  Citing Rule 1.105, the Examiner requested certain documents relating to a number of APC products.  Mr. Robert C. Ryan of Holland & Hart (attorneys for the applicants) discussed this request with the Examiner on November 20, 2009.  In this discussion, Mr. Ryan explained that we have investigated the matter, reviewed the requested materials, and found nothing material in them.  In view of that explanation, we understood the Examiner to indicate that the applicants therefore need provide nothing further in response to the Rule 1.105 request.

(P4 at APCC040085.)

48.     On February 26, 2010, Examiner Patel issued a notice of allowability and a notice of allowance.  Examiner Patel stated regarding the conversation with Mr. Ryan concerning the 105 Request: "Examiner had stated during the discussion that the material had to be reviewed for its applicability to the patentability of the claims of this application.  From the response of Mr. Ryan . . . Examiner deducts that the 'material' has nothing in it for its applicability to the patentability of the claims of this application."  (P4 at APCC040063.)

12

49.     APC asserts that, in reading the Rule 105 Request, Mr. Ryan recognized that the examiner was either confused or mistaken in requesting information concerning the products in the preliminary infringement contentions, rather than the preliminary invalidity contentions. According to APC, Mr. Ryan intentionally took advantage of the examiner's confusion or mistake. Rather than respond the way he did, APC contends that Mr. Ryan should have directed the examiner to APC's invalidity contentions that had been disclosed to the PTO along with the infringement contentions. Significantly, there is no evidence before the court that the examiner was either confused or mistaken.

50.     Mr. Ryan has testified credibly that he understood the examiner's 105 Request to cover manuals and related documents for the specific APC products listed in STI's preliminary infringement contentions.   Mr. Ryan further testified that:

- he believed that the requirement for information did not cover the MasterSwitch VM because it was not identified in STI's preliminary infringement contentions and was not listed among the "APC family of products" as that term was defined by the examiner.  (P4 at APCC040028.);

- he did not think that Examiner Patel meant to request the MasterSwitch VM manuals and/or the preliminary invalidity contentions because they already had been disclosed and provided to the examiner.  In fact, the MasterSwitch VM manuals were included as the second, third, and fourth items on the Supplemental IDS, and the preliminary invalidity contentions were listed as the sixth item. Thus, there was no reason for Mr. Ryan to believe that Examiner Patel had overlooked them.  (P4 at APCC039707-708.); and

- he believed Examiner Patel's Rule 105 request was logical because STI had accused the products of infringing related patents to the '771 patent application. If any of those accused products qualified as prior art to the inventions claimed in

the '771 patent application, they would have rendered those inventions invalid for patent protection by STI.

51.  Finally, when Mr. Ryan responded to the examiner's Rule 105 request on December 23, 2009, APC's counterclaim for inequitable conduct had been pending for over 2.5 years.  (Doc. 42 filed on April 2, 2007).  Further, under Patent Office rules, STI's response to the 105 Request would be public and readily accessible to APC and subject to scrutiny in the pending lawsuit.[2]  Therefore, in addition to his ethical and professional responsibilities as an attorney and patent lawyer, Mr. Ryan had every incentive to make sure that he and his colleagues responded fairly, reasonably and truthfully to the examiner's request.  Based on the foregoing, the court finds that Mr. Ryan's interpretation of examiner Patel's Rule 105 request was reasonable and that he responded fairly, reasonably and truthfully to the examiner's request.

## CONCLUSIONS OF LAW

**The Law of Inequitable Conduct:**

52.  The Federal Circuit recently "tighten[ed] the standard[] for finding [inequitable conduct] in order to redirect a doctrine that has been overused to the detriment of the public." *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011).  Indeed, the Federal Circuit noted that "[t]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague.  Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps." *Id.* at 1289 (quoting *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988)).  As a result, an accused infringer now faces a very high bar in proving a counterclaim for inequitable conduct.

---

[2] Under the PTO rules, documents filed in connection with applications such as the '771 application are to be made publicly available through the PTO web site promptly after filing. MPEP § 103.  This service is referred to as the Public Patent Application Information Retrieval service ("Public PAIR").  (*See* "Public PAIR" at http://www.uspto.gov/patents/process/status/index.jsp.)

14

53.     To prevail on the defense of inequitable conduct, the accused infringer must prove by clear and convincing evidence that the applicant (1) misrepresented or omitted material information (2) with the specific intent to deceive the PTO.  *Id*. at 1287, 1290; *see also Light Guard Sys., Inc. v. Spot Devices, Inc.,* 2011 WL 3022530, at *6 (D. Nev. July 22, 2011) (decision on motion for preliminary injunction).  The accused infringer must prove both elements – intent and materiality – by clear and convincing evidence.  *Id*.  If the accused infringer meets its burden, then the district court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable.  *Id*. at 1287.

**The Intent Standard:**

54.     To prove that the patentee acted with the specific intent to deceive the PTO, a finding that the misrepresentation or omission amounts to gross negligence, or negligence under a "should have known" standard, is insufficient.  *Id*. at 1290.  "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant ***made a deliberate decision*** to withhold a ***known*** material reference."  *Id*. (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995)) (emphasis supplied by *Therasense* court). "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it."  *Id*.

55.     Recognizing that direct evidence of deceptive intent is rare, the Federal Circuit has held that a district court may infer intent from indirect and circumstantial evidence.  *Id*. "However, to meet the clear and convincing evidence standard, the specific intent to deceive 'must be the single most reasonable inference able to be drawn from the evidence.'"  *Id*. (quoting *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). "Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."  *Id*. at 1290-91.

56.     "Because the party alleging inequitable conduct bears the burden of proof, the 'patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s]

a threshold level of intent to deceive by clear and convincing evidence." *Id*. at 1291 (quoting *Star*, 537 F.3d at 1365). The absence of a good faith explanation for withholding a material reference does not prove intent to deceive. *Id*.

**The Materiality Standard:**

57.    As noted, an accused infringer must establish that the patentee misrepresented or omitted material information with the specific intent to deceive the PTO. To qualify as "material," a reference must be, among other things, "prior art" under 35 U.S.C. § 102. While the determination of what constitutes prior art is very complex generally, one rule is that a reference cannot constitute a prior art if it was first published or publicly known after the priority date for a given patent claim. *Papyrus Tech. Corp. v. New York Stock Ex., LLC*, 653 F.Supp.2d 402, 420 (S.D.N.Y. 2009).

58.    The Federal Circuit has held that "the materiality required to establish inequitable conduct is but-for materiality." *Therasense*, 649 F.3d at 1291. Prior art is "but-for material" if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. *Id*. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference. This high bar for proving materiality is necessary because "inequitable conduct renders an entire patent . . . unenforceable." *Id*. at 1292. In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction. *Id*. at 1291-92.

59.    "By definition, a non-disclosed reference that is cumulative of prior art properly before the patent examiner cannot be material." *Fujitsu Ltd. v. Tellabs Operations, Inc.*, 2012 WL 3133548, *2 (N.D. Ill. July 31, 2012). As a result, "[a]n applicant has no duty to disclose a reference to the PTO if it is cumulative of or less material than references already before the examiner." *Rothman v. Target Corp.*, 556 F.3d 1310, 1326 (Fed. Cir.), *cert. denied*, 558 U.S. 1024 (2009).

16

**Conclusion Regarding Relevance of PTO's Reexamination Proceedings**

60.     On November 12, 2010, APC filed a request for reexamination of the '543 patent with the PTO.  The PTO granted the request and the examiner ultimately issued an "Action Closing Prosecution" finding, *inter alia*, that claim 15 of the '543 patent is obvious.  The PTO also issued a Right of Appeal Notice, which signifies the end of the prosecution stage and the beginning of the appeal process of the reexam.  Manual of Patent Examining Procedure ("MPEP") § 2601.01 (8th ed. Rev. 9, August 2010).  Both STI and APC filed appeals of the examiner's decision concerning numerous claims in the '543 patent.  STI and APC have filed their initial and responsive briefs in the appeal of the examiner's decision.  *See id*. at § 2675, 2677-2678, and 2681.  After the briefing closes, the Patent Trial and Appeal Board will review the pleadings and then issue a decision.  Thereafter, the parties have the right to appeal the decision to the United States Court of Appeals for the Federal Circuit.  *See id*. at § 2683.

61.     While the appeals are on-going before the PTAB and the Federal Circuit, the reexamination is not "final."  Any cancellations, amendments, or additions to the patent claims as a result of the reexamination proceeding do not become effective until the Patent Office issues the Reexamination Certificate, which does not occur until the appeals process is exhausted.  *See id*. at § 2687.

62.     Here, since a Reexamination Certificate has not issued, the current status of the reexamination proceeding is of little relevance.  Indeed, the appeal before the PTAB is ongoing, and both parties will have the right to appeal the PTAB's decision to the Federal Circuit.  Until that process runs its course, any decision in the reexam is not final.

63.     Finally, to determine patentability during a reexamination, the Patent Office applies a different claim construction standard to the patent, specifically, the broadest reasonable interpretation to the claims. MPEP § 2111 ("During patent examination, the pending claims must be 'given their broadest reasonable interpretation' consistent with the specification.").  In contrast, in an infringement action, a district court construes the patent claims in a manner that

1    "most naturally aligns with the patent's description of the invention."  *Phillips v. AWH Corp.*,

2    415 F.3d 1303, 1316 (Fed.Cir.2005)).  The Federal Circuit has summed up the interplay by

3    noting that the different proceedings "take different approaches in determining validity and on

4    the same evidence could quite correctly come to different conclusions."  *In re Swanson*, 540 F.3d

5    1368, 1377 (Fed. Cir. 2008) (quoting *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir.

6    1988)).

7          64.    Here, the examiner rejected claim 15 of the '543 patent stating that claim 15 was

8    rendered obvious by the manuals for the MasterSwitch VM ("MSVM"), an APC product that is a

9    two-piece device.  In contrast, this Court in applying its claim construction ruling twice rejected

10   APC's defense of anticipation based upon the MSVM product, applying the Court's

11   interpretation that "plugstrip" refers to a one-piece device.  *See* Doc. 381 at 9-10 ("Therefore, the

12   MSVM does not contain every limitation of claim 1 and cannot anticipate claim 1 as a matter of

13   law"); Doc. 420 at 7 ("Accordingly, the court finds that it did not err in concluding that the '543

14   patent was not anticipated by APC's MSVM product design").

15         65.    The different standard applied by the PTO in the reexam proceeding makes the

16   examiner's decision of little relevance to the proceedings before this Court.  As a result, the court

17   concludes that the examiner's decision in the reexam falls short of rendering the references

18   "material" under *Therasense*.

19   **Conclusion Regarding Testimony of Mr. Godici:**

20         66.    During the trial, APC proffered the opinion testimony of Nicholas P. Godici.

21   Specifically, Mr. Godici's opinion testimony addressed his opinion that Mr. Ewing and Mr. Ryan

22   violated their duty of disclosure under the materiality standard set forth in 37 C.F.R. § 1.56

23   ("Rule 56").  However, in its  *Therasense* decision, the Federal Circuit adopted the "but-for"

24   materiality test and rejected the PTO's broader definition of materiality in Rule 56.  *Therasense*,

25   649 F.3d at 1293-94.  The PTO's Rule 56 disclosure standards and requirements are thus no

26

18

1  longer the standard for analyzing the materiality prong in determining inequitable conduct.  As a

2  result, the court has not placed any weight on Mr. Godici's testimony.

3  **Conclusion Regarding Mr. Ewing's Intent:**

4         67.    Based on the findings above, the court concludes that Mr. Ewing never considered

5  or made a decision of any kind to withhold information concerning APC's MasterSwitch VM or

6  BayTech's RPC-7 or RPC-21 products from the PTO during prosecution of the '543 patent

7  application or the '771 patent application.  Specifically, the evidence establishes that Mr. Ewing

8  provided the MasterSwitch VM manuals and a comparison chart listing the features of the RPC-

9  21 to his patent attorney, Richard Main.  Further, there is no evidence that Mr. Ewing placed any

10 restrictions on his use of those materials.  In fact, both witnesses testified credibly and

11 consistently that Mr. Main was free to use the materials for any purpose in representing STI in

12 front of the PTO.

13        68.    In addition, as noted above, the '543 patent application originally claimed priority

14 to July 23, 1996.  There is no dispute that, based on that date, the MasterSwitch VM and RPC-21

15 were not prior art that were required to be disclosed.  When the priority date changed on October

16 22, 2004, neither the MasterSwitch VM nor the RPC-21 was a factor in the marketplace, thus

17 explaining why Mr. Ewing did not tell his then patent attorney – Robert Ryan – about either

18 product.  Likewise, the evidence establishes that Mr. Ewing did not remember the MasterSwitch

19 VM or RPC-21 when Mr. Ryan filed the '771 patent application on October 11, 2006.

20        69.    As to the RPC-7, the evidence does not establish that Mr. Ewing knew enough

21 about that product to disclose it to either of his patent attorneys or the PTO at any relevant time.

22        70.    In summary, the court concludes that Mr. Ewing did not have the specific intent to

23 deceive the PTO as a result of the nondisclosure of the MasterSwitch VM, RPC-21, and RPC-7

24 in the prosecution of the '543 or '771 patents.

25

26

**Conclusion Regarding Mr. Ryan's Intent:**

71.     APC asserts that Mr. Ryan violated his duty of candor to the PTO in response to Examiner Patel's Rule 105 request by taking advantage of Examiner Patel's confusion or mistake in requesting information concerning the products in the preliminary infringement contentions, rather than the preliminary invalidity contentions.  Rather than respond the way he did, APC contends that Mr. Ryan should have directed the examiner to APC's invalidity contentions that had been disclosed to the PTO along with the infringement contentions.

72.     However, both the invalidity contentions and the infringement contentions were fully disclosed to the PTO.  As noted above, the court finds that Mr. Ryan's interpretation of Examiner Patel's Rule 105 request was reasonable, since he took it at face value.  The court also finds that there is no evidence that Examiner Patel was confused or mistaken in directing the Rule 105 request to the preliminary infringement contentions, nor does the court agree with APC's contention that Mr. Ryan should have known whether the Examiner Patel was confused or not.  Based on these findings, the court concludes that Mr. Ryan did not have the specific intent to deceive the PTO in his response to Examiner Patel's Rule 105 request.

**Conclusion Regarding Materiality:**

73.     As noted above, on October 20, 2008, the applicants filed a supplemental IDS with respect to the '771 patent application, which included APC's preliminary invalidity contentions, and the MasterSwitch manuals.  The preliminary invalidity contentions included detailed claim charts showing how APC believes the MasterSwitch VM manuals invalidate the '543 and other patents.

74.     There is no evidence that Examiner Patel did not review the MasterSwitch VM manuals and invalidity contentions.  In fact, Examiner Patel initialed beside the MasterSwitch VM manuals and APC's invalidity contentions listed on the information disclosure statement and signed the statement dated January 13, 2010.  His initials and signature indicate that he complied with his obligation specified in the MPEP to consider the submitted references.  *See* MPEP §

609.01 ("After the examiner reviews the IDS for compliance with 37 C.F.R. 1.97 and 1.98, the examiner should: . . . (A)(2) Initial the blank column next to the citation to indicate that the information has been considered by the examiner . . . [and] (D) Sign and date the bottom of the IDS listing." Thus, Examiner Patel's initials and signature on the information disclosure statement establish that he reviewed and considered the MasterSwitch VM manuals and APC's preliminary invalidity contentions.

75.    APC's expert – Douglas Bors – testified that there are no differences between the MasterSwitch VM and the RPC-21 that are material to the validity of the '543 or '771 patents.

76.    As noted above, "[a]n applicant has no duty to disclose a reference to the PTO if it is cumulative of or less material than references already before the examiner." *Rothman*, 556 F.3d at 1326. Here, as stated by Mr. Bors, the RPC-21 is cumulative of the MasterSwitch VM manuals that STI submitted to the PTO and Examiner Patel considered in allowing the '771 patent to issue. As a result, the RPC-21 was not material to the prosecution of the '771 patent application and neither Mr. Ewing nor Mr. Ryan had any duty to submit any information concerning it to the PTO.

WHEREFORE the court finds that neither Carrel Ewing nor Robert Ryan acted with specific intent to deceive the PTO, nor was there a material nondisclosure made to the patent examiner. Accordingly, Server Tech is found not to have committed inequitable conduct during the prosecution of the applications for the '543 patent or the '771 patent. APC's affirmative defense and counterclaim is therefore DENIED.

IT IS SO ORDERED.

DATED this 8th day of August, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

21