UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| SERVER TECHNOLOGY, INC., | |
| Plaintiff, | |
| v. | Case No. 3:06-cv-0698-LRH-VPC |
| AMERICAN POWER CONVERSION CORPORATION, | ORDER |
| Defendant. | |

This order is amending and re-issuing certain vacated orders pursuant to the court's February 23, 2017 vacate order. ECF No. 691.

In brief, after an appeal following a jury trial on the issues of copyright infringement, the Federal Circuit issued an order on September 23, 2016, finding that the court's claim construction of the term "plugstrip" as used in the patents-in-suit was erroneous and thus reversed and remanded the action back to this court. *Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 Fed. Appx. 1030, 1033-34 (Fed. Cir. 2016). Upon receiving the Federal Circuit's decision, the court ordered the parties to file a joint status report addressing the impact of the Federal Circuit's decision on this action. ECF No. 689. Thereafter, the parties filed a joint status report in accordance with the court's order. ECF No. 690.

On February 23, 2017, the court issued its order vacating all orders found by the court to have relied upon or applied the court's construction of "plugstrip" in violation of the Federal

Circuit's recent construction. However, as part of that order, the court noted that several of the vacated orders addressed additional claims or issues not impacted by the Federal Circuit's decision. For those orders, the court stated that it would issue amended orders establishing which portions of these orders have been vacated pursuant to the Federal Circuit's decision and which portions of the orders remain valid and binding in this litigation. This order constitutes the court's order amending and re-issuing portions of those vacated orders.

The following orders have been amended and shall be re-issued by the court: (1) the court's order addressing defendant American Power Conversion Corp.'s ("APC") motion for summary judgment (ECF No. 381);[1] (2) the court's order addressing plaintiff Server Technology, Inc.'s ("STI") motion for a permanent injunction (ECF No. 651);[2] and (3) the court's order entering ongoing royalty (ECF No. 663).[3] The court notes the following rules guide the amended orders. First, all portions of the amended orders that are still vacated in light of the court's re-issuance of the orders are STRUCKTHROUGH. The court retains the framework of the order for the record and the court's and parties' benefit. Second, any additional language not present in the original order shall be enclosed within BRACKETS to identify the additional language. Such additional language is to comply with changes to the local rules, for ease of reading, and/or clarification purposes but such additional language does not constitute nor create any new law of the case.

Additionally, the court has amended and shall re-issue the jury verdict (ECF No. 590) in this action in accordance with the Federal Circuit's order and the parties' agreement as set forth in the joint status report.[4] The court directs the parties' attention to the amended jury verdict. Due to the nature of the Federal Circuit's order, all damages relating to the AP7900 series of products is vacated. Yet, the portion of the damages award relating to the AP8900 series of products is not vacated. The court, and the parties, recognize that the copyright infringement damages relating to

---

[1] A copy of the court's amended order addressing APC's motion for summary judgment is attached as Exhibit 1 to this order.
[2] A copy of the court's amended order addressing STI's motion for a preliminary injunction is attached as Exhibit 2 to this order.
[3] A copy of the court's amended order entering an ongoing royalty is attached as Exhibit 3 to this order.
[4] A copy of the amended jury verdict is attached as Exhibit 4 to this order.

the AP8900 series of products is 5% of total sales of those products. However, that information is solely within the control of the parties. As such, the parties shall prepare an appropriate order setting the damages for the AP8900 series of products consistent with the jury's verdict and submit the same for signature after which the court shall separately order the clerk of court to enter an appropriate judgment relating to the AP8900 series of products. The same rules guiding the court's amended orders guides the amended jury verdict.

IT IS THEREFORE ORDERED that the clerk of court shall re-issue the amended order addressing defendant's motion for summary judgement (ECF No. 381) attached as Exhibit 1 to this order.

IT IS FURTHER ORDERED that the clerk of court shall re-issue the amended order addressing plaintiff's motion for a permanent injunction (ECF No. 651) attached as Exhibit 2 to this order.

IT IS FURTHER ORDERED that the clerk of court shall re-issue the amended order entering an ongoing royalty (ECF No. 663) attached as Exhibit 3 to this order.

IT IS FURTHER ORDERED that the clerk of court shall re-issue the amended jury verdict in this action (ECF No. 590) attached as Exhibit 4 to this order.

IT IS FURTHER ORDERED that the parties shall, within twenty (20) days after entry of this order, prepare an appropriate order setting forth the damages to be awarded to plaintiff as it relates to defendant's AP8900 series of products in accordance with this order and submit the same for signature.

IT IS SO ORDERED.

DATED this 12 day of May, 2017.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

# EXHIBIT 1

6                    UNITED STATES DISTRICT COURT

7                          DISTRICT OF NEVADA

8                                * * *

9   SERVER TECHNOLOGY, INC.,                )
                                            )
10          Plaintiff and Counterdefendant, )        3:06-CV-00698-LRH-VPC
                                            )
11  v.                                      )
                                            )        <u>AMENDED ORDER</u>
12  AMERICAN POWER CONVERSION              )
    CORPORATION,                            )
13                                          )
            Defendant and Counterclaimant   )
14  _____)

15          Before the court is defendant American Power Conversion Corp.'s ("APC") motion for

16  summary judgment on the issues of anticipation, obviousness, and non-infringement. Doc. #287.[1]

17  Plaintiff Server Technology, Inc. ("STI") filed an opposition (Doc. #301) to which APC replied

18  (Doc. #324).[2]

19  **I.     Facts and Procedural History**

20          **A. Procedural Overview**

21          Plaintiff STI manufactures intelligent power distribution devices. STI brought the

22  underlying patent infringement action against defendant APC alleging that APC's product designs

23

24  _____

25          [1] Refers to the court's docket number.

26          [2] [This is an amended and re-issued order of the court's now-vacated original order granting in-part and denying
    in-part APC's motion for summary judgment. Doc. #391.]

infringe three of its patents: United States Patents numbers 7,043,543 ("the '543 patent"),[3] 7,141,461 ("the '461 patent"),[4] and 7,702,771 ("the '771 patent).[5] Specifically, STI alleges that APC's various products infringe claims 1-3, 6, and 15-17 of the '543 patent; claims 1, 3, and 8 of the '461 patent; and claims 15-17 of the '771 patent.

Like STI, APC manufacturers intelligent power distribution devices. APC denies that its products infringe STI's patents and has raised three defenses: (1) anticipation under 35 U.S.C. § 102; (2) obviousness under 35 U.S.C. § 103; and (3) non-infringement.

On April 13, 2010, the court issued a *Markman* order construing various disputed terms of the patents in suit. Doc. #163. Thereafter, APC filed the present motion for summary judgment. Doc. #287. On February 23, 2012, the court heard argument on the motion.

**B. The Patents Generally[6]**

STI's patents in suit ('543, '771, and '461 patents) describe and relate to intelligent power distribution devices, also referred to as "intelligent plugstrips" or "PDUs." Like an ordinary electrical plugstrip used in a home or office, intelligent plugstrips are primarily intended to distribute power from a wall outlet through an input power cord to a number of power outlets. But unlike ordinary plugstrips, intelligent plugstrips are intended for large scale applications such as commercial data centers and include several enhanced features. These enhanced features enable a user to locally or remotely control and monitor the power supply to connected appliances such as computers, servers, routers, and other electronic equipment through various internal relay controls.

---

[3] A copy of the '543 patent is attached as Exhibit 1 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 1.

[4] A copy of the '461 patent is attached as Exhibit 2 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 2.

[5] The '771 patent is a continuation of the '543 patent. A copy of the '771 patent is attached as Exhibit 47 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 47.

[6] For a more thorough discussion of the features of the individual patents, see the court's claim construction order (Doc. #163).

2

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

**III.  Discussion**

In its motion, APC seeks an order from the court (1) that asserted claims 1, 2, 3, and 6 of the '543 patent are invalid as anticipated under 35 U.S.C. § 102; (2) that asserted claims 15, 16, and 17 of both the '543 patent and the '771 patent are invalid as obvious under 35 U.S.C. § 103; and (3) that accused APC product designs, the AP7900 and AP8900, do not infringe asserted claims 1, 3, and 8 of the '461 patent. Doc. #287. The court shall address each argument below.

**A. Anticipation**

APC argues that claims 1, 2, 3, and 6 of the '543 patent are invalid as anticipated based on two pieces of prior art, the MasterSwitch VM ("MSVM") manufactured by APC and the RPC-21 manufactured by non-party BayTech. Doc. #287.

In opposition, STI argues that the '543 patent is not anticipated because neither identified prior art design (1) contains a "current-related information display" in "current-related information-determining communication," or (2) is a "plugstrip" as that term is used and understood in the patent. Doc. #301.

**1. Anticipation Standard**

An issued patent is presumed valid by statute. 35 U.S.C. § 282. However, a patent may be held invalid as a matter of law if it is anticipated. 35 U.S.C. § 102. A patent is anticipated if a single reference, either printed publication or prior use, published more than one year before the date of the patent application, discloses, expressly or inherently, every limitation of the claim such that a person of ordinary skill in the art could practice the invention without experimentation. 35 U.S.C. § 102(b); *see also Advanced Display Systems, Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).

The anticipating reference must describe the patented features "with sufficient clarity and detail" such that a person of ordinary skill in the field would recognize the existence of the patent features in the reference. *Crown Operations Int'l v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir.

4

1   2002). Moreover, "all of the elements and limitations of the claim must be shown in a single prior

2   reference, arranged as in the claim." *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376,

3   1383 (Fed. Cir. 2001).

4       **2. Person of Ordinary Skill in the Art**

5       A person of ordinary skill in the art is a person presumed to think "along the line of

6   conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and

7   often expensive, systematic research or by extraordinary insights." *Standard Oil Co. v. Am.*

8   *Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). For purposes of this motion, the parties agree

9   that a person of ordinary skill in the art is one who would have an electrical or computer

10  engineering degree (or the equivalent industry experience) and at least one to three years of

11  experience designing power distribution devices.

12      **3. Identified Prior Art**

13      APC identifies two pieces of prior art anticipating the '543 patent: the RPC-21[7] and the

14  MSVM.[8] *See* Doc. #287. Both of these products were advertised and sold in 1999,[9] and as such,

15  these designs pre-date the '543 patent application of December 8, 2000, by more than one year.

16      STI concedes that the RPC-21 and MSVM are prior art references for the purpose of the

17  ───────────────────────

18  [7] In 1999, non-party BayTech developed several different PDUs culminating in the RPC-21, a vertically mounted device which included certain common features of intelligent PDUs including (1) an input power cord; (2) a number of power outlets; (3) associated relays; (4) an LED display; and (5) the ability to remotely report current-related information to a technician over a network using a NIC component housed in a separate enclosure from the vertical outlet enclosure. *See* Doc. #287, Exhibit A, Claim Chart at 1-6; Doc. #288 Exhibit 16, North Depo.

21  [8] In the fall of 1999, APC developed an intelligent PDU similar to BayTech's RPC-21, the MSVM. Like the RPC-21, the MSVM was a vertical device with (1) an input cord; (2) a number of outlets; (3) a number of relays; (4) an LED display; and (5) a NIC component housed in a separate enclosure associated with the outlet component that allowed for reporting of current information over a network. *See* Doc. #287, Exhibit A, Claim Chart at 1-6; Doc. #288, Exhibit 4. Similar to the LED display of the RPC-21, the LED of the MSVM displayed current-related information, but displayed three different indicators: the LED lit up green when current was at a normal level, flashed green when current almost reached a potentially unsafe level, and lit up red when current exceeded that safe threshold level. *Id.*

24  [9] The RPC-21 was advertised as early as October 1999. Doc. #288, Exhibit 13, BayTech October 1999 Press Release; Exhibit 14, BayTech November 1999 Press Release. The MSVM was first exhibited at the Internet Service Provider Tradeshow in October 1999. *See* Doc. #288, Exhibit 8, McNally Depo., p.77-79.

court's anticipation analysis. Further, the parties do not distinguish between the MSVM and the

RPC-21 in addressing APC's motion. Therefore, for the sake of simplicity, the court will analyze

APC's anticipation arguments using the MSVM design.

### 4. Claim Language

Independent claim 1 of the '543 patent discloses:

An electrical power distribution plugstrip connectable to one or more electrical loads in a vertical electrical equipment rack, the electrical power distribution plugstrip comprising in combination:
    A. a vertical strip enclosure having a thickness and a length longer than a width of the enclosure;
    B. a power input penetrating said vertical strip enclosure;
    C. a plurality of power outputs disposed along a face of said length of the strip enclosure, each among the plurality of power outputs being connectable to a corresponding one of said one or more electrical loads;
    D. a plurality of power control relays disposed in said vertical strip enclosure, each among said plurality of power control relays being connected to said power input and in independent power controlling communication with one or more corresponding power outputs among said plurality of power outputs;
    E. a current-related information display disposed on said vertical strip enclosure in current-related information-determining communication with at least one among said power input and said plurality of power outputs; and
    F. a current-related information reporting system associated with said vertical strip enclosure and being (i) in current-related information-determining communication with at least one among said power input and said plurality of power outputs, and (ii) connectable in current-related information transfer communication with a separate communications network distal from the electrical power distribution plugstrip.

Doc. #288, Exhibit 1, '543 patent, Col. 10:57-11:19. Claim 2 is a dependent claim of claim 1 and

discloses:

The electrical power plugstrip of claim 1 further comprising at least one intelligent power section disposed in the vertical strip enclosure and in which is disposed at least one of the plurality of power control relays.

Doc. #288, Exhibit 1, '543 patent, Col. 11:20-24. Claim 3 is a dependent claim of both claims 1

and 2 and discloses:

The electrical power plugstrip of claim 2 further comprising an external power manager application external to the vertical strip enclosure in network communication with the intelligent power section disposed in the vertical strip enclosure, whereby a user

6

of the of the external power manager may control power provided to selectable ones of said plurality of power outputs.

Doc. #288, Exhibit 1, '543 patent, Col. 11:25-31. Finally, claim 6 is a dependent claim of claim 1 and discloses:

The electrical power plugstrip of claim 1 wherein the current-related information display is in current determining communication with all among the plurality of power outputs through at least one current sensing device.

Doc. #288, Exhibit 1, '543 patent, Col. 11:45-48.

### 5. Independent Claim 1

The plain language of claim 1 requires a power distribution plugstrip with the following limitations: (a) a vertical strip enclosure; (b) a power input; (c) a number of outlets; (d) remotely controllable relays associated with the outlets; (e) a current-related information display; and (f) a current reporting system. *See* Doc. #288, Exhibit 1, '543 patent, Col. 10:57-11:19.

In its motion for summary judgment, APC argues that the MSVM includes all these limitations. *See* Doc. #287. STI concedes that the MSVM meets limitations (a) through (d) of claim 1 but argues that the MSVM does not contain (1) a "current-related information display . . . in current-related information-determining communication" as required by limitation (e); and (2) a network device contained within the vertical strip enclosure as required by limitation (f). *See* Doc. #301. The court shall address each argument below.

### a. Current-related Information Display

In substance, limitation (e) requires that the device contain a display that conveys current-related information. *See* Doc. #288, Exhibit 1, '543 patent, claim 1(e). During the claim construction process, the court did not construe the phrase "current-related information-determining communication" because the parties agreed that "current-related information-determining communication" meant "communication in which current is measured." *See* Doc. #94, STI's Opening Claim Construction Brief, p.45-46; Doc. #122, APC's Response, p.39.

7

STI now argues that because "current-related information-determining communication" means "communication in which current is measured," limitation (f) requires that the same measured current information be communicated to the display. STI's interpretation requires a numerical value that is then transmitted and displayed, which, it argues, can only be accomplished through a digital display. Thus, at its core, STI's interpretation of limitation (e) requires a digital display. As the MSVM used an LED display which did not, and could not, display a numerical value, STI argues that it cannot anticipate the '543 patent.

The court has reviewed the documents and pleadings on file in this matter and finds that, contrary to STI's arguments, (1) limitation (e) does not require a digital display, and (2) the MSVM contains a "current-related information display . . . in current-related information-determining communication." First, STI's interpretation of limitation (e) is in direct contradiction to the court's claim construction order. In that order, the court found that STI's interpretation of "current-related information display" to mean a digital display that conveyed a numerical current value was contrary to the plain claim language and specification of the '543 patent. *See* Doc. #163, p. 21-22 ("STI's interpretation is contrary to the terms plain meaning and usage" and "would improperly limit the claim language based on the specification.").

Second, STI's attempt to salvage its argument by relying on the word "determining" in the claim phrase is equally unavailing. Both claims 1 and 15 of the '543 patent require a display in "current-related information-determining communication," but while claim 1 discloses a display, claim 15 specifically discloses a digital display confirming that the "determining" language is not determinative for claim construction. STI's attempt to limit claim 1 to require a digital display would render the specific "digital display" language in claim 15 meaningless. *See e.g., AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1247 (Fed. Cir. 2007) ("[C]laim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous.").

8

1        Finally, the court finds that the MSVM's LED display does, in fact, display determined

2  current information. The crux of STI's argument is that the only kind of current information that

3  can be determined is a numerical value. However, information other than a numerical value can be

4  "determined." For example, one can determine whether something is hot or cold, without

5  measuring a precise value of temperature. Similarly, a PDU device can determine that current is

6  high or low, or above or below a certain threshold, and this determined information can then be

7  communicated to an LED display.

8        Here, it is undisputed that the MSVM's LED determines and communicates a condition:

9  when the PDU is operating in a normal current condition under a pre-programmed threshold value

10  the LED displays a solid green indicator; when the PDU's current draw is approaching an overload

11  condition the LED displays a flashing green indicator; and when the current level has passed the

12  overload condition the LED displays a solid red indicator. *See* Doc. #310, Exhibit 6, Bors Depo.,

13  p.47:13-18. Hence, the MSVM measures the level of input current, determines whether the

14  measured input current is above or below a threshold level, and communicates this information to

15  the LED. Based on this function, the court finds that the MSVM displays determined current-

16  related information, and therefore, meets limitation (e) of the '543 patent.

17        ~~b. "Plugstrip"~~

18  ~~STI also argues that the MSVM does not anticipate claim 1 of the '543 patent because it is~~

19  ~~not a "plugstrip" as that term is used and understood in the '543 patent. STI contends that claim 1~~

20  ~~of the '543 patent discloses a single piece vertical plugstrip that houses all identified parts~~

21  ~~including the "current-related information reporting system" disclosed in limitation (f). Because it~~

22  ~~is undisputed that the MSVM is a two-piece device that has a separate network component for~~

23  ~~remote communication, STI argues it is not a "plugstrip." The court agrees.~~

24  ~~Claim 1 discloses "[a]n electrical power distribution plugstrip . . . comprising in~~

25  ~~combination . . . (F) a current-related information reporting system associated with said vertical~~

26

strip enclosure . . . ." Doc. #288, Exhibit 1, '543 patent, claim 1. The claim term "comprises" is
presumed to mean "includes as a part of." *See Crystal Semiconductor Corp. v. TriTech Microelecs.
Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("The transition 'comprising' creates a
presumption that the recited elements are a part of the [claimed] device. . . ."). Thus, the use of the
word "comprising" in claim 1 requires that all the limitations of the claim, including the current
reporting system, are contained within the plugstrip.

In opposition, APC argues that limitation (f) only requires that the current-related
information reporting system be "associated with" the vertical strip enclosure. APC contends that
the use of the phrase "associated with" means that the reporting system need not reside in the
plugstrip. However, the term "associated with" must be understood in the context of the entire
patent. The '543 patent as a whole makes it clear that the "plugstrip" is a one-piece, fully-
integrated device. First, the patent is entitled "Vertical-Mount Electrical Power Distribution
Plugstrip." Second, the summary of the invention refers repeatedly to the invention as a "power
distribution plugstrip." Third, the specification describes the device as a fully integrated plugstrip.
*See* Doc. #288, Exhibit 1, '543 patent, Col. 10:17-18 ("All of PDU is preferably fully integrated
within power distribution plugstrip . . . ."). Finally, the design of the plugstrip shown in Figure 1
displays a one-piece plugstrip that houses all the design features, including the reporting system.
*See* Doc. #288, Exhibit 1, '543 patent, Figure 1. Therefore, the court finds that claim 1 discloses a
fully integrated plugstrip that contains the current-related information reporting system.

Because the reporting system of the MSVM is an external system connected to the plugstrip
by a cable, it is not contained within the plugstrip. As such, the MSVM does not meet
limitation (f). Therefore, the MSVM does not contain every limitation of claim 1 and cannot
anticipate claim 1 as a matter of law. *See Karsten Mfg. Corp.*, 242 F.3d at 1383 ("[A]ll of the
elements and limitations of the claim must be shown in a single prior reference, arranged as in the
claim."). Accordingly, the court shall deny APC's motion for summary judgment on the issue of

10

1 | ~~anticipation.~~

2 | ~~5. Remaining Claims~~

3 | ~~Claims 2, 3, and 6 of the '543 patent are dependent claims of claim 1. Because the court~~

4 | ~~finds that claim 1 is not anticipated by the MSVM as addressed above, these dependent claims are~~

5 | ~~also not anticipated.~~

6 | **B. Obviousness**

7 | In its motion for summary judgment, APC argues that asserted claims 15, 16, and 17 of

8 | both the '543 patent and '771 patent are invalid as obvious under 35 U.S.C. § 103. Specifically,

9 | APC argues that a person of ordinary skill in the art would have combined APC's prior art PDU,

10 | the MSVM, with APC's identified prior art digital displays, United States patents no. 5,650,771[10]

11 | ("the Lee patent") and 6,476,729[11] ("the Liu patent"), to arrive at STI's patented PDU designs in

12 | order to alleviate the known problem of alerting an end-user to a current overload condition.[12] *See*

13 | Doc. #287.

14 | In opposition, STI argues that summary judgment is not appropriate because: (1) combining

15 | the MSVM with the digital displays disclosed in the Lee and Liu patents does not encompass the

16 | design disclosed in independent claim 15; (2) there is a disputed issue of material fact as to

17 | whether one skilled in the art would have had a reason to combine the prior art references; and

18 | (3) there is sufficient evidence of secondary considerations to support a finding of non-obviousness

19 | on summary judgment. *See* Doc. #301.

20 | ~~The court has reviewed the documents and pleadings on file in this matter, as well as the~~

---

[10] A copy of the Lee patent is attached as Exhibit 22 the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 22.

[11] A copy of the Liu patent is attached as Exhibit 23 to the declaration of Kristopher R. Kiel in support of APC's motion for summary judgment. Doc. #288, Exhibit 23.

[12] A current overload condition occurs when the level of current within the PDU begins to exceed a potentially safe level which, if not corrected, would lead to a current overload and cause the PDU, and attached devices to shut down.

11

1    ~~arguments and submissions by counsel at the February 23, 2012 hearing, and finds that there are~~

2    ~~disputed issues of fact as discussed below precluding summary judgment that claims 15, 16, and 17~~

3    ~~of the '543 and '771 patents are invalid as obvious under 35 U.S.C. §103. Accordingly, the court~~

4    ~~shall deny APC's motion for summary judgment on this issue.~~

5    ### 1. Obviousness Standard

6    Under the Patent Act, a patent may be deemed invalid as a matter of law "if the differences

7    between the subject matter sought to be patented and the prior art are such that the subject matter

8    as a whole would have been obvious at the time the invention was made to a person having

9    ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

10   A patented invention is obvious if a person of ordinary skill in the art would have had a

11   reason to combine the particular elements or technologies in the way the claimed new invention

12   does. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). The mere fact that prior references

13   could be combined to reach the patented design does not render the resultant combination obvious

14   absent a reason to combine the references in such a manner. *In re Mills*, 916 F.2d 680, 682 (Fed.

15   Cir. 1990). This "apparent reason" can be shown by identifying some teaching, suggestion or

16   motivation in the prior art to combine or modify the prior art in the manner identified in the claims.

17   *KRS*, 550 U.S. at 418-19. However, an invention is not obvious "where vague prior art does not

18   guide an inventor toward a particular solution." *Bayer Schering Pharma AG v. Barr Labs., Inc.*,

19   575 F.3d 1341, 1347 (Fed. Cir. 2009). For purposes of summary judgment, the evidence must

20   support particular findings "as to the reason the skilled artisan, with no knowledge of the claimed

21   invention, would have selected these components for combination in the manner claimed." *In re

22   Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000).

23   Although the ultimate determination of obviousness under § 103 is a question of law, it is

24   based on several underlying factual findings, including (1) the scope and content of the prior art;

25   (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention

26

12

1  and the prior art; and (4) evidence of secondary factors, such as commercial success, long-felt

2  need, and the failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). A defendant

3  proffering the affirmative defense of obviousness bears the burden to prove the patent is obvious

4  by clear and convincing evidence. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir.

5  2001); *see also, Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999).

6  **2. Prior Art**

7  For purposes of the present motion, the parties agree that the MSVM, Lee patent, and Liu

8  patent are prior art references to STI's '543 and '771 patents. The parties further agree that both the

9  Lee and Liu patents disclose a digital display to measure and display current on a power regulating

10  device.[13]

11  **3. Person of Ordinary Skill in the Art**

12  As stated above, the parties agree that a person of ordinary skill in the art is one who would

13  have an electrical or computer engineering degree (or the equivalent industry experience) and at

14  least one to three years of experience designing power distribution devices.

15  **4. Claim Language**

16  Independent claim 15 - and thereby dependent claims 16 and 17 - contains the same

17  limitations identified in claim 1 of the '543 patent except claim 15 also requires a *digital* current

18  information display. Specifically, claim 15 discloses:

19  An electrical power distribution plugstrip connectable to one or more electrical
   loads in a vertical electrical equipment rack, the electrical power distribution
20  plugstrip comprising in combination:
   A. a vertical strip enclosure having a thickness, and a length longer that a width
21     of the enclosure;
   B. a power input penetrating said vertical strip enclosure;
22  C. a plurality of power outputs disposed along an area on a face of said length

23

24  [13] The Lee patent, issued in 1997, discloses a design for an electrical socket containing digital displays to monitor various operating conditions including ambient temperature, voltage, and current. *See* Doc. #288, Exhibit 22, Abstract; Figure 1.

25  The Liu patent, issued in 2002, discloses a digital display power monitoring module that can be mounted into different types of power regulating devices, and measures various electrical parameters including current. *See* Doc. #288,

26  Exhibit 23, Col. 1:44-46; Col. 4:47-5:2; Abstract Figure 1 and Figure 3.

13

of the strip enclosure, each among the plurality of power outputs being connectable to a corresponding one of said one or more electrical loads;

D. a plurality of power control relays disposed in said vertical strip enclosure, each among said plurality of power control relays being connected to said power input and to one or more corresponding power outputs among said plurality of power outputs;

E. a digital current information display disposed on another area of said vertical strip enclosure and adjacent to said plurality of outputs in current-determining communication with at least one among said power input and said power outputs; and

F. a plugstrip current reporting system (i) associated with the vertical strip enclosure (ii) in power information determining communication with at least one among said power input and said plurality of power outputs, and (iii) communicatingly connectable with a distal current reporting system through a communications network external to the electrical power distribution plugstrip.

Doc. #288, Exhibit 1, '543 patent, Col. 12:21-50. Claim 16 is a dependent claim of claim 15 and

discloses:

The electrical plugstrip of claim 15 further comprising at least one intelligent power section disposed in the vertical strip enclosure and in which is disposed at least one of the plurality of power control relays.

Doc. #288, Exhibit 1, '543 patent, Col. 12:51-54. Claim 17 is also a dependent claim of both

claims 15 and 16 and discloses:

The electrical power plugstrip of claim 16 further comprising, an external power manager application external to the vertical strip enclosure in network communication with the intelligent power section disposed in the vertical strip enclosure, whereby a user of the external power manager may control power provided to selectable ones of said plurality of power outputs.

Doc. #288, Exhibit 1, '543 patent, Col. 12:55-62.

Claims 15-17 of the '771 patent are virtually identical to those of the '543 patent, except

that the '771 patent claims are broader in nature in that they are not limited to a "vertical" device.

*See* Doc. #288, Exhibit 47, '771 patent, Col. 12:19-57. Because the claims of the '771 patent are

broader than those of the '543 patent, a finding that the '543 patent claims are not obvious

necessarily means that those of the '771 patent are likewise not obvious. ~~Thus, for purposes of this~~

~~motion, the court analyzes obviousness with respect to the claims of the '543 patent only.~~

14

### 5. Combined Prior Art

In order for a patented design to be obvious as a matter of law, the combination of all prior art references must include all the limitations of the patented design. *See KRS*, 550 U.S. at 418-419. As addressed in the previous section on anticipation, the court has found that the MSVM does not contain all the limitations of claim 1 of the '543 patent because the MSVM does not contain a current-related information reporting system contained within the vertical plugstrip enclosure. That finding carries over to the court's analysis of obviousness. Thus, for claim 15 of the '543 patent to be obvious, that additional limitation, along with the disclosure of a digital display, must be found in the Lee and Liu patents. Reviewing the Lee and Liu patents, the court finds that neither reference meets the "plugstrip" limitation of claim 1, and thus does not meet the same limitation of claim 15. Because the Lee and Liu patents do not disclose this limitation, combining these references with the MSVM does not reach the patented design of claim 15 of the '543 patent. Therefore, the patented design cannot be held invalid as obvious as a matter of law. Accordingly, the court shall deny APC's motion as to this issue. Nevertheless, the Court will consider the obviousness question in light of the remaining *Graham* factors.

### 6. Reason to Combine

APC argues that a person of ordinary skill in the art would have combined the identified prior art references in order to solve the known problem of how to alert a user about a possible current overload condition. *See* Doc. #287. APC contends that during the relevant time period, those skilled in the art were aware of the problem of excessive current levels in a PDU and knew that adding a display showing current output could alert the end user that he was approaching a current overload condition.

It is undisputed that both an LED and a digital display were known design options to those

15

1  in the art as a way to alert an end user of a possible current overload condition.[14] However, the

2  relevant question before the court is not whether a digital display was a known option to alert an

3  end-user to a current overload condition as APC contends, but whether one skilled in the art would

4  have had a reason to use a digital display as a design alternative to an LED. *See In re Kotzab*, 217

5  F.3d at 1371 (holding that for a patent to be obvious, a person of ordinary skill must have had a

6  reason to use a particular component over another). As the problem of alerting an end-user to a

7  current overload condition was already addressed in the market by the use of an LED, for the

8  digital display to be obvious, a person of ordinary skill must have had a reason, articulated by clear

9  and convincing evidence, to use the digital display in lieu of an LED.

10       Here, viewing the evidence in the light most favorable to STI, the court finds that there was

11  no reason a person of ordinary skill would have combined a digital display into a vertical plugstrip

12  solely to alert an end-user of a current overload condition. The evidence before the court

13  establishes that an LED worked better than a digital display for alerting an end-user to a current

14  overload condition. *See* Doc. #310, Exhibit 14, Rohr Depo., p.296:8-297:7 (testifying that a digital

15  display was too "complex" and that an LED was the "best solution" to providing an end-user with

16  a visual display). In particular, Alex North, the lead engineer at BayTech testified that he believed

17  a display was "*worthless*" because an LED indicator provided technicians with all of the

18  information required. Doc. #310, Exhibit 12, North Depo., p.72:10-73:13; p.146:17-147:7.

19  Further, the evidence establishes that a digital display was more costly than an LED display to add

20  to a vertical plugstrip and lead to additional unnecessary "complications" in product design.

21  Doc. #310, Exhibit 14, Rohr Depo., p.296:8-297:7.

22       Finally, the evidence establishes that there were no design incentives to incorporate a

23

---

24  [14] By its nature, the LED of the MSVM (which lights up when a potentially unsafe current level has been reached) was directed to address this problem. Further, the Lee patent teaches that the digital display may be used to alert a user to a potential overload condition. Doc. #288, Exhibit 22, Col.1:42-47 ("The object of the present invention is to provide an electrical socket with a monitoring unit that is capable of monitoring operating conditions of the electrical socket and that can be used to alert the user in the event that a preset overload condition has been detected to help avert actual occurrent of an overload.").

16

digital display into a PDU. APC's expert Douglas Bors, in his export report, stated that there was no need for a digital display because users had acceptable alternative means, including the use of manufacturers' "name plate" data, to determine appropriate equipment use. Doc. #314, Exhibit 1, Bors Expert Report, § 247. Thus, designers during that time thought the inclusion of a digital display was unnecessary. Based on the foregoing, the court concludes that there is no clear and convincing evidence establishing any reason for a person of ordinary skill to include a digital display in a PDU.

### 7. Secondary Considerations of Non-Obviousness

Before a court can make a finding of obviousness, and thereby hold a patent invalid, a court must determine whether there are any "secondary considerations" supporting a finding of nonobviousness. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 405 (2007). This is because "[s]econdary considerations 'may often establish that an invention appearing to have been obvious in light of the prior art was not.'" *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310 (Fed. Cir. 2010) (quoting *Stratoflex, Inc. v. Areoquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)). Further, "[s]econdary considerations 'can be the most probative evidence of non-obviousness in the record, and enables the . . . court to avert the trap of hindsight.'" *Id.* (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed Cir. 1986)); *see also, Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (citing *Stratoflex, Inc.*, 713 F.2d at 1538 ("[O]bjective indicia may often be the most probative and cogent evidence [of non-obviousness] in the record.").

Secondary considerations relevant to an obviousness determination include: commercial success; skepticism in the field; copying by others; meeting a long felt, but unsolved need; and failure by others. *See e.g., KRS*, 550 U.S. at 405 (commercial success and long felt need); *Metabolite Labs. Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004) (initial skepticism); *Akami Techs., Inc. v. Cable & Wireless Servs., Inc.*, 344 F.3d 1186, 1196 (Fed. Cir.

17

2003) (copying); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1304-05 (Fed. Cir. 2010) (affirming non-obviousness based on commercial success, copying by others).

In further support of its opposition, STI argues that substantial evidence of secondary considerations establish that adding a digital display to a vertical plugstrip was not obvious. *See* Doc. #301. In particular, STI focuses on (1) the commercial success of its digital display PDUs; (2) subsequent copying by others, including APC; and (3) a long felt, but unsolved need of knowing the exact measured current value. As addressed below, the court finds that STI's evidence of secondary considerations supports the court's finding that claims 15-17 of the '543 and '771 patents are not obvious.

### a. Commercial Success

Initially, STI argues that the commercial success of its digital display PDUs establishes the products' novelty and non-obviousness.

Taken in the light most favorable to STI, the evidence indicates that STI's digital display PDUs have been commercially successful. First, the combined sales revenue for STI's PDUs containing a digital display have grown significantly over the last several years since their introduction in 2003. Doc. #13, Exhibit 41, Ewing Decl., ¶14, 17-18. Second, STI's products have carved out a large market share of the total intelligent PDU market. *Id.* at ¶21-22 (quoting Frost & Sullivan Award for Product Line Strategy through Competitive Growth Strategy Report).

Further, the evidence supports STI's contention that its commercial success is related directly to the use of a digital display in its PDUs. *Id.* at ¶ 21 (quoting Frost & Sullivan Award for Product Line Strategy through Competitive Growth Strategy Report) ("Server Technology, Inc. was the first company to bring input current monitoring (ICM) to the market with digital display indicators built into the Sentry enclosures to report the true RMS input.").

///

18

**b. Copying By Others**

STI also contends that its design of a digital display has now become the industry standard in vertical PDUs, further establishing the patented design's novelty and non-obviousness.

Viewing the evidence in the light most favorable to STI, the court finds that STI's digital display has now become the industry standard. *See* Doc. #311, Exhibit 1, Mares Decl., ¶23 ("[V]ertical PDUs having a local display remote reporting, and switchable output design characteristics have become a de facto standard in the industry."). Testimony of representatives from both APC and BayTech confirms this fact. APC's designer, Joe Kramer, testified that he was "not aware of a single competing product" available today without the local current display. Doc. #310, Exhibit 9, Kramer Depo., p.171:5-172:17. Further, BayTech's lead engineer Alex North testified that having a digital display is standard, and that BayTech "would be at a competitive disadvantage" if it did not have a digital current display. Doc. #310, Exhibit 12, North Depo., p.239:22-240:4; p.303:8-17.

**c. Long Felt, but Unsolved Need**

Finally, STI argues that its digital display solved the problem of allowing an end-user to maximize the capacity of each individual PDU which was a desired outcome. It is undisputed that prior art intelligent PDUs did not provide an end-user with a measured value of how much current was being drawn by the equipment connected to the PDU. It is further undisputed that end-users wishing to maximize PDU efficiency by connecting the maximum amount of equipment into each PDU would have to add pieces individually to see when a current overload condition was being approached. STI argues that its digital display allowed an end-user to locally determine how much current was being used and therefore maximize the total draw of the PDU without overloading the plugstrip and causing the connected equipment to fail.

STI argues that at the time it was necessary for end-users to know, particularly in large data centers, how much equipment could be connected to an individual PDU to maximize efficiency

19

1  and save space. ~~Data center technicians using conventional methods without readily visible digital~~
2  ~~displays would risk making significant and costly errors in determining power consumption and in~~
3  ~~building data centers. LED displays did not provide this information and discouraged users from~~
4  ~~adding additional equipment to the racks, whereas digital displays showed exactly how much~~
5  ~~current was being used. The digital display end user knew how much more current he could draw,~~
6  ~~and how many more pieces of equipment could be added before reaching an overload condition.~~
7  ~~The ability to monitor current levels locally allowed users to observe the amount of remaining~~
8  ~~capacity, and determine actual power consumption of the various network devices and storage~~
9  ~~equipment.~~

10  ~~In short, reviewing the evidence in the light most favorable to STI, it appears that only STI~~
11  ~~solved the problem arising from the lack of a digital display: that technicians needed detailed~~
12  ~~information concerning the amount of current drawn by a PDU displayed directly on the PDU. It~~
13  ~~appears that STI alone discovered that a current-related information display could be used to~~
14  ~~maximize rack capacity.~~

15  **C. Patent Non-Infringement ['461 Patent]**

16  In its motion for summary judgment, APC argues that its accused product designs, the

17  AP7900 and AP8900, do not infringe claims 1, 3, and 8 of the '461 patent because these designs

18  do not: (1) include a current sensor in communication with a communication bus; (2) display

19  "power-related information;" (3) monitor or display parameters at the "output" level; or (4) include

20  more than one intelligent power section.

21  In opposition, STI argues that there are disputed issues of material fact concerning the

22  accused designs that preclude summary judgment on the issue of non-infringement.

23  **1. Patent Infringement Standard**

24  A district court analyzes a patent infringement claim in two steps. First, the court construes

25  the claims as a matter of law, then the court applies the properly construed claims to the accused

26

20

1 invention. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir.1999); *EMI Group N.*

2 *America, Inc. v. Intel Corp.*, 157 F.3d 887, 891 (Fed. Cir. 1998). Infringement can occur either

3 literally or under the doctrine of equivalents. *Kahn v. Gen'l Motors Corp.*, 135 F.3d 1472, 147-78

4 (Fed. Cir. 1998). Literal infringement occurs when every limitation set forth in a patent claim is

5 found in an accused product. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir.

6 1991). The smallest deviation from the literal claim language precludes infringement. *Telemac*

7 *Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

8          Under the doctrine of equivalents, infringement "requires a showing that the difference

9 between the claimed invention and the accused product [is] insubstantial." *Sumbo v. Eastman*

10 *Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007) (*citing Graver Tank & Mfg. Co. v. Linde Air*

11 *Prods. Co.,* 339 U.S. 605, 608 (1950)). This is accomplished by demonstrating on a limitation by

12 limitation basis that the accused product performs substantially the same function in substantially

13 the same way and with substantially the same result as each limitation of the patented product. *Id.*

14          **2. APC's Allegedly Infringing Devices**

15          APC's AP7900 and AP8900 product designs are for intelligent PDUs. The AP7900

16 product design has been sold since 2003 and the AP8900 product design since 2010. Both designs

17 include a power input, a number of relay controlled outlets, a display, and the ability to remotely

18 monitor and control the devices over a network. But the AP7900 and AP8900 product designs

19 differ with respect to which electric parameters the devices measure and display. The AP7900

20 design measures and displays information solely about current. Doc. #293, Exhibit 45, Horenstein

21 Decl., Exhibit 2 at 16-17. The AP8900 design measures and displays both current and power. *Id.*

22          **3. Claim Language**

23          Independent claim 1 of the '461 patent discloses:

24          A remotely manageable power management output strip comprising in
combination:

25          A. a power strip housing;

         B. a plurality of power inputs disposed in the power strip housing;

26

C. a first plurality of power outputs disposed in the power strip housing, each among the first plurality of power outputs being connectable to one or more electrical loads external to the power strip housing and connected to a first power input among the plurality of power inputs;

D. a second plurality of power outputs disposed in the power strip housing, each among the second plurality of power outputs being connectable to one or more electrical loads external to the power strip housing and connected to a second power input among the plurality of power inputs;

E. a communications bus disposed in the power strip housing;

F. a plurality of power control sections disposed in the power strip housing, each said power control section being in communication with the communications bus and thereby in power controlling communication with one or more corresponding power outputs among the first or second plurality of power outputs;

G. a communications system disposed in the power strip housing, being in communication with said communications bus, and having a communications processor system in communication with (i) said communications bus; (ii) said plurality of power control sections through the communications bus; (iii) a communications port connectable to an external communications link external to the power strip housing;

H. a display disposed in the power strip housing in communication with the communications bus; and

I. a current determining section disposed in the power strip housing in communication with the communications bus, whereby the current determining section may communicate power-related information to said display.

Doc. #288, Exhibit 2, '461 patent, Col. 21:44-22:17. Claim 3 is a dependent claim of claim 1 and discloses:

The remotely manageable power management output strip of claim 1 wherein each among the plurality of power control sections includes a power-on status determination circuit, whereby the power-on status determination circuit may report power-on status of said corresponding power output through said communications bus.

Doc. #288, Exhibit 2, '461 patent, Col. 22:24-29. Finally, independent claim 8 discloses:

A remotely manageable power management output strip of the type useable to remotely control, or assess information relating to, power provided to external electrical loads from a manager location distal from the external electrical loads, the remotely manageable power management output strip comprising in combination:

A. a power strip housing;

B. a power input disposed in the power strip housing;

C. a plurality of power outputs disposed in the power strip housing, each said power output being connectable to an electrical load external to the power-strip housing;

D. at least one intelligent power section disposed in the power strip housing in

22

1   power controlling communication with at least one corresponding power
    output among said plurality of power outputs;

2   E.  a network communications module (i) having memory and a transfer-control-
        protocol/Internet Protocol network interface application system residing in
3       the memory and providing a web page interface, and (ii) being disposed in the
        power strip housing in independent communication with the intelligent power
4       sections and in communication with at least a first external network
        communications port; and

5   F.  a current display mounted in association with the power strip housing in
        current-determining communication with at least one among the plurality of
6       power outputs; whereby an external power manager and the network
        communications module may exchange, through the first external network
7       communications port and an external network link, information relating to the
        intelligent power sections in the power strip housing.

8

9   Doc. #288, Exhibit 2, '461 patent, Col. 22:53-23:16.

10          **4. Claim 1**

11          In its motion, APC argues that its AP7900 and AP8900 product designs do not literally

12   infringe claim 1 of the '461 patent because these designs do not have a "current determining

13   section" in communication with a "communications bus." *See* Doc. #287. APC also argues that the

14   AP7900 design does not literally infringe claim 1 because it does not display power-related

15   information. The court shall address both arguments below.

16          **a. Current-determining Section**

17          The plain language of limitation (i) of claim 1 requires a current determining section in

18   communication with a communications bus. Doc. #288, Exhibit 2, '461 patent, Col. 22:15-17.

19   APC argues that its accused designs do not have a current determining section that is in

20   communication with a communications bus because STI, in its final infringement contentions,

21   identified the current determining section as only the "load sensors" or "load sensing toroids"[15] of

22   the accused designs. Doc. #290, Exhibit 32 at C-5. It is undisputed that the current sensing toroids

23   are not "in communication" with the communications bus as no information passes directly from

24   the toroids to the communications bus. Therefore, APC argues there is no literal infringement of

25   _____

26          [15] The toroids are the component within the APC designs that senses current.

                                                    23

claim 1.

In opposition, STI argues that the accused designs include a "current determining section" in communication with a "communications bus" because the current determining section is more than just the current sensing toroids. STI argues that the current determining section also comprises the signal conditioner, the analog-to-digital converter, and the microprocessor; all of which are housed on the PCB board with the current sensing toroids. STI argues that there is evidence that the PCB board and its components are in communications with the communications bus, and therefore, APC's accused designs literally infringe claim 1.

In reviewing STI's arguments in opposition, the court finds that STI effectively seeks to amend its final infringement contentions to add these additional components. The Patent Rules allow a plaintiff to modify its infringement theory upon a showing of "good cause." N.D. Cal. Patent Local R. 3-7 (2001); *cf.* D. Nev. Patent Local R. 16.1-12 (2011).

Here, the court finds that there is no good cause to allow STI to amend its final infringement contentions concerning limitation (i) to include the additional components in the PCB board. First, STI has waited over four years to identify these components as part of the infringing design even though STI knew all of these components were on the PCB board at the time it filed its final infringement contentions. Second, expert discovery has already concluded in this action. Allowing amendment would require also allowing expanded expert discovery and increased litigation costs. Finally, the new components were only identified in response to APC's motion for summary judgment after STI conceded that the current sensing toroids alone were not in communication with a communications bus and thus, did not infringe claim 1. Therefore, the court finds there is no good cause to allow STI to amend its final infringement contentions concerning claim 1 of the '461 patent. As such, the court finds that, as addressed above, APC's

AP7900 and AP8900 product designs do not literally infringe claim 1 of the '461 patent.[16]

Accordingly, the court shall grant APC's motion for summary judgment on this issue.

### b. Power-related Information[17]

APC also argues that its AP7900 design does not literally infringe limitation (i) of claim 1 because it does not display "power-related information." The court agrees. It is undisputed that the AP7900 design displays only current-related information. In the court's claim construction order, the court found that current and power are distinct concepts and that current alone is insufficient to determine power. Specifically, the court construed the terms "power information" from the '543 patent and "power-related information" from the '461 patent to mean "information necessary to quantify or describe power, rather than current alone." Doc. #163, p. 25. A current only display, as in the AP7900 design, does not meet this limitation. Accordingly, based on the court's claim construction of these terms, the court holds that the AP7900 design does not infringe claim 1 of the '461 patent.

In opposition, STI argues that the court's construction of "power information" and "power-related information" should be reconsidered. STI contends that the court's construction rendered the term "related" in "power-related information" superfluous. In STI's opinion, once the court construed the term "power information" narrowly, it became necessary to differentiate between the meaning of "power information" and "power-related information." Construing the two phrases identically discounts the word "related." STI concludes that the construction of the term "power-related information" should be revised to mean: "information related to power, namely, at least one of power, voltage or current."

The court disagrees and finds that reconsideration of the court's claim construction order is

---

[16] Because claim 3 is dependent on claim 1, the court's finding that the AP7900 and AP8900 designs do not literally infringe claim 1 necessarily means that these designs also do not literally infringe claim 3 of the '461 patent.

[17] This section applies only to the AP7900 product as APC concedes that the AP8900 product displays power-related information.

25

not warranted. First, during claim construction proceedings, STI offered the same argument that "power information" and "power-related information" are broad enough to include the concept of current. However, the court rejected that argument. *See* Doc. #163, p. 25 ("Permitting current information to satisfy the power information limitation" in STI's claims "would eliminate the distinction suggested by the plain language of the claims.").

Second, in support of its request for reconsideration, STI now asserts that "power information" and "power-related information" must necessarily have a different scope because the word "related" only appears in one of the terms. This position is entirely inconsistent with STI's position during claim construction. There, STI proposed the same construction for both of these terms, and presented the same analysis treating the terms as identical in scope. *See* Doc. #163, p. 25, fn. 9. Further, STI's reliance on the word "related" as a basis to expand the scope of "power-related information" would again eliminate the distinction between power and current suggested by STI's patent claims. As noted above, some of STI's claims require "current" or "current-related" information, and other claims specifically require "power" or "power-related" information. This language clearly suggests a difference between current and power, whether the claim language at issue is "power" information or "power-related" information, and thus, the term "related" is not determinative of the claims.

In light of the above, the court declines to reconsider its earlier claim construction of the terms "power information" and "power-related information." Therefore, the court finds that the AP7900 design also does not infringe claim 1 of the '461 patent because it does not display "power-related information."

### 5. Claim 8

In its motion, APC argues that its designs do not literally infringe claim 8 of the '461 patent. Specifically, APC argues that its designs: (1) contain a display of input, rather than output, current; and (2) do not contain "intelligent power sections." The court shall address each argument

below.

**a. Display of Outputs**

Limitation (f) of claim 8 discloses in relevant part: "a current display mounted in association with the power strip housing in current-determining communication with at least one among the plurality of power outputs." Doc. #288, Exhibit 2, '461 patent, Col. 23:13-16. Based on the plain language limitation (f) requires that the display communicates with at least one power output. It is undisputed that APC's accused designs do not communicate with any power output, and instead only display total input current. Accordingly, the court finds that the accused products do not literally infringe claim 8 because they do not have a current display "in current-determining communication with at least one among the plurality of power outputs the output."

In opposition, STI argues that even though the accused designs do not literally infringe limitation (f), the accused designs infringe under the doctrine of equivalents. *See* Doc. #301. The equivalent at issue here is whether a display in current determining communication with the power input is equivalent to communication with at least one of the power outputs.

The function of limitation (f) is to display the amount of current flowing to the connected devices. There is evidence that the APC designs display total aggregate current being used by the PDU. *See* Doc. #310, Exhibit 3; Doc. #309, Exhibit 9. That is the same function served by limitation (f). There is also evidence before the court that APC's designs serve that function in substantially the same way as described in claim 8. *See* Doc. #320, Exhibit 15, Aucoin Decl., ¶ 45. Even though APC's designs measure aggregate input current, that measured value, minus some negligible draw from internal parts, is equal to the aggregate output current flowing to the connected devices. *Id*. at ¶¶ 41-43. Thus, the result of both designs is that a user has a measured value of all current flowing to the connected devices. *Id*. at ¶¶ 40-41.

Applying the doctrine of equivalents to this claim, and viewing the evidence in the light most favorable to STI, the court finds that there is a genuine issue of material fact concerning

27

whether the APC accused products infringe limitation (f). Accordingly, the court shall deny APC's motion for summary judgment as to this issue.

### b. Intelligent Power Sections

When the '461 patent issued, limitation (e) and (f) required a design that included "intelligent power sections." *See* Doc. #288, Exhibit 2, '461 patent, Claim 8(e) and (f). The court construed "intelligent power section" to require a microcontroller and associated outlet/relays combinations. *See* Doc. #163. It is undisputed that APC's designs only contain a single microcontroller and therefore, do not include "intelligent power *sections*" as required by limitations (e) and (f). Thus, the court finds that the AP7900 and AP8900 designs do not literally infringe claim 8 of the '461 patent.

In opposition, STI argues that a certificate of correction, issued by the patent office on April 10, 2007, revised limitations (e) and (f) to require only a single "intelligent power section." The Federal Circuit has held that the issuance of a certificate of correction applies only to causes of action that accrue after the certificate issues. *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1294 (Fed. Cir. 2000) ("for causes arising after the PTO issues a certificate of correction, the certificate of correction is to be treated as part of the original patent-i.e., as if the certificate had been issued along with the original patent."). But,"each act of infringement gives rise to a separate cause of action." *E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.*, 525 F.3d 1353, 1362 (Fed. Cir. 2008). Thus, STI seeks to revise its final infringement contentions regarding claim 8 to refer to the revised language in the certificate of correction issued on the '461 patent.

The court has reviewed the documents and pleadings on file in this matter and finds that there is not good cause to allow STI to amend its final infringement contentions to include the revised language of claim 8. The court notes that STI was obligated to amend its pleadings to assert the '461 patent as corrected or in some way alert APC and the Court that it was proceeding

28

1    under the patent as corrected as soon as the certificate of correction was issued. *See LG Elecs., Inc.*

2    *v. Quanta Comp., Inc.*, 566 F. Supp. 910, 912-13 (W.D. Wis. 2008) ("any certificate of correction

3    [patentee] received from the patent office would not be effective for the purpose of enforcement

4    unless it filed a new lawsuit or amended its complaint"). In *LG Electronics*, the court refused to

5    allow a patentee to raise a corrected version of the patent in light of the fact that the plaintiff

6    waited three months after it had received a Certificate of Correction and raised the corrected

7    version of the patent three days before the deadline for filing summary judgment motions.

8        Here, STI's actions are even more egregious in that it failed to raise its corrected claim at

9    any point during the four years of this litigation, and did so only in response to APC's motion for

10   summary judgment. Indeed, at no point in this litigation did STI seek to amend its complaint to

11   add the altered '461 patent to the list of STI patents asserted against APC even though STI filed an

12   amended complaint after having the certificate of correction issued. *See* Doc. #185. Rather, in

13   litigating this case between 2007 and 2011, STI consistently asserted only the original claim 8 and

14   completely ignored the revised claim 8. For example, STI relied on the original claim 8 in its

15   pleadings (Doc. ##21, 185), its claim construction documents (Doc. #94, Exhibit C, original

16   '461 patent), its preliminary and final infringement contentions (Doc. #284, App. 48 at "Exhibit

17   C," p. 5-7; Doc #290, Ex. 32 at "Exhibit C," p. 10-11), and even in the exhibits that STI presented

18   to the court in support of its own motion for summary judgment (Doc. #281, App. 16, original

19   '461 patent).

20       Thus, the court finds that STI relied on the original claim 8 throughout this litigation. There

21   is no good cause to allow STI to amend its contentions after more than four years of litigation. To

22   allow STI to raise the revised claim 8 in this litigation at this stage, and solely in response to a

23   motion for summary judgment, would be fundamentally unfair and prejudicial to APC. Thus, the

24   court holds that STI is precluded from relying on the corrected claim 8 language in this litigation

25   and the court shall deny STI's request to amend its final infringement contentions to add in the

26

revised claim 8 language.

Because it is undisputed that APC's accused designs do not have "intelligent power *sections*," APC is entitled to summary judgment that the AP7900 and AP8900 designs do not literally infringe limitations (e) and (f) of claim 8 of the '461 patent. Accordingly, the court shall grant APC's motion for summary judgment on this issue.

**III.  Conclusion**

In conclusion, the court finds: (1) ~~that asserted claims 1, 2, 3, and 6 of the '543 patent are not invalid as anticipated under 35 U.S.C. § 102; (2) that asserted claims 15, 16, and 17 of both the '543 patent and the '771 patent are not invalid as obvious under 35 U.S.C. § 103; (3)~~ that the AP7900 and AP8900 designs do not literally infringe claims 1 and 3 of the '461 patent; and [2] ~~(4)~~ that the AP7900 and AP8900 designs do not literally infringe claim 8 of the '461 patent.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (Doc. #287) is addressed in accordance with this AMENDED and RE-ISSUED ORDER.

IT IS SO ORDERED.

RE-ISSUED this *12* day of May, 2017.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

30

# EXHIBIT 2

1

2

3

4

5

6                     UNITED STATES DISTRICT COURT

7                          DISTRICT OF NEVADA

8                                  * * *

9  SERVER TECHNOLOGY, INC.,            )
                                       )
10           Plaintiff and Counterdefendant,  )        3:06-CV-00698-LRH-VPC
                                       )
11  v.                                 )
                                       )        <u>AMENDED ORDER</u>
12  AMERICAN POWER CONVERSION          )
    CORPORATION,                       )
13                                     )
             Defendant and Counterclaimant.  )
14  _____ )

15         Before the court are plaintiff Server Technology, Inc.'s ("STI") motion for a permanent

16  injunction (Doc. #618[1]), and motion for supplemental damages and prejudgment interest

17  (Doc. #619). Defendant American Power Conversion Corp. ("APC") filed oppositions to both

18  motions (Doc. ##630, 631) to which STI replied (Doc. ##636, 637).

19         Also before the court is defendant APC's motion for judgment as a matter of law, or in the

20  alternative, motion for a new trial. Doc. #626. STI filed an opposition (Doc. #635) to which APC

21  replied (Doc. #638).[2]

22  **I.      Facts and Procedural History**

23         This action has an extensive factual and procedural history. In brief, plaintiff STI

24  _____

25         [1] Refers to the court's docket number.

26         [2] [This is an amended and re-issued order of the court's now-vacated original order granting in-part and denying
    in-part the parties' post-trial motions (Doc. #651).]

manufactures intelligent power distribution units ("PDUs"). In 2006, STI brought the underlying patent infringement action against defendant APC alleging that APC's AP7900 and AP8900 series of products infringed two of STI's patents: United States Patents numbers 7,043,543 ("the '543 patent"), and 7,702,771 ("the '771 patent). Doc. #1.

Like STI, APC manufacturers intelligent PDUs. APC denied that its AP7900 and AP8900 products infringed STI's patents and raised two affirmative defenses. First, APC alleged that STI's '543 and '771 patents were invalid as obvious under 35 U.S.C. § 103. Second, APC alleged that STI engaged in inequitable conduct before the Patent Office during the prosecution of both patents.

Between May 12 and May 27, 2014, a jury trial was held on the issues of infringement and invalidity. On May 29, 2014, the jury returned a verdict finding that APC's AP7900 and AP8900 products infringed claim 15 of both the '543 and '771 patents. Doc. #590. The jury also made an advisory finding that STI's '543 and '771 patents were not invalid as obvious. *Id*. As part of this advisory finding, the jury made several factual findings concerning secondary considerations of non-obviousness. *Id*.[3]

From May 28 through May 30, 2014, following the jury trial, the court conducted a bench trial on APC's inequitable conduct claim. On August 8, 2014, after additional post-trial briefing the court entered final findings of fact and conclusions of law on APC's inequitable conduct claim. Doc. #613. In that order, the court found that neither STI CEO Carrol Ewing ("Mr. Ewing") nor STI patent prosecution Attorney Robert Ryan ("Attorney Ryan") engaged in inequitable conduct before the Patent Office during the prosecution of the '543 and '771 patents. *Id*. The same day, the court issued a separate order finding that the '543 and '771 patents were not invalid as obvious

---

[3] [The jury's verdict has subsequently been vacated pursuant to the court's February 23, 2017 vacate order. Doc. #691. An amended verdict reflecting the Federal Circuit's decision in *Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 Fed. Appx. 1030 (Fed. Cir. 2016) is forthcoming and those amendments, particularly as they relate to the finding of infringement for the AP7900 products and the advisory finding on the issue of obviousness, are reflected in the amended order.]

1    under 35 U.S.C. § 103. Doc. #615.[4]

2       After entry of final judgment, the parties filed the present post-trial motions.

3    **II.**     **Claimed Inventions**

4       **A. Claim 15 - '543 Patent** (Col. 12:21-50)

5       An electrical power distribution plugstrip connectable to one or more electrical loads in a

6 vertical electrical equipment rack, the electrical power distribution plugstrip comprising in

7 combination:

8       A. a vertical strip enclosure having a thickness, and a length longer that a width of the

9          enclosure;

10       B. a power input penetrating said vertical strip enclosure;

11       C. a plurality of power outputs disposed along an area on a face of said length of the strip

12          enclosure, each among the plurality of power outputs being connectable to a

13          corresponding one of said one or more electrical loads;

14       D. a plurality of power control relays disposed in said vertical strip enclosure, each among

15          said plurality of power control relays being connected to said power input and to one or

16          more corresponding power outputs among said plurality of power outputs;

17       E. a digital current information display disposed on another area of said vertical strip

18          enclosure and adjacent to said plurality of outputs in current-determining

19          communication with at least one among said power input and said power outputs; and

20       F. a plugstrip current reporting system (i) associated with the vertical strip enclosure (ii) in

21          power information determining communication with at least one among said power

22          input and said plurality of power outputs, and (iii) communicatingly connectable with a

23          distal current reporting system through a communications network external to the

24          electrical power distribution plugstrip.

25

26    [4] [The court's order on the issue of obviousness has likewise been vacated pursuant to the court's February 23, 2017 order. Doc. #691.]

**B. Claim 15 - '771 Patent** (Col. 12:19-46)

An electrical power distribution plugstrip connectable to one or more electrical loads in an electrical rack, the electrical power distribution device comprising in combination:

A. an enclosure having length that is longer than a width of the enclosure;

B. a power input penetrating the enclosure;

C. a plurality of power outputs disposed along an area on a face of said length of the enclosure, each among the plurality of power outputs being removably connectable to a corresponding one of said one or more electrical loads;

D. a plurality of power control relays disposed in the enclosure, each among said plurality of power control relays being connected to said power input and to one or more corresponding power outputs among said plurality of power outputs;

E. a digital current information display disposed on another area of the enclosure in current determining communication with at least one among said power input and said plurality of power outputs; and

F. a current information reporting system (i) associated with the enclosure (ii) in power information determining communication with at least one among said power input and said plurality of power outputs, and (iii) communicatingly connectable with a distal current reporting system through a communications network external to the electrical power distribution device.

**III. STI's Motion for a Permanent Injunction (Doc. #618)**

In its first post-trial motion, STI moves for entry of a permanent injunction prohibiting APC from selling the ~~AP7900 and~~ AP8900 products, as well as any other PDU that is "not colorably different" from the ~~AP7900 and~~ AP8900 products. *See* Doc. #618. In the alternative, if an injunction is not issued, STI seeks an order from the court ordering a compulsory license and establishing an ongoing royalty rate of 15% - or three times the 5% reasonable royalty rate established by the jury - for any future sales of APC's ~~AP7900 and~~ AP8900 products. *Id.*

A permanent injunction is an "extraordinary remedy that may only be awarded upon a clear showing that [the moving party] is entitled to such relief." *Id.* (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). A patent holder seeking a permanent injunction after a finding of infringement must satisfy a four-factor test: (1) irreparable harm; (2) inadequacy of monetary damages; (3) the balance of hardships is in the patent holder's favor; and (4) that the public interest would not be disserved by a permanent injunction. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). As addressed below, the court finds that STI is not entitled to the extraordinary remedy of a permanent injunction in this action.

### A. Irreparable Injury

As part of an irreparable injury analysis, courts regularly examine three main considerations: (1) direct competition between the parties; (2) the patentee's loss of market share due to the infringement; and (3) loss of goodwill by the patentee. *See, e.g., Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012) (stating that direct competition in the same market strongly supports the potential for irreparable harm absent an injunction); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (finding that harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee has suffered an irreparable injury); *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (holding that loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm).

The court has reviewed the documents and pleadings on file in this matter and finds that STI has established that continued infringement by APC will cause harm to STI's business. First, it is undisputed that STI and APC compete directly in the limited rack-mounted PDU market. In fact, at trial, both STI's and APC's witnesses acknowledged that both companies are direct competitors and have the largest market share of the rack-mounted PDU market. *See* Doc. #599, Pat Johnson Trial Testimony, p.1462:5-23, 1501:11-23; Doc. #602, Julie Davis Trial Testimony, p.2301:11-17. Second, as APC and STI directly competed for the same limited sales in the market, continued

1     infringement by APC will cause STI to lose customers and market share to APC as APC sells its

2     infringing PDUs at a lower price than STI's patented products.[5] Therefore, the court finds that STI

3     has established irreparable harm resulting from APC's continued infringement.

4        However, while there is no question that STI and APC compete to sell PDUs in the market,

5     STI has competed in this market despite APC's infringement throughout the eight-years of this

6     litigation. During that time STI has maintained a competitive edge in the market, holding the

7     second largest market share next to APC. Thus, the court finds that although STI has established

8     irreparable harm, this factor does not weigh heavily in the court's permanent injunction analysis.

9     **B. Inadequacy of Monetary Damages**

10       In order to establish that an injunction is warranted, a plaintiff must show that monetary

11     damages alone are inadequate to compensate plaintiff for any continued infringement by the

12     infringer. *See eBay*, 547 U.S. at 391. In its motion, STI argues that monetary damages alone are

13     inadequate to compensate it for the losses suffered by APC because certain damages like lost

14     market share and customer goodwill are not quantifiable. The court disagrees.

15       Although STI has suffered a loss of market share, brand recognition, and customer

16     goodwill as a result of APC's infringement, the court finds that monetary damages are sufficient

17     compensation for these losses. STI, as part of its overall business strategy, has continuously

18     licensed the patents-in-suit to competitors. For example, the evidence at trial established that STI

19     licensed its patents to three competitors: Chatsworth Products, Inc.; Leviton Manufacturing Co.;

20     and Western Telematic, Inc. Although these competitors have considerably less market presence

21     than APC, STI's willingness to licenses its products, particularly as part of litigation settlements,

22     shows that monetary damages are sufficient and adequate to compensate STI for infringement of

23     its patents.

24       Further, throughout this trial, STI continuously focused on APC's lack of a license and

25

26     [5] The evidence at trial established that APC's selling price for the infringing units was $633, which is substantially lower than STI's average selling price of $885.

repeatedly stated that APC could have received a license to keep manufacturing and selling the ~~AP7900 and~~ AP8900 products. *See, e.g.,* STI's Opening Statement, Trial Transcript, p. 79 ("[APC] could have chosen to license the technology and use it the honest way, but, instead, it chose to infringe."); p. 108 ("[APC] could have licensed the technology. [STI] has licensed to three other competitors to use this technology. APC could have signed a license. They chose not to. They chose to go ahead and infringe."); STI's Closing Statement, Trial Transcript, p. 2794-2795 ("When the '543 patent issues in 2006, competitors in this market had a choice. They could either take a license from STI, as many have, or they could stop selling their product. . . . [APC] could have taken a license. They didn't."). This repeated reference to APC licensing the patents-in-suit does not support a finding that monetary damages are inadequate to compensate STI for APC's infringement. Rather, this evidence shows that monetary damages were adequate compensation to STI. Finally, the court notes that STI never sought an injunction during the pendency of this litigation. STI never asked for a preliminary injunction, nor did it request an injunction as part of its requested remedies in its amended complaint. Based on these considerations, the court finds that monetary damages are adequate to compensate STI for APC's infringement which weighs heavily against granting an injunction.

**C. The Balance of Hardships**

The court finds that the balance of hardships in this action is a neutral factor. Absent an injunction, STI has established that it will suffer ongoing hardship by having to compete against its own patented invention in a limited market. However, evidence at trial has established that STI successfully competed in the marketplace against APC, despite APC's sales of the infringing products. Further, to the extent that there is any continued infringement, the availability of a higher reasonable royalty rate or other monetary damages weighs against a finding that STI would experience substantial hardship absent an injunction.

**D. The Public Interest**

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and

effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." i4i, 598 F.3d at 863.

Here, the court finds that the public interest would be harmed by an injunction. The entry of an injunction would require APC to remove all ~~AP7900 and~~ AP8900 products, as well as any products not colorably different from the infringing products, from the limited rack-mounted PDU market. As APC's products are a significantly cheaper alternative for customers building data centers, by roughly $200 per unit, entering an injunction against APC would ultimately hurt consumers and the public. Especially when there is an alternative to an injunction that would allow APC to maintain selling its products to the public. Therefore, the court finds that an injunction would not be in the public's interest. Accordingly, the court shall deny STI's motion for a permanent injunction.

### E. Compulsory License[6]

Because the court finds that an injunction is not warranted in this action, the court must now examine STI's alternative request for a compulsory license for the patents-in-suit at an ongoing [5%] ~~15%~~ royalty rate on all sales of APC's ~~AP7900 and~~ AP8900 products from the date of judgment. *See* Doc. #618.

The court has reviewed the documents and pleadings on file in this matter and finds that a compulsory license at a [5%] ~~15%~~ royalty rate is an appropriate remedy in this action. First, the court notes that absent a compulsory license, STI will continue to suffer harm from the sale of the ~~AP7900 and~~ AP8900 products. Second, a [5%] ~~15%~~ royalty rate, ~~or three times the jury's 5% reasonable royalty rate,~~ on post-judgment sales is reasonable in this action. Because there is an inherent and fundamental difference between pre-verdict infringement - where the question of

---

[6] [In the court's original order addressing STI's request for a compulsory license, the court granted STI's motion and set a 15% royalty rate as a compulsory license on the infringing products. *See* Doc. #651, p. 8. The parties have since agreed that the court "should vacate the order setting the amount of the royalty rate for the post-trial compulsory license at 15%" and instead set a 5% royalty consistent with the jury's verdict. Doc. #690, p. 2. Rather than vacate this section in its entirety, the court has amended this section to comport with the parties' agreement of a 5% royalty rate on infringing sales.]

8

1  patent validity and infringement are questionable - and post-verdict infringement - where those

2  questions have been answered affirmatively - the calculus for determining an appropriate or

3  reasonable royalty rate changes. *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361-62 (Fed. Cir.

4  2008). In order to avoid incentivizing defendants to fight each patent infringement action for as

5  long as possible to obtain the maximum benefit of infringement, an ongoing post-verdict royalty

6  may appropriately be higher than the jury's pre-verdict reasonable royalty. *Id.* Here, a [5%] ~~15%~~

7  royalty rate would still leave APC with a reasonable profit on sales as well as an incentive to sell

8  products under the license - especially as the evidence in this action established that APC had sales

9  in excess of $215 million from 2006-2013 on the infringing products. Further, a [5%] ~~15%~~ royalty

10  rate would more equitably compensate STI for any lost sales, customer goodwill, and lost market

11  share. Therefore, the court shall grant STI's motion and set a compulsory license of the patents-in-

12  suit with an ongoing royalty rate of [5%] ~~15%~~ from the date of judgment.

13  **IV.    STI's Motion for Supplemental Damages and Prejudgment Interest (Doc. #619)**

14        In its second post-trial motion, STI moves for an order awarding supplemental damages

15  against APC for sales of the infringing ~~AP7900 and~~ AP8900 products after December 31, 2013,

16  through the date of judgment, and for prejudgment interest on the damages award at the Prime

17  Interest rate. *See* Doc. #619. Both issues are addressed below.

18        **A. Supplemental Damages**

19        The jury verdict against APC established a 5% royalty rate on APC's sales of infringing

20  products from December 18, 2006, through December 31, 2013. However, at the time of trial,

21  APC had not yet produced records for sales after December 31, 2013, through the date of

22  judgment. To compensate STI fully for APC's infringement, STI argues that the court should

23  award supplemental damages for all infringing sales of APC's ~~AP7900 and~~ AP8900 product lines

24  from January 1, 2014, through the date of judgment, August 8, 2014, at the 5% reasonable royalty

25  rate found by the jury. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 964-65

26  (N.D. Cal. 2009) (holding that in calculating damages through the date of judgment, a court

9

applies the reasonable royalty rate found by the jury). The court agrees and notes that APC does not oppose an award of supplemental damages from January 1, 2014, through the date of judgment. Therefore, the court shall grant STI's motion as to this issue.

### B. Prejudgment Interest

Section 284 of the Patent Act governs the award of prejudgment interest in patent infringement cases and states that: "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement . . . together with interest and costs as fixed by the court." 35 U.S.C. § 284. The purpose behind prejudgment interest is "to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered." *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013).

In its motion, STI seeks prejudgment interest at the Prime interest rate on both the jury's damages award and any supplemental damage award by the court. *See* Doc. #619. STI argues that using the Prime rate to calculate prejudgment interest is reasonable in this action because the Prime rate is sufficient to cover inflation over the lengthy infringement and litigation period. The court agrees.

In contrast to the Prime rate, the court finds that APC's proposed Treasury Bill rate would not cover inflation over the infringing period. Moreover, in the context of patent infringement, the Treasury Bill rate is often inappropriate, as its lower rate of return has the potential to result in a windfall profit for the infringer. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 2009 WL 920300, at *2 (D. Ariz. 2009). Therefore, the court shall grant STI's motion and apply prejudgment interest at the Prime Interest rate.

## V. APC's Motion for Judgment as a Matter of Law, and for New Trial (Doc. #626)

### A. Motion for Judgment as a Matter of Law

#### 1. Legal Standard

Under Rule 50(b), after the court enters judgment, a party may file a renewed motion for judgment as a matter of law. Rule 50 provides that judgment as a matter of law is appropriate if "a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). Under Rule 50, the court reviews whether "substantial evidence" supports the jury verdict. *See Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013). A verdict is not supported by substantial evidence "when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Id.* In other words, Rule 50 "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000).

## 2. Discussion

In its renewed motion for judgment as a matter of law, APC raises five challenges to the jury verdict. First, APC argues that there is insufficient evidence to support the jury's finding that the AP7900 products literally infringe claim 15 of the '543 and '771 patents. Second, APC argues that it was clear error for the court to allow STI to proceed on, and for the jury to consider, a doctrine of equivalents infringement theory related to the AP7900 products. Third, APC argues that there is insufficient evidence to support the jury's finding that both the AP7900 and AP8900 products literally infringe claim 15 of the '543 and '771 patents. Fourth, APC argues that the jury verdict on the issue of obviousness is contrary to law. Finally, APC argues that the court's inequitable conduct findings are not supported by the evidence. Each separate challenge is addressed below.

### a. AP7900: Literal Infringement Finding

In its motion, APC contends that claim 15 of both the '543 and '771 patents require a device that includes a current reporting system in "power information determining communication with at least one among said power input and said plurality of power outputs." *See* Claim 15(f), '543 Patent; Claim 15(f), '771 Patent. At summary judgment, the court construed "power-related information" to mean "information necessary to quantify or describe power, rather than current alone." Doc. #163, p. 25. Thus, for literal infringement APC argues that the AP7900 product must

11

display information necessary to quantify power. APC argues that because the AP7900 products only measure current and do not have any power-sensing capabilities, the products do not literally infringe claim 15 of the '543 and '771 patents. Thus, the jury verdict is not supported by the evidence submitted at trial.

APC's argument is premised on an erroneous characterization of the court's interpretation of "power information." In contrast to APC's position, "power information" is not limited to the measurement, quantification or reporting of power. Rather, the court has interpreted "power information" to mean information sufficient to quantify and/or describe power. Because the AP7900 products communicate information sufficient to *describe* power, the jury verdict of literal infringement was supported by substantial evidence. For example, Dr. Michael Aucoin ("Dr. Aucoin") testified that the vertical AP7900 products (1) report current information, including the quantity of current flowing at an outlet, and (2) communicate and report voltage information by reporting whether voltage is present at the outlet. *See* Doc. #596, Dr. Aucoin Trial Testimony, p.620-23. Although Dr. Aucoin testified that the AP7900 products do not "directly report a quantity of power like the [AP]8900 does," he testified that power information could still be determined by the AP7900 products simply by knowing whether voltage was present at the outlets. Doc. #596, Dr. Aucoin Trial Testimony, p. 624. Dr. Aucoin testified that by knowing the voltage present at the outlet, which is a known constant depending on the type of outlet, a person can perform simple math to determine the power present in each outlet and the total power of the PDU. Multiplying known voltage by the measured current necessarily provides information sufficient to quantify or describe power, supporting the jury's verdict of literal infringement. APC's own product development documentation acknowledges that users of the AP7900 products were determining power information by performing exactly the same calculations described in Dr. Aucoin's testimony. Therefore, the court finds that there was sufficient evidence at trial to support the jury verdict that the AP7900 products literally infringe claim 15 of both the '543 and '771 patents.

**b. AP7900: Doctrine of Equivalents Finding**

In its second challenge to the jury verdict, APC argues that it is entitled to judgment as a matter of law that the AP7900 products do not satisfy the "power information" limitation under a doctrine of equivalents infringement theory.[7] First, APC argues that STI's doctrine of equivalent claim should have been barred due to prosecution history estoppel and thus, it was improper for the court to allow STI to proceed with this infringement theory. Specifically, APC argues that because the term "power information" was added to claim 15 by amendment during patent prosecution, the question of whether the AP7900 products could infringe the asserted claims under the doctrine of equivalents was not properly before the jury. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733-34 (2002).

Here, the court finds that prosecution history estoppel does not bar the doctrine of equivalents infringement theory in this case because the narrowing of the claim to include the term "power information" was peripheral, or not directly relevant, to the alleged equivalent. Nowhere in the patent history did the examiner or the inventors make a distinction between a current reporting system that was in current-related information determining communication, as opposed to a current reporting system that was in power information determining communication. The distinction between current-related information and power information had no bearing whatsoever on the amendment. Thus, the amendment of claim 15 bears no more than a tangential relation to STI's assertion of the doctrine of equivalents in this case. As such, STI did not surrender its equivalence argument that the communication of current information, where the voltage is known to be constant, is substantially equivalent to the communication of power information. Therefore, the issue of whether the AP7900 product infringed under the doctrine of equivalents was properly before the jury in this action.

---

[7] A doctrine of equivalents infringement theory allows for a finding of infringement where the process of an allegedly infringing product performs in the same manner as a patented design, but does so in a different manner. However, because that different manner is so insubstantial from the manner in which the patented design performs the process, it is essentially an "equivalent" to the patented design.

APC also argues that the jury's finding that the current-reporting feature of the AP7900 products satisfies the "power information" limitation of claim 15 of the '543 and '771 patents under a doctrine of equivalents infringement theory would entirely vitiate the court's construction of "power information" which was defined as "information necessary to quantify or describe power, rather than current alone." *See* Doc. #163. APC argues STI's doctrine of equivalents theory erased the important distinction between current and power and should have been precluded. *See Warner-Jenkinson Co., Inc. v. Hilton-Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997) (stating that when a theory of equivalence entirely vitiates a particular claim element, partial or complete judgment should be rendered by the court.). *Warner-Jenkinson Co., Inc. v. Hilton-Davis Chemical Co.*, 520 U.S. 17, 39 n.8 (1997).

The court has reviewed the documents and pleadings on file in this matter as well as the evidence submitted at trial and finds that STI's doctrine of equivalents theory in this case does not vitiate the court's construction of power information because the court's claim construction left open the issue of equivalents when the voltage is known to be constant. *See* Doc. #163, Claim Construction Order, p. 25 n. 10 ("Whether a current measurement alone can qualify as "power information" where the voltage is known to be constant, as STI argues, raises a question under the doctrine of equivalents that is not properly before the court at the present time."). At no point did STI argue that communicating current information alone constituted the communication of power information. Instead, Dr. Aucoin testified that it is the communication of current information when voltage is known to be constant that lead to him to conclude that APC infringed under the doctrine of equivalents. The evidence at trial established that the voltage level in the data centers was both constant and known, thereby allowing for an easy computation of power information. The communication of the amount of measured current coupled with the evidence of the known voltage levels falls well within the insubstantial difference allowed under a doctrine of equivalents infringement theory. Therefore, the court finds that STI's doctrine of equivalents theory did not vitiate the "power information" limitation.

### c. ~~AP7900 and~~ AP8900: Literal Infringement Finding

In its third challenge, APC argues that the jury finding that ~~both~~ the ~~AP7900 and~~ AP8900 products literally infringe claim 15 of the '543 and '771 patents is unsupported by the evidence at trial because claim 15 requires a display on "another area" of the plugstrip adjacent to the outputs. The court disagrees.

At trial, STI presented sufficient evidence to support the jury's finding that ~~both~~ the ~~AP7900 and~~ AP8900 products literally infringe the 'another area' element of claim 15. For example, Dr. Aucoin testified that the vertical AP8900 products had a digital current information display that was in 'an other area' of the enclosure from the power outputs or outlets. *See* Doc. #596, Dr. Aucoin Trial Testimony, p.604-06, 715-17. ~~His analysis for the AP7900 products was the same. *Id.* at 617.~~ Dr. Aucoin based his conclusions on the fact that the ~~AP7900 and~~ AP8900 products ~~both~~ have multiple groups, or pluralities, of outlets and that each group constituted its own area. He opined that the display in each product was in a different area adjacent to each separate group of outlets. *Id.* at 612, 715-16. ~~APC's witness Daniel Rohr agreed, testifying directly that the digital display in the AP7900 products is in another area from the outlets. Doc. #601, Daniel Rohr Trial Testimony, p. 198.~~ Therefore, the court finds that there was sufficient evidence to support the jury verdict of literal infringement for ~~both~~ the ~~AP7900 and~~ AP8900 products.

### d. ~~Obviousness Advisory Verdict~~

~~In its fourth challenge, APC argues that based on the evidence presented at trial, STI's '543 and '771 patent claims are obvious as a matter of law, and therefore, the jury verdict is not supported by substantial evidence. Specifically, APC argues that there was no dispute that all of the limitations of the asserted claims were known in the prior art. As such, the dispute between the parties was only whether one of ordinary skill in the art at the time of the invention would have had any motivation to combine the prior art in the same manner declared in STI's patents. APC argues that the evidence at trial established that the longstanding problem of current overloads in~~

1  ~~electronic devices would have provided a strong reason for one of ordinary skill to use a digital~~
2  ~~display in a PDU, and thus, STI's patents were obvious as a matter of law.~~
3  ~~Initially, the court notes that the jury only rendered an advisory finding on the issue of~~
4  ~~obviousness as obviousness is solely an issue for the court to decide as a matter of law based on~~
5  ~~the evidence submitted at trial. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007)~~
6  ~~(holding that obviousness under 35 U.S.C. § 103 is a question of law based on underlying factual~~
7  ~~inquiries). Thus, it was ultimately the court's decision whether the patents were obvious and~~
8  ~~APC's argument that the jury verdict is not supported by substantial evidence is irrelevant in this~~
9  ~~matter.~~
10 ~~Additionally, the court finds that its ultimate determination that the patents-in-suit were not~~
11 ~~obvious is supported by substantial evidence. After the jury trial, the court rendered a final order~~
12 ~~on the issue of obviousness separate from the jury's advisory finding. *See* Doc. #615. In that order,~~
13 ~~the court found that "[a]fter reviewing all of the evidence submitted in this action . . . neither~~
14 ~~STI's '543 patent nor '771 patent would have been obvious to a person of ordinary skill in the field~~
15 ~~at the time of the invention. In particular, the court finds that the weight of the evidence, consistent~~
16 ~~with the jury's verdict and [APC's] clear and convincing evidence burden, does not allow for a~~
17 ~~finding of obviousness." *Id.* The court has reviewed the evidence at trial and finds that the~~
18 ~~evidence was sufficient to support the court's order that the '543 and '771 patents were not invalid~~
19 ~~as obvious.~~

20 ### e. Inequitable Conduct Findings

21 A plaintiff's inequitable conduct during the patent application process "is an equitable

22 defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v.*

23 *Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (9th Cir. 2011). To establish the affirmative

24 defense of inequitable conduct in a patent infringement action, an accused infringer must show that

25 (1) an individual associated with the prosecution of the patent application at issue made

26 affirmative misrepresentations of fact, failed to disclose material information, or submitted false

material information; and (2) the individual acted with the specific intent to deceive the Patent and Trademark Office ("PTO"). *Therasense, Inc.*, 649 F.3d at 1289; *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).

In its motion, APC argues that the court's inequitable conduct findings are not supported by substantial evidence. Specifically, APC argues that there is no reasonable inference from the evidence presented at trial other than that Mr. Ewing, along with Attorney Richard Main ("Attorney Main") and Attorney Ryan, intended to deceive the Patent Office by making misrepresentations about the state of the prior art during prosecution of the '543 and '771 patents.

Initially, APC argues that the court erred by making no findings regarding the inequitable conduct of STI's initial patent attorney, Attorney Main. However, APC did not accuse Attorney Main of inequitable conduct until just a few days before trial on May 5, 2014, when APC filed its proposed findings of fact and conclusions of law on the inequitable conduct claim. The court appropriately struck the claim against Attorney Main and no further findings were necessary.

APC also argues that the court failed to address its allegations that Mr. Ewing and Attorney Ryan made repeated misrepresentations to the Patent Office. Nor did the court make any findings regarding the materiality of prior art to the '543 patent. Rather, the court only addressed Mr. Ewing's failure to disclose prior art to the Patent Office. Finally, APC argues that the court's limited findings on materiality and intent are not supported by the law of the evidence submitted at trial. The court disagrees.

The evidence submitted at the bench trial does not support APC's contentions that Attorney Ryan and Mr. Ewing made any misrepresentations to the patent examiner. APC asserts that the court did not make any findings regarding Ryan's misrepresentations. However, the court specifically found that Ryan "responded fairly, reasonably and truthfully to the examiner's request." *See* Doc. #613. This finding necessarily means that Ryan did not make any misrepresentations before the Patent Office. Similarly, the court finds that general materiality findings were unnecessary in this action because the court found that Mr. Ewing and Attorney

17

Ryan did not have the specific intent to deceive the Patent Office during the prosecution of the '543 patent. Thus, the court was not required to make additional findings on materiality as that issue is irrelevant absent a finding of specific intent to deceive. Further, the evidence submitted at trial supports the court's finding that Mr. Ewing and Attorney Ryan did not intend to deceive the PTO. The overwhelming weight of evidence conclusively establishes that the specific intent to deceive the PTO is not "the single most reasonable inference able to be drawn from the evidence." Doc. #613. Instead, a more plausible inference is that Mr. Ewing - having already provided the MSVM user manual, RPC-21 comparison chart, and other material to his attorney - reasonably relied on his attorney to decide what had to be disclosed to the PTO. Thus, there is utterly no evidence that either Mr. Ewing or Attorney Ryan made a deliberate decision to withhold any prior art from the patent office. Therefore, the court finds that there was substantial evidence to support its inequitable conduct findings and shall deny APC's motion for judgment as a matter of law.

### B. Motion for a New Trial

#### 1. Legal Standard

Under Rule 59, the court may grant a motion for a new trial after a jury trial for any reason for which a new trial has previously been granted in federal court. FED. R. CIV. P. 59(a)(1)(A). These reasons include (1) correcting manifest errors of law or fact; (2) newly discovered evidence; (3) to prevent manifest injustice; and (4) an intervening change in controlling or governing law. *See Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).

#### 2. Discussion

As an alternative argument to its renewed motion for judgment as a matter of law, APC argues that it is entitled to a new trial on both the infringement and invalidity issues because the court committed several highly prejudicial errors at trial including: (1) improperly stating the law concerning the issue of obviousness in Jury Instruction No. 22; (2) presenting the jury with an inappropriate verdict form; (3) improperly applying the clear and convincing evidence burden of proof in Jury Instruction No. 18; (4) improperly defining the term "plugstrip" in Jury Instruction

No. 10; (5) excluding evidence about the BayTech RPC-7, a relevant piece of prior art;

(6) excluding the patent file history; (7) excluding evidence of the '543 patent re-examination; and

(8) failing to instruct the jury of the term "power." *See* Doc. #626. Each issue is addressed below.

### a. Jury Instruction No. 22

In its motion for a new trial, APC argues that the court presented an incorrect and

prejudicial instruction on the issue of obviousness to the jury. APC argues that Jury Instruction

No. 22,[8] improperly required APC to prove that a person of skill would have "realized the benefit

of the combination." APC argues that under *KSR*, there is simply no requirement for a defendant to

show that one of skill would have realized the benefit of the combination in order to show

obviousness.

The court disagrees and finds that Jury Instruction No. 22 correctly states the legal test for

obviousness. The language to which APC objects is taken directly from *KSR* and has been cited

repeatedly by the Federal Circuit and district courts. *See KSR*, 550 U.S. at 424 ("The proper

question to have asked was whether a . . . designer of ordinary skill . . . would have seen a benefit

to" combining the elements). Thus, the court did not err by including this language in the

instruction.

### b. Verdict Form[9]

In its second argument, APC contends that the verdict form presented the jury with a

distorted view of the test for obviousness that unfairly favored STI. Specifically, APC argues that

the verdict form included special interrogatories on secondary considerations that favored STI's

---

[8] Jury Instruction No. 22 states in its entirety: "To prove that [STI's] patent claims would have been obvious, APC need not show that a person having ordinary skill in the field of the invention would have combined the elements in the manner claimed for the same reason as the reason that motivated the inventor(s) of the '543 patent and/or '771 patents. Any need or problem in the field of invention at the time of the invention can provide a reason for combining the elements in the manner claimed, but only if a person of ordinary skill in the art would have realized the benefits of the combination."

[9] [In this challenge, APC contended that the court presented an improper verdict form to the jury because it contained certain question on the issue of patent obviousness. The court notes that the challenged portion of the jury verdict has been vacated pursuant to the court's February 23, 2017 order. Doc. #691. However, because APC's challenge in the present motion relates solely to the manner in which the verdict form was written, and not the jury's actual verdict, this section is not impacted by the Federal Circuit's remand order or the court's February 23, 2017 order. Doc. #691.]

non-obviousness arguments, yet excluded interrogatories regarding the primary *Graham* inquiries of obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1 (1966). APC argues that this verdict form improperly focused the jury's consideration of obviousness on 'secondary considerations' of nonobviousness and unfairly primed the jury for a finding of nonobviousness. Given STI's heavy reliance on secondary considerations at trial, this error severely prejudiced APC.

APC's argument concerning the format of the verdict form is without merit. The verdict form correctly presented the obviousness issues to the jury. First, as previously addressed in APC's motion for judgment as a matter of law, the issue of whether the patent claims were obvious was a question of law for the court. Thus, whether or not the verdict form favored STI on the issue of obviousness is of no importance as it was the court, and not the jury, that made the ultimate decision to reject APC's defense that the patent claims were obvious. Further, APC's argument is erroneous because it ignores all of the jury instructions on the issue of obviousness. In the jury instructions, the jury was properly instructed that it must evaluate the four *Graham* factual inquiries, and the court's instructions appropriately addressed each factor in separate instructions. Given the specific direction provided by the instructions, and in light of the fact that most of the *Graham* factors were not disputed by the parties or at issue in this action, the verdict form correctly identified the only relevant factual issues for the jury. Therefore, the court finds that the verdict form was not prejudicial to APC.

### c. Jury Instruction No. 18

In its third challenge, APC argues that Jury Instruction No. 18[10] improperly applied the clear and convincing burden of proof to the legal question of obviousness. However, it is well established that obviousness must be proven by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) ("[A] defendant seeking to overcome this presumption must persuade the factfinder of its invalidity defense by clear and convincing

---

[10] Jury Instruction No. 18 provides in relevant part: "APC must prove obviousness by clear and convincing evidence, which means that you must be persuaded by the evidence that obviousness is highly probable."

evidence"). Therefore, the court properly instructed the jury that APC had the burden of proving

obviousness by clear and convincing evidence.

~~d. Jury Instruction No. 10~~

~~In its fourth challenge, APC argues that the court incorrectly defined the term "plugstrip" to~~
~~be a "one-piece" configuration in Jury Instruction No. 10.[11] APC argues that the court's~~
~~construction of plugstrip limiting the claimed invention to a "one-piece" configuration was clearly~~
~~erroneous because that is not supported by the claim language and specification.~~

~~The court finds that it correctly defined the term plugstrip in Jury Instruction No. 10.~~
~~Throughout this action, the court and the partes repeatedly referred to the the term plugstrip in the~~
~~'543 patent as a "one-piece, fully integrated device." The court's definition of the term "plugstrip"~~
~~is entirely consistent with the language of the claims, the specification and the prosecution history~~
~~of the '543 patent. Therefore, the court did not err in its definition of plugstrip in the jury~~
~~instructions.~~

### e. BayTech RPC-7

In its fifth argument for a new trial, APC argues that the court improperly limited evidence

of the BayTech RPC-7 device which APC claims was relevant to its obviousness defense.

Initially, the court notes that its exclusion of evidence relating to certain features of the

BayTech RPC-7 product has been the subject of extensive briefing and two rulings. *See*

Doc. ##505, 524. Certain evidence relating to the RPC-7 was excluded from trial because APC

failed to meet the disclosure requirements of the local rules governing this case. After APC filed

its motion for clarification, the court reiterated that "APC is precluded from proffering any

evidence that the RPC-7 satisfies any other claim element at issue in the '543 patent" because APC

failed to follow the local patent rules during prosecution of this case. *See* Doc. #524. Therefore,

the court's limitation of the RPC-7 was proper and a new trial is not warranted on this issue.

---

[11] ~~Jury Instruction No. 10 provides in pertinent part: "'Plugstrip' appears in Claim 15 of the '543 patent. The term~~
~~'plugstrip' requires all of the limitations of the claim, that is, elements A, B, C, D, E, and F, including the reporting system,~~
~~are contained within a one-piece device."~~

21

### f. Patent File History

In its sixth argument for a new trial, APC argues that the court improperly limited evidence of the file history of the '543 and '771 patents which prejudiced APC's ability to prove its affirmative defenses. Specifically, APC contends that the court excluded testimony about the patent prosecution history and precluded APC's expert from explaining what happened during the lengthy prosecution history of the patents at issue to the jury. APC argues that such testimony explaining the prosecution history was directly relevant to the jury's consideration of invalidity and obviousness.

The court disagrees and finds that it correctly limited testimony regarding the file history of the '543 patent. During trial, the court admitted the complete file history for each patent, and the court twice played for the jury the Federal Judicial Center's video entitled "The Patent Process, An Overview for Jurors," which provided a clear explanation of Patent Office practices and procedures. Further, the court provided the jury with a detailed glossary of terms relating to the prosecution of the patents, as requested by APC. Thus, sufficient evidence of the file history was presented to the jury. All the court excluded was APC's attempts to have a witness characterize the prosecution history or argue its meaning. The court properly excluded such testimony under Rule 403 of the Federal Rules of Evidence.

### g. '543 Patent Reexamination

In its seventh challenge, APC argues that the court improperly excluded evidence of the '543 patent reexamination before the patent office.

This issue was fully briefed and addressed in connection with STI's motion in limine #1. *See* Doc. #431. In a thorough and well-reasoned order, the court granted STI's motion, concluding that (1) the '543 reexamination was not final and the status and holdings of the reexamination proceedings were of little relevance to the present action, (2) the prejudicial effect of informing the jury about the reexamination proceeding would far outweigh any probative value; and (3) allowing evidence of the reexamination would confuse the jury. *See* Doc. #505. Under relevant federal

circuit precedent, the court's ruling was correct. Thus, the court properly excluded evidence of the reexamination proceedings involving the '543 patent and a new trial is not warranted on this issue.

### h. "Power" Instruction

Finally, APC argues that the court did not instruct the jury on the agreed definition of the term "power" which left the jury confused at to what that key term meant. However, the court properly defined and instructed the jury on the meaning of the term "power information" which was the relevant claim term in claim 15 of the '543 and '771 patents. At trial, APC argued that the AP7900 products were not "in power information determining communication" with at least one of the power input or power outputs as required by element 15(f) of both patents. APC did not argue that there was a dispute as to the issue of power. As such, the relevant disputed term at trial was "power information" and not "power." Because the court defined the relevant claim term in the jury instructions, a new trial is not warranted. Accordingly, the court shall deny APC's motion for a new trial.


IT IS THEREFORE ORDERED that plaintiff's motions for a permanent injunction, or in the alternative, for a compulsory license (Doc. #618) and for supplemental damages and prejudgment interest (Doc. #619), and defendant's renewed motion for judgment as a matter of law, or in the alternative, for a new trial (Doc. #626) are addressed in accordance with this AMENDED and RE-ISSUED ORDER.

IT IS SO ORDERED.

RE-ISSUED this 12 day of May, 2017.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

23

# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SERVER TECHNOLOGY, INC.,

      Plaintiff and Counter-Defendant,

    v.

AMERICAN POWER CONVERSION
CORPORATION,

      Defendant and Counterclaimant.

Case No. 3:06-cv-0698-LRH-VPC

AMENDED ORDER

Following a jury trial in May 2014, certain of the ~~AP7900 and~~ AP8900 products sold by defendant American Power Conversion Corporation ("APC") were found to infringe claim 15 of U.S. Patent No. 7,043,543 ("the '543 patent") and claim 15 of U.S. Patent No. 7,702,771 ("the '771 patent"). On March 31, 2015, the court entered an order directing the parties to prepare an appropriate compulsory license with an ongoing [5%] ~~15%~~ royalty rate on sales of certain licensed products, defined below, that are sold by APC from the date of judgment, August 8, 2014. Doc. #651. The parties submitted a proposed order with the terms set forth below.

The court hereby enters the following [amended] order:[1]

----

[1] [This is an amended order of the court's now-vacated order entering an ongoing royalty (ECF No. 663) pursuant to the court's February 23, 2017 vacate order (ECF No. 691).]

1. The licensed products are defined to include the following products sold by APC: ~~AP7930, AP7931, AP7932, AP7940, AP7941, AP7950, AP7951, AP7952, AP7953, AP7954, AP7960, AP7961, AP7990, AP7991, AP7998,~~ AP8941, AP8958, AP8958NA3, AP8959, AP8959NA3, AP8961, AP8965, AP8981, and products that are not colorably different from one or more of the specifically identified licensed products.

2. For the period beginning on the date judgment was entered, August 8, 2014, and continuing until the expiration of the last to expire of the '543 patent or the '771 patent, APC shall pay plaintiff Server Technology, Inc. ("STI") an ongoing royalty, as a percentage of gross sales, of [5%] ~~15%~~ on all licensed products manufactured, sold, imported into, or exported from, the United States.

   a. APC represents that it promptly will submit a supersedeas bond or similar instrument (jointly referred to as the "bond") for court approval pursuant to Rule 62(d) of the Federal Rules of Civil Procedure. The royalty payment obligation set forth in the following paragraph 2(b) is conditioned upon the inclusion of a provision in the bond providing that the proceeds of the bond may be used to satisfy both the amended judgment entered in this case and any royalty payments that are due pursuant to this order.

   b. APC will be obligated to pay to STI all reasonable royalties from the date of judgment (August 8, 2014), plus post-judgment interest, owed under the terms of the compulsory license set forth in this order within 45 days of the date the appellate court's mandate would issue under Federal Rule of Appellate Procedure 41(b) in the appeal from the judgment in this case, regardless of whether a motion for stay of mandate is filed or the mandate is stayed pursuant to Rule 41(d)(2).

   c. Thereafter, APC shall pay to STI all royalties owed on a quarterly basis, with payment to be made within 60 days of the end of each calendar quarter, except that for any payment that would be due less than 45 days after the date the

2

appellate court's mandate would issue as set forth in paragraph 2(a), the deadline for any such payment shall be extended to a date 45 days after the issuance of the mandate as set forth above. If for any reason any royalty is not paid when due, interest shall accrue on the unpaid balance at a rate of one and one-half percent (1.5%) per month from the date the payment was due.

3. Each quarterly payment shall be accompanied by a written accounting of the sales of licensed products that (a) states total sales (in dollars) of licensed products during the quarter, and (b) provides by product number, total sales during the quarter (in units and dollars) of each licensed product. The accounting shall be certified under penalty of perjury as accurate by an appropriate representative of APC. APC shall keep proper records and books of account in accordance with past practices necessary to calculate royalties under this order.

4. APC shall allow STI to conduct an audit, to occur no more than once per twelve-month period, of APC's records and documents to ensure compliance with this order. Any such audit shall be conducted by an independent certified public accountant of STI's choosing. The auditor shall obligate him or herself in writing to APC to maintain in confidence all information that it receives from APC, and shall submit a written report to STI (with a copy to APC) containing only its conclusions as to the quantity and sales of licensed products for which royalties should be paid under this order. The cost of the audit will be borne solely by STI unless the results of the audit show a 5% or more underpayment of royalties due to STI during the period audited, in which case all auditing costs including the fees of the auditor shall be paid by APC.

5. APC shall notify STI of any design changes that may be applied to the licensed products should APC take the position that such design changes take the modified product outside the scope of an ongoing royalty.

6. APC shall mark all licensed products manufactured in, sold in, imported into, or exported from the United States with the applicable patent number in compliance with 35 U.S.C. § 287.

7. The court specifically retains jurisdiction to enforce, modify, or terminate this order as the equities may require, and to resolve any disputes, including disputes over whether an APC product other than the licensed products is subject to the royalty provisions of this order or infringes claim 15 of the '543 patent or claim 15 of the '771 patent.

IT IS SO ORDERED.

DATED this _12_ day of May, 2017.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

# EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SERVER TECHNOLOGY, INC.,

        Plaintiff and Counter-Defendant,

    v.

AMERICAN POWER CONVERSION
CORPORATION,

        Defendant and Counterclaimant.

Case No. 3:06-cv-0698-LRH-VPC

AMENDED VERDICT

Instructions: When answering the following questions and filling out this Verdict Form, please refer to the Jury Instructions for guidance on the law applicable to the subject matter covered by each question.

    WE THE JURY, in the above-entitled case, unanimously find as follows:[1]

///

////

///

///

///

---

[1] [This is an amended jury verdict in light of the Federal Circuit's September 23, 2016 remand order in this action (*Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 Fed. Appx. 1030 (Fed. Cir. 2016)), the parties' joint status report (ECF No. 690), and the court's February 23, 2017 vacate order (ECF no. 691).]

1

# INFRINGEMENT

~~Question 1: Server Tech's '543 Patent: APC's 7900 Series~~

~~Has Server Tech proven by a preponderance of the evidence that APC's AP 7900 series of products infringe Claim 15 of its '543 Patent?~~

~~___X___ Yes _____ No~~


~~If you find that Server Tech has proven by a preponderance of the evidence that APC's AP 7900 series of products infringe Claim 15 of its '543 Patent, do you find that these products literally infringe Claim 15 of the '543 Patent, infringe under the doctrine of equivalents, or both? (Check all the apply)~~

~~___X___ Literal Infringement~~

~~___X___ Infringement under the Doctrine of Equivalents as to the "power information" element in Claim 15, element F(ii), in the '543 Patent, as referred to in Instruction No. 15.~~


## Question 2: Server Tech's '543 Patent: APC's 8900 Series

Has Server Tech proven by a preponderance of the evidence that APC's AP 8900 series of products infringe Claim 15 of the '543 patent?

___X___ Yes _____ No


~~Question 3: Server Tech's '771 Patent: APC's 7900 Series~~

~~Has Server Tech proven by a preponderance of the evidence that APC's AP 7900 series of products infringe Claim 15 of its '543 Patent?~~

~~___X___ Yes _____ No~~

///
///
///
///
///

2

~~If you find that Server Tech has proven by a preponderance of the evidence that APC's~~
~~AP 7900 series of products infringe Claim 15 of its '771 Patent, do you find that these products~~
~~literally infringe Claim 15 of the '771 Patent, infringe under the doctrine of equivalents, or both?~~
~~(Check all the apply)~~

~~___X___ Literal Infringement~~

~~___X___ Infringement under the Doctrine of Equivalents as to the "power information"~~
~~element in Claim 15, element F(ii), in the '771 Patent, as referred to in Instruction No. 15.~~

**Question 4: Server Tech's '771 Patent: APC's 8900 Series**

Has Server Tech proven by a preponderance of the evidence that APC's AP 8900 series
of products infringe Claim 15 of the '543 patent?

___X__ Yes _____ No

**<u>INVALIDITY</u>**

~~The ultimate legal conclusion that must be reached on the obviousness question is~~
~~whether APC has proven by clear and convincing evidence that the claimed invention(s), recited~~
~~in Claim 15 of the '543 patent and Claim 15 of the '771 patent, would have been obvious to a~~
~~person or ordinary skill in the field at the time of the invention. In order to property reach a~~
~~conclusion the following questions must be answered:~~

~~**Question 5:**~~

~~Do you find that APC has proven by clear and convincing evidence that Claim 15 of the~~
~~'543 Patent would have been obvious to a person of ordinary skill in the field at the time of the~~
~~invention ("person of ordinary skill" being defined in Instruction No. 23 titled "Level of~~
~~Ordinary Skill")?~~

~~_____ Yes ___X__ No~~

///

3

| | |
|---|---|
| 1 | ~~**Question 6:**~~ |
| 2 | ~~Do you find that APC has proven by clear and convincing evidence that Claim 15 of the~~ |
| 3 | ~~'771 patent would have been obvious to a person of ordinary skill in the field at the time of the~~ |
| 4 | ~~invention ("person of ordinary skill" being defined in Instruction No. 23 titled "Level of~~ |
| 5 | ~~Ordinary Skill")?~~ |
| 6 | ~~Yes     X   No~~ |
| 7 | |
| 8 | ~~**Question 7: Considerations bearing upon Obviousness or Non-obviousness**~~ |
| 9 | ~~A.  Commercial Success~~ |
| 10 | ~~Do you find that Server Tech's claimed invention was commercially successful due to the~~ |
| 11 | ~~merits of the claimed invention?~~ |
| 12 | ~~X   Yes     No~~ |
| 13 | |
| 14 | ~~B.  Long Felt Need~~ |
| 15 | ~~Do you find that there was a long felt need for a solution to the problem facing the~~ |
| 16 | ~~inventors?~~ |
| 17 | ~~X   Yes     No~~ |
| 18 | |
| 19 | ~~C.  Copying~~ |
| 20 | ~~Do you find that APC or others copied Server Tech's claimed invention?~~ |
| 21 | ~~X   Yes     No~~ |
| 22 | |
| 23 | ~~D.  Unexpected Superior Results~~ |
| 24 | ~~Do you find that Server Tech's claimed invention achieved unexpectedly superior results~~ |
| 25 | ~~over the closest prior art?~~ |
| 26 | ~~X   Yes     No~~ |
| 27 | /// |
| 28 | /// |

~~E. Praise from the Industry~~

~~Do you find that others in the field praised Server Tech's claimed invention?~~

~~__X__ Yes   _____ No~~

## DAMAGES

Proceed to Questions 8-11 only if you answered "yes" to at least one of Questions 1 through 4. On the other hand, if you answered "no" to all of Questions 1 through 4, then skip Questions 8-11.

**Question 8: Infringement Damages**

Did Server Tech prove by a preponderance of the evidence that it is entitled to recover lost profits as a direct result of APC's infringement?

_____ Yes   __X__ No

If your answer to Question 8 is "Yes," then proceed to Questions 9 through 11. If you answer to Question 8 is "No," then skip Question 9 and proceed to Questions 10 and 11.

**Question 9: Lost Profits**

What amount of lost profits, if any, do you award Server Tech as a result of infringement by APC?

$__0.00___

**Question 10: Reasonable Royalty**

For those infringing sales for which Server Tech has not proven lost damages, what amount has it proved it is entitled to as a reasonable royalty?

$ ~~10,787,634.00~~

///

///

**Question 11: Total Damages**

If Server Tech has proven lost profits and/or reasonable royalty, what amount has it proved it is entitled to as total damages?

$ ~~10,787,634.00~~

You have now completed the Verdict Form. Have your foreperson date and sign the form below. Then, inform the court security officer that you have reached a unanimous verdict. Do not give the envelope to the bailiff. Your foreperson should retain possession of the Verdict Form until it is requested by the judge when the court reconvenes.

Dated this __29__ day of May, 2014          _/s/ Jury Foreperson_____

                                            JURY FOREPERSON

IT IS THEREFORE ORDERED that the vacated jury verdict dated May 29, 2014 (ECF No. 590) is AMENDED and RE-ISSUED in accordance with this Amended Verdict.

IT IS SO ORDERED.

DATED this _12_ day of May, 2017.          _____

                                            LARRY R. HICKS
                                            UNITED STATES DISTRICT JUDGE