1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                                DISTRICT OF NEVADA

8                                      * * *

9    SERVER TECHNOLOGY, INC.,                )
                                             )
10            Plaintiff and Counterdefendant, )        3:06-CV-00698-LRH-VPC
                                             )
11   v.                                      )
                                             )        AMENDED ORDER
12   AMERICAN POWER CONVERSION               )
     CORPORATION,                            )
13                                           )
             Defendant and Counterclaimant.  )
14   _____)

15          Before the court are plaintiff Server Technology, Inc.'s ("STI") motion for a permanent

16   injunction (Doc. #618[1]), and motion for supplemental damages and prejudgment interest

17   (Doc. #619). Defendant American Power Conversion Corp. ("APC") filed oppositions to both

18   motions (Doc. ##630, 631) to which STI replied (Doc. ##636, 637).

19          Also before the court is defendant APC's motion for judgment as a matter of law, or in the

20   alternative, motion for a new trial. Doc. #626. STI filed an opposition (Doc. #635) to which APC

21   replied (Doc. #638).[2]

22   I.     Facts and Procedural History

23          This action has an extensive factual and procedural history. In brief, plaintiff STI

24   _____

25          [1] Refers to the court's docket number.

26          [2] [This is an amended and re-issued order of the court's now-vacated original order granting in-part and denying
     in-part the parties' post-trial motions (Doc. #651).]

manufactures intelligent power distribution units ("PDUs"). In 2006, STI brought the underlying patent infringement action against defendant APC alleging that APC's AP7900 and AP8900 series of products infringed two of STI's patents: United States Patents numbers 7,043,543 ("the '543 patent"), and 7,702,771 ("the '771 patent). Doc. #1.

Like STI, APC manufacturers intelligent PDUs. APC denied that its AP7900 and AP8900 products infringed STI's patents and raised two affirmative defenses. First, APC alleged that STI's '543 and '771 patents were invalid as obvious under 35 U.S.C. § 103. Second, APC alleged that STI engaged in inequitable conduct before the Patent Office during the prosecution of both patents.

Between May 12 and May 27, 2014, a jury trial was held on the issues of infringement and invalidity. On May 29, 2014, the jury returned a verdict finding that APC's AP7900 and AP8900 products infringed claim 15 of both the '543 and '771 patents. Doc. #590. The jury also made an advisory finding that STI's '543 and '771 patents were not invalid as obvious. *Id*. As part of this advisory finding, the jury made several factual findings concerning secondary considerations of non-obviousness. *Id*.[3]

From May 28 through May 30, 2014, following the jury trial, the court conducted a bench trial on APC's inequitable conduct claim. On August 8, 2014, after additional post-trial briefing the court entered final findings of fact and conclusions of law on APC's inequitable conduct claim. Doc. #613. In that order, the court found that neither STI CEO Carrol Ewing ("Mr. Ewing") nor STI patent prosecution Attorney Robert Ryan ("Attorney Ryan") engaged in inequitable conduct before the Patent Office during the prosecution of the '543 and '771 patents. *Id*. The same day, the court issued a separate order finding that the '543 and '771 patents were not invalid as obvious

---

[3] [The jury's verdict has subsequently been vacated pursuant to the court's February 23, 2017 vacate order. Doc. #691. An amended verdict reflecting the Federal Circuit's decision in *Server Tech., Inc. v. Am. Power Conversion Corp.*, 657 Fed. Appx. 1030 (Fed. Cir. 2016) is forthcoming and those amendments, particularly as they relate to the finding of infringement for the AP7900 products and the advisory finding on the issue of obviousness, are reflected in the amended order.]

1 under 35 U.S.C. § 103. Doc. #615.[⁴]

2     After entry of final judgment, the parties filed the present post-trial motions.

## II. Claimed Inventions

### A. Claim 15 - '543 Patent (Col. 12:21-50)

An electrical power distribution plugstrip connectable to one or more electrical loads in a vertical electrical equipment rack, the electrical power distribution plugstrip comprising in combination:

    A. a vertical strip enclosure having a thickness, and a length longer that a width of the enclosure;

    B. a power input penetrating said vertical strip enclosure;

    C. a plurality of power outputs disposed along an area on a face of said length of the strip enclosure, each among the plurality of power outputs being connectable to a corresponding one of said one or more electrical loads;

    D. a plurality of power control relays disposed in said vertical strip enclosure, each among said plurality of power control relays being connected to said power input and to one or more corresponding power outputs among said plurality of power outputs;

    E. a digital current information display disposed on another area of said vertical strip enclosure and adjacent to said plurality of outputs in current-determining communication with at least one among said power input and said power outputs; and

    F. a plugstrip current reporting system (i) associated with the vertical strip enclosure (ii) in power information determining communication with at least one among said power input and said plurality of power outputs, and (iii) communicatingly connectable with a distal current reporting system through a communications network external to the electrical power distribution plugstrip.

---

⁴ [The court's order on the issue of obviousness has likewise been vacated pursuant to the court's February 23, 2017 order. Doc. #691.]

**B. Claim 15 - '771 Patent** (Col. 12:19-46)

An electrical power distribution plugstrip connectable to one or more electrical loads in an electrical rack, the electrical power distribution device comprising in combination:

    A. an enclosure having length that is longer than a width of the enclosure;

    B. a power input penetrating the enclosure;

    C. a plurality of power outputs disposed along an area on a face of said length of the enclosure, each among the plurality of power outputs being removably connectable to a corresponding one of said one or more electrical loads;

    D. a plurality of power control relays disposed in the enclosure, each among said plurality of power control relays being connected to said power input and to one or more corresponding power outputs among said plurality of power outputs;

    E. a digital current information display disposed on another area of the enclosure in current determining communication with at least one among said power input and said plurality of power outputs; and

    F. a current information reporting system (i) associated with the enclosure (ii) in power information determining communication with at least one among said power input and said plurality of power outputs, and (iii) communicatingly connectable with a distal current reporting system through a communications network external to the electrical power distribution device.

**III.  STI's Motion for a Permanent Injunction (Doc. #618)**

In its first post-trial motion, STI moves for entry of a permanent injunction prohibiting APC from selling the ~~AP7900 and~~ AP8900 products, as well as any other PDU that is "not colorably different" from the ~~AP7900 and~~ AP8900 products. *See* Doc. #618. In the alternative, if an injunction is not issued, STI seeks an order from the court ordering a compulsory license and establishing an ongoing royalty rate of 15% - or three times the 5% reasonable royalty rate established by the jury - for any future sales of APC's ~~AP7900 and~~ AP8900 products. *Id.*

4

A permanent injunction is an "extraordinary remedy that may only be awarded upon a clear showing that [the moving party] is entitled to such relief." *Id.* (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). A patent holder seeking a permanent injunction after a finding of infringement must satisfy a four-factor test: (1) irreparable harm; (2) inadequacy of monetary damages; (3) the balance of hardships is in the patent holder's favor; and (4) that the public interest would not be disserved by a permanent injunction. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). As addressed below, the court finds that STI is not entitled to the extraordinary remedy of a permanent injunction in this action.

**A. Irreparable Injury**

As part of an irreparable injury analysis, courts regularly examine three main considerations: (1) direct competition between the parties; (2) the patentee's loss of market share due to the infringement; and (3) loss of goodwill by the patentee. *See, e.g., Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012) (stating that direct competition in the same market strongly supports the potential for irreparable harm absent an injunction); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (finding that harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee has suffered an irreparable injury); *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (holding that loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm).

The court has reviewed the documents and pleadings on file in this matter and finds that STI has established that continued infringement by APC will cause harm to STI's business. First, it is undisputed that STI and APC compete directly in the limited rack-mounted PDU market. In fact, at trial, both STI's and APC's witnesses acknowledged that both companies are direct competitors and have the largest market share of the rack-mounted PDU market. *See* Doc. #599, Pat Johnson Trial Testimony, p.1462:5-23, 1501:11-23; Doc. #602, Julie Davis Trial Testimony, p.2301:11-17. Second, as APC and STI directly competed for the same limited sales in the market, continued

1 infringement by APC will cause STI to lose customers and market share to APC as APC sells its

2 infringing PDUs at a lower price than STI's patented products.[5] Therefore, the court finds that STI

3 has established irreparable harm resulting from APC's continued infringement.

4       However, while there is no question that STI and APC compete to sell PDUs in the market,

5 STI has competed in this market despite APC's infringement throughout the eight-years of this

6 litigation. During that time STI has maintained a competitive edge in the market, holding the

7 second largest market share next to APC. Thus, the court finds that although STI has established

8 irreparable harm, this factor does not weigh heavily in the court's permanent injunction analysis.

9 **B. Inadequacy of Monetary Damages**

10       In order to establish that an injunction is warranted, a plaintiff must show that monetary

11 damages alone are inadequate to compensate plaintiff for any continued infringement by the

12 infringer. *See eBay*, 547 U.S. at 391. In its motion, STI argues that monetary damages alone are

13 inadequate to compensate it for the losses suffered by APC because certain damages like lost

14 market share and customer goodwill are not quantifiable. The court disagrees.

15       Although STI has suffered a loss of market share, brand recognition, and customer

16 goodwill as a result of APC's infringement, the court finds that monetary damages are sufficient

17 compensation for these losses. STI, as part of its overall business strategy, has continuously

18 licensed the patents-in-suit to competitors. For example, the evidence at trial established that STI

19 licensed its patents to three competitors: Chatsworth Products, Inc.; Leviton Manufacturing Co.;

20 and Western Telematic, Inc. Although these competitors have considerably less market presence

21 than APC, STI's willingness to licenses its products, particularly as part of litigation settlements,

22 shows that monetary damages are sufficient and adequate to compensate STI for infringement of

23 its patents.

24       Further, throughout this trial, STI continuously focused on APC's lack of a license and

25 _____

26   [5] The evidence at trial established that APC's selling price for the infringing units was $633, which is substantially lower than STI's average selling price of $885.

1  repeatedly stated that APC could have received a license to keep manufacturing and selling the

2  ~~AP7900 and~~ AP8900 products. *See, e.g.,* STI's Opening Statement, Trial Transcript, p. 79 ("[APC]

3  could have chosen to license the technology and use it the honest way, but, instead, it chose to

4  infringe."); p. 108 ("[APC] could have licensed the technology. [STI] has licensed to three other

5  competitors to use this technology. APC could have signed a license. They chose not to. They

6  chose to go ahead and infringe."); STI's Closing Statement, Trial Transcript, p. 2794-2795 ("When

7  the '543 patent issues in 2006, competitors in this market had a choice. They could either take a

8  license from STI, as many have, or they could stop selling their product. . . . [APC] could have

9  taken a license. They didn't."). This repeated reference to APC licensing the patents-in-suit does

10 not support a finding that monetary damages are inadequate to compensate STI for APC's

11 infringement. Rather, this evidence shows that monetary damages were adequate compensation to

12 STI. Finally, the court notes that STI never sought an injunction during the pendency of this

13 litigation. STI never asked for a preliminary injunction, nor did it request an injunction as part of

14 its requested remedies in its amended complaint. Based on these considerations, the court finds

15 that monetary damages are adequate to compensate STI for APC's infringement which weighs

16 heavily against granting an injunction.

## C. The Balance of Hardships

The court finds that the balance of hardships in this action is a neutral factor. Absent an

injunction, STI has established that it will suffer ongoing hardship by having to compete against its

own patented invention in a limited market. However, evidence at trial has established that STI

successfully competed in the marketplace against APC, despite APC's sales of the infringing

products. Further, to the extent that there is any continued infringement, the availability of a higher

reasonable royalty rate or other monetary damages weighs against a finding that STI would

experience substantial hardship absent an injunction.

## D. The Public Interest

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and

7

1  effect, strikes a workable balance between protecting the patentee's rights and protecting the

2  public from the injunction's adverse effects." i4i, 598 F.3d at 863.

3      Here, the court finds that the public interest would be harmed by an injunction. The entry

4  of an injunction would require APC to remove all ~~AP7900 and~~ AP8900 products, as well as any

5  products not colorably different from the infringing products, from the limited rack-mounted PDU

6  market. As APC's products are a significantly cheaper alternative for customers building data

7  centers, by roughly $200 per unit, entering an injunction against APC would ultimately hurt

8  consumers and the public. Especially when there is an alternative to an injunction that would allow

9  APC to maintain selling its products to the public. Therefore, the court finds that an injunction

10  would not be in the public's interest. Accordingly, the court shall deny STI's motion for a

11  permanent injunction.

12  **E.  Compulsory License[6]**

13      Because the court finds that an injunction is not warranted in this action, the court must

14  now examine STI's alternative request for a compulsory license for the patents-in-suit at an

15  ongoing [5%] ~~15%~~ royalty rate on all sales of APC's ~~AP7900 and~~ AP8900 products from the date

16  of judgment. *See* Doc. #618.

17      The court has reviewed the documents and pleadings on file in this matter and finds that a

18  compulsory license at a [5%] ~~15%~~ royalty rate is an appropriate remedy in this action. First, the

19  court notes that absent a compulsory license, STI will continue to suffer harm from the sale of the

20  ~~AP7900 and~~ AP8900 products. Second, a [5%] ~~15%~~ royalty rate, ~~or three times the jury's 5%~~

21  ~~reasonable royalty rate,~~ on post-judgment sales is reasonable in this action. Because there is an

22  inherent and fundamental difference between pre-verdict infringement - where the question of

23

24      [6] [In the court's original order addressing STI's request for a compulsory license, the court granted STI's motion
    and set a 15% royalty rate as a compulsory license on the infringing products. *See* Doc. #651, p. 8. The parties have since

25  agreed that the court "should vacate the order setting the amount of the royalty rate for the post-trial compulsory license
    at 15%" and instead set a 5% royalty consistent with the jury's verdict. Doc. #690, p. 2. Rather than vacate this section in

26  its entirety, the court has amended this section to comport with the parties' agreement of a 5% royalty rate on infringing
    sales.]

1    patent validity and infringement are questionable - and post-verdict infringement - where those

2    questions have been answered affirmatively - the calculus for determining an appropriate or

3    reasonable royalty rate changes. *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361-62 (Fed. Cir.

4    2008). In order to avoid incentivizing defendants to fight each patent infringement action for as

5    long as possible to obtain the maximum benefit of infringement, an ongoing post-verdict royalty

6    may appropriately be higher than the jury's pre-verdict reasonable royalty. *Id.* Here, a [5%] ~~15%~~

7    royalty rate would still leave APC with a reasonable profit on sales as well as an incentive to sell

8    products under the license - especially as the evidence in this action established that APC had sales

9    in excess of $215 million from 2006-2013 on the infringing products. Further, a [5%] ~~15%~~ royalty

10   rate would more equitably compensate STI for any lost sales, customer goodwill, and lost market

11   share. Therefore, the court shall grant STI's motion and set a compulsory license of the patents-in-

12   suit with an ongoing royalty rate of [5%] ~~15%~~ from the date of judgment.

13   **IV.    STI's Motion for Supplemental Damages and Prejudgment Interest (Doc. #619)**

14          In its second post-trial motion, STI moves for an order awarding supplemental damages

15   against APC for sales of the infringing ~~AP7900 and~~ AP8900 products after December 31, 2013,

16   through the date of judgment, and for prejudgment interest on the damages award at the Prime

17   Interest rate. *See* Doc. #619. Both issues are addressed below.

18          **A. Supplemental Damages**

19          The jury verdict against APC established a 5% royalty rate on APC's sales of infringing

20   products from December 18, 2006, through December 31, 2013. However, at the time of trial,

21   APC had not yet produced records for sales after December 31, 2013, through the date of

22   judgment. To compensate STI fully for APC's infringement, STI argues that the court should

23   award supplemental damages for all infringing sales of APC's ~~AP7900 and~~ AP8900 product lines

24   from January 1, 2014, through the date of judgment, August 8, 2014, at the 5% reasonable royalty

25   rate found by the jury. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 964-65

26   (N.D. Cal. 2009) (holding that in calculating damages through the date of judgment, a court

9

applies the reasonable royalty rate found by the jury). The court agrees and notes that APC does not oppose an award of supplemental damages from January 1, 2014, through the date of judgment. Therefore, the court shall grant STI's motion as to this issue.

## B. Prejudgment Interest

Section 284 of the Patent Act governs the award of prejudgment interest in patent infringement cases and states that: "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement . . . together with interest and costs as fixed by the court." 35 U.S.C. § 284. The purpose behind prejudgment interest is "to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered." *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013).

In its motion, STI seeks prejudgment interest at the Prime interest rate on both the jury's damages award and any supplemental damage award by the court. *See* Doc. #619. STI argues that using the Prime rate to calculate prejudgment interest is reasonable in this action because the Prime rate is sufficient to cover inflation over the lengthy infringement and litigation period. The court agrees.

In contrast to the Prime rate, the court finds that APC's proposed Treasury Bill rate would not cover inflation over the infringing period. Moreover, in the context of patent infringement, the Treasury Bill rate is often inappropriate, as its lower rate of return has the potential to result in a windfall profit for the infringer. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 2009 WL 920300, at *2 (D. Ariz. 2009). Therefore, the court shall grant STI's motion and apply prejudgment interest at the Prime Interest rate.

## V. APC's Motion for Judgment as a Matter of Law, and for New Trial (Doc. #626)

### A. Motion for Judgment as a Matter of Law

#### 1. Legal Standard

Under Rule 50(b), after the court enters judgment, a party may file a renewed motion for judgment as a matter of law. Rule 50 provides that judgment as a matter of law is appropriate if "a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). Under Rule 50, the court reviews whether "substantial evidence" supports the jury verdict. *See Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013). A verdict is not supported by substantial evidence "when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Id.* In other words, Rule 50 "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000).

### 2. Discussion

In its renewed motion for judgment as a matter of law, APC raises five challenges to the jury verdict. First, APC argues that there is insufficient evidence to support the jury's finding that the AP7900 products literally infringe claim 15 of the '543 and '771 patents. Second, APC argues that it was clear error for the court to allow STI to proceed on, and for the jury to consider, a doctrine of equivalents infringement theory related to the AP7900 products. Third, APC argues that there is insufficient evidence to support the jury's finding that both the AP7900 and AP8900 products literally infringe claim 15 of the '543 and '771 patents. Fourth, APC argues that the jury verdict on the issue of obviousness is contrary to law. Finally, APC argues that the court's inequitable conduct findings are not supported by the evidence. Each separate challenge is addressed below.

### ~~a. AP7900: Literal Infringement Finding~~

~~In its motion, APC contends that claim 15 of both the '543 and '771 patents require a device that includes a current reporting system in "power information determining communication with at least one among said power input and said plurality of power outputs." See Claim 15(f), '543 Patent; Claim 15(f), '771 Patent. At summary judgment, the court construed "power-related information" to mean "information necessary to quantify or describe power, rather than current alone." Doc. #163, p. 25. Thus, for literal infringement APC argues that the AP7900 product must~~

11

display information necessary to quantify power. APC argues that because the AP7900 products only measure current and do not have any power-sensing capabilities, the products do not literally infringe claim 15 of the '543 and '771 patents. Thus, the jury verdict is not supported by the evidence submitted at trial.

APC's argument is premised on an erroneous characterization of the court's interpretation of "power information." In contrast to APC's position, "power information" is not limited to the measurement, quantification or reporting of power. Rather, the court has interpreted "power information" to mean information sufficient to quantify and/or describe power. Because the AP7900 products communicate information sufficient to *describe* power, the jury verdict of literal infringement was supported by substantial evidence. For example, Dr. Michael Aucoin ("Dr. Aucoin") testified that the vertical AP7900 products (1) report current information, including the quantity of current flowing at an outlet, and (2) communicate and report voltage information by reporting whether voltage is present at the outlet. *See* Doc. #596, Dr. Aucoin Trial Testimony, p.620-23. Although Dr. Aucoin testified that the AP7900 products do not "directly report a quantity of power like the [AP]8900 does," he testified that power information could still be determined by the AP7900 products simply by knowing whether voltage was present at the outlets. Doc. #596, Dr. Aucoin Trial Testimony, p. 624. Dr. Aucoin testified that by knowing the voltage present at the outlet, which is a known constant depending on the type of outlet, a person can perform simple math to determine the power present in each outlet and the total power of the PDU. Multiplying known voltage by the measured current necessarily provides information sufficient to quantify or describe power, supporting the jury's verdict of literal infringement. APC's own product development documentation acknowledges that users of the AP7900 products were determining power information by performing exactly the same calculations described in Dr. Aucoin's testimony. Therefore, the court finds that there was sufficient evidence at trial to support the jury verdict that the AP7900 products literally infringe claim 15 of both the '543 and '771 patents.

12

**b. AP7900: Doctrine of Equivalents Finding**

In its second challenge to the jury verdict, APC argues that it is entitled to judgment as a matter of law that the AP7900 products do not satisfy the "power information" limitation under a doctrine of equivalents infringement theory.[7] First, APC argues that STI's doctrine of equivalent claim should have been barred due to prosecution history estoppel and thus, it was improper for the court to allow STI to proceed with this infringement theory. Specifically, APC argues that because the term "power information" was added to claim 15 by amendment during patent prosecution, the question of whether the AP7900 products could infringe the asserted claims under the doctrine of equivalents was not properly before the jury. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733-34 (2002).

Here, the court finds that prosecution history estoppel does not bar the doctrine of equivalents infringement theory in this case because the narrowing of the claim to include the term "power information" was peripheral, or not directly relevant, to the alleged equivalent. Nowhere in the patent history did the examiner or the inventors make a distinction between a current reporting system that was in current-related information determining communication, as opposed to a current reporting system that was in power information determining communication. The distinction between current-related information and power information had no bearing whatsoever on the amendment. Thus, the amendment of claim 15 bears no more than a tangential relation to STI's assertion of the doctrine of equivalents in this case. As such, STI did not surrender its equivalence argument that the communication of current information, where the voltage is known to be constant, is substantially equivalent to the communication of power information. Therefore, the issue of whether the AP7900 product infringed under the doctrine of equivalents was properly before the jury in this action.

_____

[7] A doctrine of equivalents infringement theory allows for a finding of infringement where the process of an allegedly infringing product performs in the same manner as a patented design, but does so in a different manner. However, because that different manner is so insubstantial from the manner in which the patented design performs the process, it is essentially an "equivalent" to the patented design.

13

APC also argues that the jury's finding that the current-reporting feature of the AP7900 products satisfies the "power information" limitation of claim 15 of the '543 and '771 patents under a doctrine of equivalents infringement theory would entirely vitiate the court's construction of "power information" which was defined as "information necessary to quantify or describe power, rather than current alone." See Doc. #163. APC argues STI's doctrine of equivalents theory erased the important distinction between current and power and should have been precluded. See Warner-Jenkinson Co., Inc. v. Hilton-Davis Chemical Co., 520 U.S. 17, 39 n.8 (1997) (stating that when a theory of equivalence entirely vitiates a particular claim element, partial or complete judgment should be rendered by the court.). Warner-Jenkinson Co., Inc. v. Hilton-Davis Chemical Co., 520 U.S. 17, 39 n.8 (1997).

The court has reviewed the documents and pleadings on file in this matter as well as the evidence submitted at trial and finds that STI's doctrine of equivalents theory in this case does not vitiate the court's construction of power information because the court's claim construction left open the issue of equivalents when the voltage is known to be constant. See Doc. #163, Claim Construction Order, p. 25 n. 10 ("Whether a current measurement alone can qualify as "power information" where the voltage is known to be constant, as STI argues, raises a question under the doctrine of equivalents that is not properly before the court at the present time."). At no point did STI argue that communicating current information alone constituted the communication of power information. Instead, Dr. Aucoin testified that it is the communication of current information when voltage is known to be constant that lead to him to conclude that APC infringed under the doctrine of equivalents. The evidence at trial established that the voltage level in the data centers was both constant and known, thereby allowing for an easy computation of power information. The communication of the amount of measured current coupled with the evidence of the known voltage levels falls well within the insubstantial difference allowed under a doctrine of equivalents infringement theory. Therefore, the court finds that STI's doctrine of equivalents theory did not vitiate the "power information" limitation.

### c. ~~AP7900 and~~ AP8900: Literal Infringement Finding

In its third challenge, APC argues that the jury finding that ~~both the~~ ~~AP7900 and~~ AP8900 products literally infringe claim 15 of the '543 and '771 patents is unsupported by the evidence at trial because claim 15 requires a display on "another area" of the plugstrip adjacent to the outputs. The court disagrees.

At trial, STI presented sufficient evidence to support the jury's finding that ~~both the~~ ~~AP7900 and~~ AP8900 products literally infringe the 'another area' element of claim 15. For example, Dr. Aucoin testified that the vertical AP8900 products had a digital current information display that was in 'an other area' of the enclosure from the power outputs or outlets. *See* Doc. #596, Dr. Aucoin Trial Testimony, p.604-06, 715-17. ~~His analysis for the AP7900~~ ~~products was the same. *Id.* at 617.~~ Dr. Aucoin based his conclusions on the fact that the ~~AP7900~~ ~~and~~ AP8900 products ~~both~~ have multiple groups, or pluralities, of outlets and that each group constituted its own area. He opined that the display in each product was in a different area adjacent to each separate group of outlets. *Id.* at 612, 715-16. ~~APC's witness Daniel Rohr agreed, testifying~~ ~~directly that the digital display in the AP7900 products is in another area from the outlets. Doc.~~ ~~#601, Daniel Rohr Trial Testimony, p. 198.~~ Therefore, the court finds that there was sufficient evidence to support the jury verdict of literal infringement for ~~both the~~ ~~AP7900 and~~ AP8900 products.

### ~~d. Obviousness Advisory Verdict~~

~~In its fourth challenge, APC argues that based on the evidence presented at trial, STI's '543~~ ~~and '771 patent claims are obvious as a matter of law, and therefore, the jury verdict is not~~ ~~supported by substantial evidence. Specifically, APC argues that there was no dispute that all of~~ ~~the limitations of the asserted claims were known in the prior art. As such, the dispute between the~~ ~~parties was only whether one of ordinary skill in the art at the time of the invention would have~~ ~~had any motivation to combine the prior art in the same manner declared in STI's patents. APC~~ ~~argues that the evidence at trial established that the longstanding problem of current overloads in~~

1  electronic devices would have provided a strong reason for one of ordinary skill to use a digital
2  display in a PDU, and thus, STI's patents were obvious as a matter of law.
3        Initially, the court notes that the jury only rendered an advisory finding on the issue of
4  obviousness as obviousness is solely an issue for the court to decide as a matter of law based on
5  the evidence submitted at trial. See KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 427 (2007)
6  (holding that obviousness under 35 U.S.C. § 103 is a question of law based on underlying factual
7  inquiries). Thus, it was ultimately the court's decision whether the patents were obvious and
8  APC's argument that the jury verdict is not supported by substantial evidence is irrelevant in this
9  matter.
10       Additionally, the court finds that its ultimate determination that the patents-in-suit were not
11  obvious is supported by substantial evidence. After the jury trial, the court rendered a final order
12  on the issue of obviousness separate from the jury's advisory finding. See Doc. #615. In that order,
13  the court found that "[a]fter reviewing all of the evidence submitted in this action . . . neither
14  STI's '543 patent nor '771 patent would have been obvious to a person of ordinary skill in the field
15  at the time of the invention. In particular, the court finds that the weight of the evidence, consistent
16  with the jury's verdict and [APC's] clear and convincing evidence burden, does not allow for a
17  finding of obviousness." Id. The court has reviewed the evidence at trial and finds that the
18  evidence was sufficient to support the court's order that the '543 and '771 patents were not invalid
19  as obvious.

20              **e.  Inequitable Conduct Findings**

21       A plaintiff's inequitable conduct during the patent application process "is an equitable
22  defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v.*
23  *Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (9th Cir. 2011). To establish the affirmative
24  defense of inequitable conduct in a patent infringement action, an accused infringer must show that
25  (1) an individual associated with the prosecution of the patent application at issue made
26  affirmative misrepresentations of fact, failed to disclose material information, or submitted false

16

material information; and (2) the individual acted with the specific intent to deceive the Patent and Trademark Office ("PTO"). *Therasense, Inc.*, 649 F.3d at 1289; *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).

In its motion, APC argues that the court's inequitable conduct findings are not supported by substantial evidence. Specifically, APC argues that there is no reasonable inference from the evidence presented at trial other than that Mr. Ewing, along with Attorney Richard Main ("Attorney Main") and Attorney Ryan, intended to deceive the Patent Office by making misrepresentations about the state of the prior art during prosecution of the '543 and '771 patents.

Initially, APC argues that the court erred by making no findings regarding the inequitable conduct of STI's initial patent attorney, Attorney Main. However, APC did not accuse Attorney Main of inequitable conduct until just a few days before trial on May 5, 2014, when APC filed its proposed findings of fact and conclusions of law on the inequitable conduct claim. The court appropriately struck the claim against Attorney Main and no further findings were necessary.

APC also argues that the court failed to address its allegations that Mr. Ewing and Attorney Ryan made repeated misrepresentations to the Patent Office. Nor did the court make any findings regarding the materiality of prior art to the '543 patent. Rather, the court only addressed Mr. Ewing's failure to disclose prior art to the Patent Office. Finally, APC argues that the court's limited findings on materiality and intent are not supported by the law of the evidence submitted at trial. The court disagrees.

The evidence submitted at the bench trial does not support APC's contentions that Attorney Ryan and Mr. Ewing made any misrepresentations to the patent examiner. APC asserts that the court did not make any findings regarding Ryan's misrepresentations. However, the court specifically found that Ryan "responded fairly, reasonably and truthfully to the examiner's request." *See* Doc. #613. This finding necessarily means that Ryan did not make any misrepresentations before the Patent Office. Similarly, the court finds that general materiality findings were unnecessary in this action because the court found that Mr. Ewing and Attorney

17

Ryan did not have the specific intent to deceive the Patent Office during the prosecution of the '543 patent. Thus, the court was not required to make additional findings on materiality as that issue is irrelevant absent a finding of specific intent to deceive. Further, the evidence submitted at trial supports the court's finding that Mr. Ewing and Attorney Ryan did not intend to deceive the PTO. The overwhelming weight of evidence conclusively establishes that the specific intent to deceive the PTO is not "the single most reasonable inference able to be drawn from the evidence." Doc. #613. Instead, a more plausible inference is that Mr. Ewing - having already provided the MSVM user manual, RPC-21 comparison chart, and other material to his attorney - reasonably relied on his attorney to decide what had to be disclosed to the PTO. Thus, there is utterly no evidence that either Mr. Ewing or Attorney Ryan made a deliberate decision to withhold any prior art from the patent office. Therefore, the court finds that there was substantial evidence to support its inequitable conduct findings and shall deny APC's motion for judgment as a matter of law.

### B. Motion for a New Trial

#### 1. Legal Standard

Under Rule 59, the court may grant a motion for a new trial after a jury trial for any reason for which a new trial has previously been granted in federal court. FED. R. CIV. P. 59(a)(1)(A). These reasons include (1) correcting manifest errors of law or fact; (2) newly discovered evidence; (3) to prevent manifest injustice; and (4) an intervening change in controlling or governing law. *See Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).

#### 2. Discussion

As an alternative argument to its renewed motion for judgment as a matter of law, APC argues that it is entitled to a new trial on both the infringement and invalidity issues because the court committed several highly prejudicial errors at trial including: (1) improperly stating the law concerning the issue of obviousness in Jury Instruction No. 22; (2) presenting the jury with an inappropriate verdict form; (3) improperly applying the clear and convincing evidence burden of proof in Jury Instruction No. 18; (4) improperly defining the term "plugstrip" in Jury Instruction

18

No. 10; (5) excluding evidence about the BayTech RPC-7, a relevant piece of prior art;

(6) excluding the patent file history; (7) excluding evidence of the '543 patent re-examination; and

(8) failing to instruct the jury of the term "power." *See* Doc. #626. Each issue is addressed below.

### a. Jury Instruction No. 22

In its motion for a new trial, APC argues that the court presented an incorrect and

prejudicial instruction on the issue of obviousness to the jury. APC argues that Jury Instruction

No. 22,[8] improperly required APC to prove that a person of skill would have "realized the benefit

of the combination." APC argues that under *KSR*, there is simply no requirement for a defendant to

show that one of skill would have realized the benefit of the combination in order to show

obviousness.

The court disagrees and finds that Jury Instruction No. 22 correctly states the legal test for

obviousness. The language to which APC objects is taken directly from *KSR* and has been cited

repeatedly by the Federal Circuit and district courts. *See KSR*, 550 U.S. at 424 ("The proper

question to have asked was whether a . . . designer of ordinary skill . . . would have seen a benefit

to" combining the elements). Thus, the court did not err by including this language in the

instruction.

### b. Verdict Form[9]

In its second argument, APC contends that the verdict form presented the jury with a

distorted view of the test for obviousness that unfairly favored STI. Specifically, APC argues that

the verdict form included special interrogatories on secondary considerations that favored STI's

---

[8] Jury Instruction No. 22 states in its entirety: "To prove that [STI's] patent claims would have been obvious, APC need not show that a person having ordinary skill in the field of the invention would have combined the elements in the manner claimed for the same reason as the reason that motivated the inventor(s) of the '543 patent and/or '771 patents. Any need or problem in the field of invention at the time of the invention can provide a reason for combining the elements in the manner claimed, but only if a person of ordinary skill in the art would have realized the benefits of the combination."

[9] [In this challenge, APC contended that the court presented an improper verdict form to the jury because it contained certain question on the issue of patent obviousness. The court notes that the challenged portion of the jury verdict has been vacated pursuant to the court's February 23, 2017 order. Doc. #691. However, because APC's challenge in the present motion relates solely to the manner in which the verdict form was written, and not the jury's actual verdict, this section is not impacted by the Federal Circuit's remand order or the court's February 23, 2017 order. Doc. #691.]

non-obviousness arguments, yet excluded interrogatories regarding the primary *Graham* inquiries of obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1 (1966). APC argues that this verdict form improperly focused the jury's consideration of obviousness on 'secondary considerations' of nonobviousness and unfairly primed the jury for a finding of nonobviousness. Given STI's heavy reliance on secondary considerations at trial, this error severely prejudiced APC.

APC's argument concerning the format of the verdict form is without merit. The verdict form correctly presented the obviousness issues to the jury. First, as previously addressed in APC's motion for judgment as a matter of law, the issue of whether the patent claims were obvious was a question of law for the court. Thus, whether or not the verdict form favored STI on the issue of obviousness is of no importance as it was the court, and not the jury, that made the ultimate decision to reject APC's defense that the patent claims were obvious. Further, APC's argument is erroneous because it ignores all of the jury instructions on the issue of obviousness. In the jury instructions, the jury was properly instructed that it must evaluate the four *Graham* factual inquiries, and the court's instructions appropriately addressed each factor in separate instructions. Given the specific direction provided by the instructions, and in light of the fact that most of the *Graham* factors were not disputed by the parties or at issue in this action, the verdict form correctly identified the only relevant factual issues for the jury. Therefore, the court finds that the verdict form was not prejudicial to APC.

### c. Jury Instruction No. 18

In its third challenge, APC argues that Jury Instruction No. 18[10] improperly applied the clear and convincing burden of proof to the legal question of obviousness. However, it is well established that obviousness must be proven by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) ("[A] defendant seeking to overcome this presumption must persuade the factfinder of its invalidity defense by clear and convincing

---

[10] Jury Instruction No. 18 provides in relevant part: "APC must prove obviousness by clear and convincing evidence, which means that you must be persuaded by the evidence that obviousness is highly probable."

20

1    evidence"). Therefore, the court properly instructed the jury that APC had the burden of proving

2    obviousness by clear and convincing evidence.

3            ~~d.  Jury Instruction No. 10~~

4            ~~In its fourth challenge, APC argues that the court incorrectly defined the term "plugstrip" to~~

5    ~~be a "one-piece" configuration in Jury Instruction No. 10.[11] APC argues that the court's~~

6    ~~construction of plugstrip limiting the claimed invention to a "one-piece" configuration was clearly~~

7    ~~erroneous because that is not supported by the claim language and specification.~~

8            ~~The court finds that it correctly defined the term plugstrip in Jury Instruction No. 10.~~

9    ~~Throughout this action, the court and the partes repeatedly referred to the the term plugstrip in the~~

10   ~~'543 patent as a "one-piece, fully integrated device." The court's definition of the term "plugstrip"~~

11   ~~is entirely consistent with the language of the claims, the specification and the prosecution history~~

12   ~~of the '543 patent. Therefore, the court did not err in its definition of plugstrip in the jury~~

13   ~~instructions.~~

14            **e.  BayTech RPC-7**

15            In its fifth argument for a new trial, APC argues that the court improperly limited evidence

16   of the BayTech RPC-7 device which APC claims was relevant to its obviousness defense.

17            Initially, the court notes that its exclusion of evidence relating to certain features of the

18   BayTech RPC-7 product has been the subject of extensive briefing and two rulings. *See*

19   Doc. ##505, 524. Certain evidence relating to the RPC-7 was excluded from trial because APC

20   failed to meet the disclosure requirements of the local rules governing this case. After APC filed

21   its motion for clarification, the court reiterated that "APC is precluded from proffering any

22   evidence that the RPC-7 satisfies any other claim element at issue in the '543 patent" because APC

23   failed to follow the local patent rules during prosecution of this case. *See* Doc. #524. Therefore,

24   the court's limitation of the RPC-7 was proper and a new trial is not warranted on this issue.

25

26        [11] ~~Jury Instruction No. 10 provides in pertinent part: "'Plugstrip' appears in Claim 15 of the '543 patent. The term 'plugstrip' requires all of the limitations of the claim, that is, elements A, B, C, D, E, and F, including the reporting system, are contained within a one-piece device."~~

### f. Patent File History

In its sixth argument for a new trial, APC argues that the court improperly limited evidence of the file history of the '543 and '771 patents which prejudiced APC's ability to prove its affirmative defenses. Specifically, APC contends that the court excluded testimony about the patent prosecution history and precluded APC's expert from explaining what happened during the lengthy prosecution history of the patents at issue to the jury. APC argues that such testimony explaining the prosecution history was directly relevant to the jury's consideration of invalidity and obviousness.

The court disagrees and finds that it correctly limited testimony regarding the file history of the '543 patent. During trial, the court admitted the complete file history for each patent, and the court twice played for the jury the Federal Judicial Center's video entitled "The Patent Process, An Overview for Jurors," which provided a clear explanation of Patent Office practices and procedures. Further, the court provided the jury with a detailed glossary of terms relating to the prosecution of the patents, as requested by APC. Thus, sufficient evidence of the file history was presented to the jury. All the court excluded was APC's attempts to have a witness characterize the prosecution history or argue its meaning. The court properly excluded such testimony under Rule 403 of the Federal Rules of Evidence.

### g. '543 Patent Reexamination

In its seventh challenge, APC argues that the court improperly excluded evidence of the '543 patent reexamination before the patent office.

This issue was fully briefed and addressed in connection with STI's motion in limine #1. *See* Doc. #431. In a thorough and well-reasoned order, the court granted STI's motion, concluding that (1) the '543 reexamination was not final and the status and holdings of the reexamination proceedings were of little relevance to the present action, (2) the prejudicial effect of informing the jury about the reexamination proceeding would far outweigh any probative value; and (3) allowing evidence of the reexamination would confuse the jury. *See* Doc. #505. Under relevant federal

circuit precedent, the court's ruling was correct. Thus, the court properly excluded evidence of the reexamination proceedings involving the '543 patent and a new trial is not warranted on this issue.

### h. "Power" Instruction

Finally, APC argues that the court did not instruct the jury on the agreed definition of the term "power" which left the jury confused at to what that key term meant. However, the court properly defined and instructed the jury on the meaning of the term "power information" which was the relevant claim term in claim 15 of the '543 and '771 patents. At trial, APC argued that the AP7900 products were not "in power information determining communication" with at least one of the power input or power outputs as required by element 15(f) of both patents. APC did not argue that there was a dispute as to the issue of power. As such, the relevant disputed term at trial was "power information" and not "power." Because the court defined the relevant claim term in the jury instructions, a new trial is not warranted. Accordingly, the court shall deny APC's motion for a new trial.

IT IS THEREFORE ORDERED that plaintiff's motions for a permanent injunction, or in the alternative, for a compulsory license (Doc. #618) and for supplemental damages and prejudgment interest (Doc. #619), and defendant's renewed motion for judgment as a matter of law, or in the alternative, for a new trial (Doc. #626) are addressed in accordance with this AMENDED and RE-ISSUED ORDER.

IT IS SO ORDERED.

RE-ISSUED this *12* day of May, 2017.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

23